UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------X
CARLA BARKER,

       *Plaintiff*,

         -against-

IZIA ROKOSZ, JANELLE DEFREITAS,
STEVEN G. LEGUM, FRANK RICHARD
HURLEY, GREGG TELSEY, ROBERT
FISHBEIN, BETTY J. HINGLE, ROYCE
LLC, JACKIE MARKETING LLC, LOCKDECO
A/K/A LODECO, "JOHN DOE #1" though
"JOHN DOE #100," said names being
fictitious and unknown, the parties
intended being persons or
corporations, if any, having
participated in the enterprise
described in the complaint,

       *Defendants*.
---------------------------------X

**MEMORANDUM & ORDER**

19-CV-00514(KAM)(SMG)

**MATSUMOTO, United States District Judge:**

       This case arises from an alleged equity-stripping scheme whereby defendants misled the plaintiff and induced her to transfer the equity in her home to a separate corporation while encumbering her home with two mortgage loans totalling $450,000. (ECF No. 1, Complaint ("Compl."), ¶ 1.) As a result of defendants' actions, plaintiff claims she was exposed to the risk of losing the home she has lived in for more than three decades. (*Id.*)

       Plaintiff commenced this action on January 25, 2019, alleging that defendants committed violations of federal and New York state lending laws. (Compl. ¶¶ 126-191.) The complaint's

fifth and sixth causes of action allege defendants violated New York's Deceptive Practices Act, N.Y. Gen. Bus. Law § 349 ("Section 349"), and the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), respectively. (*Id.* ¶¶ 192-219.) Before the court are motions to dismiss plaintiff's Section 349 and RICO claims.

Defendant Steven Legum ("Legum"), proceeding *pro se*, filed his motion to dismiss Counts Five and Six of the complaint on August 1, 2019. (*See* ECF No. 76-18, Defendant Steven G. Legum's Memorandum of Law ("Legum Mot.").) Defendant Izia Rokosz also moved to dismiss plaintiff's Section 349 and RICO claims on June 7, 2019. (ECF No. 77-1, Memorandum of Law in Support of Defendant Izia Rokosz's Motion to Dismiss ("Rokosz Mot.").) Defendant Frank Richard Hurley ("Hurley") sought and obtained the court's permission to join the arguments asserted in Legum's motion; defendants Gregg Telsey ("Telsey") and Royce LLC ("Royce") have likewise received permission to join the arguments asserted by Rokosz's motion. (*See* Order dated June 5, 2019; Order dated June 28, 2019; Order dated July 26, 2019.) Rokosz, Hurley, Legum, Telsey, and Royce will be referred to collectively herein as the "Moving Defendants." This Memorandum

and Order pertains only to the fifth and sixth claims of the complaint that are raised in the Moving Defendants' motions.[1]

For the reasons set forth below, the court GRANTS the Moving Defendants' motions and DISMISSES plaintiff's Section 349 and RICO claims.

## BACKGROUND

The following facts are drawn exclusively from plaintiff's complaint, which the court presumes to be true for purposes of a motion to dismiss. *See Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 154 (2d Cir. 2006) (citing *Allaire Corp. v. Okumus,* 433 F.3d 248, 249–50 (2d Cir. 2006)) (For a 12(b)(6) "motion, we are constrained to accept as true the factual allegations contained in the complaint and draw all inferences in plaintiff's favor.").

## I. The Parties

Plaintiff is a 51-year-old Afro-Caribbean woman who resides at 611 East 48th Street in the East Flatbush neighborhood of Brooklyn, New York ("Property"). (Compl. ¶¶ 1, 7.) Plaintiff has lived at the Property for over 35 years. (*Id.* ¶ 11.) The complaint notes that the Kings County District

---

[1]    In addition to the Moving Defendants' opening motions, plaintiff submitted two opposition briefs. The first, filed on July 24, 2019, responds to the motions as they relate to all Moving Defendants, except Hurley. (ECF No. 78-1, Plaintiff's Omnibus Memorandum of Law in Opposition ("Pl.'s Opp. (1st)").) The second, served August 1, 2019, only concerns the arguments that implicate Hurley. (ECF No. 85-1, Plaintiff's Memorandum of Law in Opposition to Hurley's Motion to Dismiss ("Pl.'s Opp. (2nd)").) The court also considered replies filed by Legum and Rokosz. (*See* ECF No. 79, Legum Reply; ECF No. 83, Rokosz Reply.)

Attorney's Office referred plaintiff to Mobilization for Justice, Inc., her current counsel, in light of the possibility that plaintiff was a "victim of mortgage fraud in need of free civil legal services." (*Id.* ¶ 19.)

Rokosz, a New York resident, is the lender who originated the mortgage loans in question, and, since 2014, has originated at least thirteen other mortgage loans for one-to-four family homes in New York City with terms requiring interest-only payments, for a period of one to three years, at a 12 percent interest rate. (*Id.* ¶ 8.) Of these fourteen known loans, Rokosz issued ten in predominately minority communities. (*Id.* ¶ 125.) Legum, also a New York resident, is an attorney admitted to practice in the State of New York, and served as Rokosz's agent and attorney for the mortgage loans to plaintiff. (*Id.* ¶ 10.) Legum is also alleged to have been involved on six of Rokosz's above-described loan transactions. (*Id.* ¶ 120.)

Defendant Janelle Defreitas, who is not a Moving Defendant, brokered the loan transactions at issue. (*Id.* ¶ 9.) In April 2017, Defreitas was indicted and arrested by the Kings County District Attorney and New York Attorney General on charges related to a complex mortgage fraud and money laundering scheme, and is currently incarcerated on charges stemming from the indictment. (*Id.*)

Hurley, a New York-licensed attorney, acted as plaintiff's attorney in connection with the mortgage loans in question. (*Id.* ¶ 11.) Defreitas allegedly arranged for Hurley to act as plaintiff's attorney. (*Id.*) Telsey, a New York resident, is a managing partner of Royce, a limited liability company that is registered in New York State and maintains a principal place of business in Jackson Heights, New York. (*Id.* ¶¶ 11, 15.) The complaint alleges, on information and belief, that Telsey is an associate of one or more unspecified defendants, and that both Telsey and Royce received proceeds from the subject loan transactions. (*Id.*)

## II.   The Property

Plaintiff has lived in the Property, a two-family home, since her mother first purchased it in 1983. (Compl. ¶¶ 18, 20-21.) In 2004, after plaintiff's mother passed away, the Property was devised to plaintiff and her half-sister, Sandra Vaughan. (*Id.* ¶¶ 21, 22.) Plaintiff continued to reside in the Property after her mother died, and was solely responsible for making all mortgage payments and maintaining the home. (*Id.* ¶ 23.) By 2006, plaintiff successfully paid off the remaining mortgage balance on the Property. (*Id.* ¶ 24.)

In 2008, plaintiff's situation grew precarious. Plaintiff's half-sister, Ms. Vaughan, brought a partition action against plaintiff to divide the Property. (*Id.* ¶ 25.) At the

time, plaintiff was undergoing chemotherapy and could not continue her job as a home health aide. (*Id.*) Plaintiff claims her vulnerable circumstances rendered her unable to defend against her half-sister's partition suit, leading to a default judgment against plaintiff. (*Id.*) Following her default, plaintiff was subjected to pressure tactics by Ms. Vaughan, including demands for plaintiff to take out a loan to buy Ms. Vaughan's portion of the Property, and unannounced visits by Ms. Vaughan, or her agents, to show the Property for sale. (*Id.* ¶ 26.) To make matters worse, plaintiff also fell behind on her property taxes. (*Id.* ¶ 27.)

Confronted by potential tax liens and her half-sister's pressure tactics, plaintiff decided to seek a loan to avoid losing her home. (*Id.* ¶¶ 26-28, 30.)[2] Plaintiff was not able to secure a loan from traditional mortgage lenders, however, because she was not working at the time. (*Id.* ¶ 28.) In 2016, a neighborhood confidante of plaintiff's referred her to Defreitas, who was a member of plaintiff's local community. (*Id.* ¶¶ 30-31.) Defreitas assured plaintiff that she could help plaintiff obtain a mortgage to pay off Ms. Vaughan. (*Id.* ¶ 31.) Plaintiff alleges, on information and belief, that Defreitas was aware of plaintiff's lack of income. (*Id.*)

---

[2] The complaint does not make clear the purpose for which plaintiff intended to use the loan proceeds, but implies that plaintiff sought to pay Ms. Vaughan for her share of the Property and/or her outstanding tax liabilities.

In late 2016 or early 2017, Defreitas advised plaintiff that she had found a lender. (*Id.* ¶ 33.) But in order for plaintiff to obtain the loan, Defreitas told her that she had to transfer the Property to a corporation—J&M Holdings, Inc. ("J&M"). (*Id.* ¶¶ 33-35.) Defreitas explained that the use of a corporation was necessary because plaintiff planned to live at the Property while renting out its second-floor apartment, and according to Defreitas, the person who receives a loan could not both live in and own a property. (*Id.* ¶ 33.)

Defreitas then orchestrated the transfer of the Property from plaintiff to J&M. Defreitas drove plaintiff to Queens to meet with Jaipaul Persaud,[3] who Defreitas said would prepare the paperwork to effectuate the transfer of the Property. (*Id.* ¶ 34.) When plaintiff and Defreitas arrived at Mr. Persaud's office, Defreitas instructed plaintiff to wait in the car, and after a prolonged wait, Defreitas returned without any paper work for plaintiff to sign or retain for her records. (*Id.*) According to a document filed by Mr. Persaud with the New York Department of State on January 13, 2017, Defreitas signed the "Certificate of Incorporation" for J&M as the "Incorporator." (*Id.* ¶ 35.)

Around the same time, Defreitas arranged for plaintiff to meet with defendant Hurley, who Defreitas said would

---

[3]    Mr. Persaud is not named as a defendant in this action.

represent plaintiff in a closing for a mortgage loan. (*Id.* ¶ 36.) Defreitas introduced plaintiff to Hurley at a local restaurant for a short meeting at which Defreitas mostly spoke on plaintiff's behalf. (*Id.*) Plaintiff was not presented with a retainer agreement for defendant Hurley's legal services. (*Id.*) In early 2017, Defreitas notified plaintiff of a date, time, and place for the closing, but provided plaintiff with no information about the name of the lender or anyone else who would attend the closing. (*Id.* ¶ 39.)

Before the closing took place, Telsey paid a visit to the Property, accompanied by another, unidentified man. (*Id.* ¶ 40.) Plaintiff believed that Telsey was an appraiser, though the complaint does not allege the basis for plaintiff's belief nor does it allege that Telsey presented himself as an appraiser. (*Id.*) Telsey inspected the Property and handed plaintiff a business card from Royce. (*Id.*)

## III.  The First Closing

On February 6, 2017, plaintiff attended the loan closing at Legum's office in Mineola, New York ("First Closing"). (Compl. ¶ 41.) There, plaintiff learned for the first time that Rokosz was the lender. (*Id.* ¶ 42.) Rokosz did not attend the First Closing, however, and was represented by his attorney, Legum. (*Id.*) In addition to Legum, the First Closing was attended by Defreitas, Hurley, Telsey, defendant

Betty Hingle, as well as plaintiff's half-sister Ms. Vaughan, Vaughan's attorney, and Vaughan's son. (*Id.* ¶¶ 43-47.) Right before or during the First Closing, Hurley told plaintiff to sign a letter, dated February 6, 2017, which stated that the loan she was about to receive was a "hard money loan," that most borrowers are unable to afford such a loan, and that she would release Hurley of any liability in connection with any future lawsuit arising from the loan. (*Id.* ¶ 48.) After plaintiff signed the letter, Hurley proceeded to represent her at the First Closing. (*Id.* ¶ 49.)

At the closing, plaintiff signed and executed an agreement whereby she received a loan in the principal amount of $330,000.00 ("First Loan"). (*Id.* ¶ 65.) Plaintiff was not informed of the First Loan's terms, which provided for a 12 percent annual interest rate, a one-year term, and interest-only payments for the term of the loan. (*Id.* ¶ 66.) The bulk of the First Loan proceeds, $221,276.85, was applied to plaintiff's debts, including $150,000 to pay Vaughan for her share of the Property, $71,126.85 to pay outstanding property taxes, and $150 to satisfy another debt. (*Id.* ¶ 67.) Plaintiff did not directly receive any of the remaining $108,723.15, of which $45,792.68 was retained in escrow, and various amounts

distributed to other parties, including $3,000 to Legum, $1,500 to Hurley, and nearly $3,000 to Royce.  (*Id.* ¶ 68.)[4]

At some point during the First Closing, Hurley took plaintiff aside for a private conversation in a separate room. (*Id.* ¶ 55.)  Once the two were alone, Hurley told plaintiff that he "didn't like the figures" that were provided, but plaintiff did not understand what he meant.  (*Id.*)  Before Hurley could explain, Defreitas barged in and told Hurley that his only job was to have plaintiff sign the documents.  (*Id.*)  Hurley and plaintiff returned to the conference room where the closing was taking place without Hurley clarifying his concern about "the figures."  (*Id.*)  Defreitas also reassured plaintiff that she had no need to worry about the monthly payments associated with the mortgage loan because Defreitas would make the payments herself until plaintiff refinanced the First Loan with a Federal Housing Administration (FHA) loan.  (*Id.* ¶¶ 38, 56.)

At the closing, Legum gave Hurley a number of documents, which Hurley, in turn, passed on to plaintiff for her signature.  (*Id.* ¶¶ 51, 57.)  These documents included a Promissory Note, an Escrow Agreement, an Assignment and Security Agreement, a Guarantee, and a Corporate Resolution, the pertinent provisions of which are described below.  (*Id.* ¶ 57.)

---

[4]    Over $36,000 was distributed to a title company, EastCor Land Services, and more than $14,000 was distributed to "Lodeco," a construction company. (*Id.*)  Lodeco is named as a defendant, but EastCor Land Services is not.

Despite instructing plaintiff to sign these documents, Hurley did not provide plaintiff with any explanation of the documents' contents or the implications of plaintiff signing them. (*Id.* ¶ 51.) Plaintiff was also not afforded an opportunity to read the documents. (*Id.* ¶ 57.) Among the documents Legum passed to Hurley for plaintiff's signature was the deed transferring the Property from plaintiff to J&M. (*Id.* ¶ 52.) Hurley instructed plaintiff to sign the deed, which she signed on behalf of J&M. (*Id.*) Ms. Vaughan then signed the deed transferring her share of the Property to J&M. (*Id.* ¶ 53; *see also* ECF No. 77-4, Declaration of Jeremy M. Doberman, Exhibit B (Indenture, dated February 6, 2017, conveying Sandra Vaughan's interest in Property to J&M).)

Pursuant to the Promissory Note, plaintiff agreed to personally advance $10,000 to Telsey and defendant Robert Fishbein. (Compl. ¶ 59.) According to the Promissory Note, the funds advanced to Telsey and Fishbein were for the purpose of closing the First Loan. (*Id.*) Critically, the Promissory Note provided that any default under its terms would be deemed a default of the First Loan as well. (*Id.*)

The Escrow Agreement that plaintiff signed required her to post $45,792 to Legum, in his capacity as escrow agent. (*Id.* ¶ 60.) The Escrow Agreement further provided that, upon plaintiff's default, Rokosz could authorize Legum to make

payments out of the escrowed funds, without notice to plaintiff.
Plaintiff signed the Escrow Agreement in her capacity as
"president" of J&M.  (*Id.*)

The Assignment and Security Agreement, which plaintiff
signed as "president and secretary" of J&M, assigned all
interest and stock in J&M to Rokosz, the assignee.  (*Id.* ¶ 61.)
Per the terms of the agreement, the assignment to Rokosz would
be held in escrow by Legum, and released to Rokosz upon
plaintiff's default on the loan.  (*Id.*)  The Guarantee, which
plaintiff was instructed to sign in her personal capacity, made
plaintiff a personal obligor under the loan.  (*Id.* ¶ 62.)  And
according to the Corporate Resolution, "all shareholders,
officers, and directors of J&M Holdings unanimously agreed to
borrow $330,000.00" from defendant Rokosz "and to provide a
security interest to him" in the Property.  (*Id.* ¶ 63.)

Plaintiff did not receive any copies of the
aforementioned documents that she signed at the First Closing.
(*Id.* ¶ 64.)  The defendants also did not advise plaintiff about
meeting with a certified housing counselor prior to agreeing to
obtain the loan.  (*Id.* ¶ 76.)

## IV.  The Second Closing

After the First Closing, Defreitas told plaintiff that
she had to sign additional documents at Legum's office.  (*Id.* ¶
78.)  On February 16, 2017, ten days after the First Closing,

plaintiff returned to Legum's office to sign additional mortgage paperwork ("Second Closing," and together with the First Closing, the "Closings"). (*Id.* ¶ 79.) Legum, Hurley, Defreitas, and Fishbein were present at the Second Closing. (*Id.*) Telsey was not present at the latter closing, and it is not alleged that any other defendants were present. (*Id.*)

Plaintiff believed that the documents she signed at the Second Closing pertained to the First Loan. (*Id.* ¶ 80.) But, as it turned out, plaintiff was agreeing to an additional loan in the principal amount of $120,000.00 ("Second Loan," and together with the First Loan, the "Mortgage Loans"). (*Id.*) The terms of the Second Loan were substantially identical to the First Loan, and plaintiff was required to sign updated copies of the Escrow agreement, Assignment and Security Agreement, Guarantee, and Corporate Resolution, all of which reflected a consolidated loan of $450,000.00. (*Id.* ¶ 82.) The Second Loan did not disburse any proceeds directly to plaintiff. (*Id.* ¶ 85.) Instead, $14,400.00 was allocated as additional escrow, and Legum, Royce, and Hurley received $3,500, $5,733.33, and $1,500, respectively. (*Id.*) In addition, Rokosz received $1,193.42, which apparently represented interest accrued on the First Loan in the ten days since it was executed. (*Id.*)

No one at the Second Closing informed plaintiff that she was executing an additional loan agreement. (*Id.* ¶¶ 79-80.)

As before, plaintiff did not receive any copies of the paperwork she signed at the Second Closing. (*Id.* ¶ 86.)

## V.   Post-Closing Incidents

In April 2017, about two months after the Second Closing, Telsey, accompanied by a man otherwise unidentified in the complaint, visited the Property and informed plaintiff that she was behind on her mortgage loan payments. (*Id.* ¶ 97.) Telsey insisted that plaintiff sign over all paperwork for the house to Rokosz, the purported new owner of plaintiff's home. (*Id.*)  Plaintiff ascertained at that point that Defreitas had not been making payments on the mortgage, as she had promised. (*Id.* ¶ 98.)

Plaintiff thereafter contacted Legum, who confirmed to plaintiff that she was in default. (*Id.* ¶ 99.)  Plaintiff requested that the funds held in escrow be released to cure the default, but Legum responded that "this would not be possible." (*Id.*)  On May 9, 2017, plaintiff received a letter from Legum claiming that plaintiff was in default and that Legum was therefore transferring shares of J&M—*i.e.,* the Property—to Rokosz. (*Id.* ¶ 101.)  Plaintiff did not receive a notice of default or mortgage statement before receiving Legum's letter. (*Id.* ¶¶ 98, 100.)

Later that summer, two men whose identities are
unknown to plaintiff,[5] unexpectedly entered the Property and
found plaintiff in her backyard, where they informed her that
she no longer owned her home and was required to leave the
Property in eight days. (*Id.* ¶ 102.) Subsequently, in November
2017, J&M initiated eviction proceedings against plaintiff.
(*Id.* ¶ 104.) In that action, petitioner J&M alleged that Rokosz
was J&M's president and sole shareholder, which allowed Rokosz
not to have to pursue a residential foreclosure against
plaintiff. (*Id.* ¶¶ 106-07.) The housing court dismissed the
eviction actions on July 10, 2018, but plaintiff nonetheless
continued to endure harassment. (*Id.* ¶ 109.) In July 2018, an
unknown individual placed a "for sale" sign on the Property.
(*Id.* ¶ 111.) In or around October 2018, an unknown man tried to
enter the Property using a key to the door's bottom lock. (*Id.*
¶ 112.) These incidents have caused plaintiff to feel "unsafe,"
"ashamed," and depressed. (*Id.* ¶¶ 113, 116.) Further,
plaintiff transitioned to working only night shifts so that she
could be present at the Property during the day to guard it
against intruders. (*Id.* ¶ 115.) In December 2018, a fire at
the Property forced plaintiff and her son to temporarily
relocate, and she is no longer able to keep watch on her home.
(*Id.* ¶ 118.)

---

[5]   The complaint names "JOHN DOE #1" through "JOHN DOE #100" as
defendants.

Plaintiff alleges that Rokosz and Legum have conducted deceptive acts or practices in the conduct of their business in violation of New York state law, and that this conduct has caused injury to plaintiff and "has a broad impact on consumers at large." (*Id*. ¶¶ 192-97.) In addition, plaintiff alleges that the defendants are part of an enterprise whose purpose is to effectuate "a fraudulent equity-stripping scheme" that targets distressed homeowners, convinces them to transfer title to their homes to "sham" corporations to evade consumer protection laws, issues "onerous" loans to these individuals, and then engages in a pattern of collecting unlawful debt once the homeowners default on their loans. (*Id*. ¶¶ 211-17.)

**THE MOTIONS**

Rokosz, joined by Hurley, and Legum, joined by Telsey and Royce, each moved to dismiss the complaint's Section 349 claim and federal civil RICO claim for failure to state a cause of action. (*See generally* Rokosz Mot. 1-3; Legum Mot. 1-2.)

Rokosz seeks dismissal of the Section 349 cause of action on three grounds. First, Rokosz argues that he, individually, did not participate in any "consumer-oriented" conduct, as required under the statute, because he never interacted with plaintiff. (Rokosz Mot. 9-13.) Instead, Rokosz appears to shift responsibility for the alleged conduct to Defreitas. (*Id.*) Rokosz also contends that because the nominal

obligor of the Mortgage Loans was the corporate entity J&M, and
not plaintiff, the alleged conduct did not target an actual
consumer.  (*Id.* 13.)  Second, Rokosz argues, relying on his
personal absence at the Closings, that *he, personally,* did not
make any misrepresentations to plaintiff.  (*Id.* 14-15.)
According to Rokosz, plaintiff bet her home on Defreitas's
"naked assurances," a patently unreasonable" decision.  (*Id.*
15.)  Third, Rokosz maintains that any injury plaintiff suffered
was not caused by his actions or omissions, and also, that
plaintiff was not injured at all because she received the
benefit of satisfying liens and judgments encumbering the
Property.  (*Id.* 21.)  Legum's motion is brief and makes only one
contention: the alleged conduct was not "consumer-oriented"
because it did not "have a broad impact on consumers at large."
(Legum Mot. 13-14.)

      With respect to plaintiff's RICO cause of action,
Rokosz asserts that plaintiff fails to establish the existence
of a RICO "enterprise," an essential element of a RICO claim,
because the complaint "has not provided more than conclusory
allegations outside of [the] Defendant's roles with respect to
this one transaction . . . ."  (Rokosz Mot. 23.)  Legum's RICO-
related arguments primarily seek to absolve him personally of
culpability.  For example, Legum argues that he could not be a
"RICO conspirator" because he was just the lender's (*i.e.,*

Rokosz's) attorney, and there are no facts suggesting he "shared intent with any of the other defendants."  (Legum Mot. 7-8.)

## JURISDICTION

The court has original jurisdiction over plaintiff's federal claims pursuant to 28 U.S.C. § 1332, 15 U.S.C. § 1640(e), and 18 U.S.C. § 1964.  Pursuant to 28 U.S.C. § 1367, the court can exercise supplemental jurisdiction over plaintiff's state law claims, given their relationship to plaintiff's federal claims.  Venue in this District is proper because the Property at the center of the dispute is located in Brooklyn, New York.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead facts that, if accepted as true, "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A complaint is facially plausible when the "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint need not contain detailed factual allegations, but must contain more than mere "labels and conclusions" or a "formulaic recitation of the elements of a cause of action" or "naked assertions" devoid of "further factual enhancement." *Id*.  For motions under Rule 12(b)(6), the

court assumes the truth of all well-pleaded facts asserted in the complaint and draws all reasonable inferences from those facts in favor of the plaintiff.  *Cohen v. Rosicki, Rosicki & Assocs., P.C.*, 897 F.3d 75, 78 n.1 (2d Cir. 2018) (citing *Hutchison v. Deutsche Bank Sec., Inc.*, 647 F.3d 479, 481 (2d Cir. 2011)).  In addition, the court considers written attachments to the complaint, as well as any statements or documents incorporated by reference.  *Id*.

Although Rule 8 of the Federal Rules of Civil Procedure "does not demand that a complaint be a model of clarity or exhaustively present the facts alleged, it requires, at a minimum, that a complaint give each defendant fair notice of what the plaintiff's claim is and the ground upon which it rests."  *Atuahene v. City of Hartford*, 10 Fed. Appx. 33, 34 (2d Cir. 2001) (internal quotation omitted).  A complaint that "lump[s] all the defendants together in each claim and provid[es] no factual basis to distinguish their conduct . . . fail[s] to satisfy this minimum standard."  *Id.; see also Leneau v. Ponte*, No. 1:16-CV-776-GHW, 2018 WL 566456, at *15 (S.D.N.Y. Jan. 25, 2018) ("[C]omplaints that rely on group pleading and fail to differentiate as to which defendant was involved in the alleged unlawful conduct are insufficient to state a claim[.]") (internal quotation omitted); *Adamou v. Cty. of Spotsylvania, Virginia*, No. 112CV07789ALCSN, 2016 WL 1064608, at *11 (S.D.N.Y.

Mar. 14, 2016) ("Pleadings that fail to differentiate as to which defendant was involved in the alleged unlawful conduct are insufficient to state a claim.").

In addition, "an action under § 349 is not subject to the pleading-with-particularity requirements of Rule 9(b) . . . but need only meet the bare-bones pleading requirements of Rule 8(a) . . . ." *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005) (citations omitted). However, "a plaintiff still must show that the alleged deceptive acts would mislead a reasonable consumer acting reasonably under the circumstances." *Kennedy v. Covidien, LP*, No. 118 Civ. 1907 (LTS) (KNF), 2019 WL 1429979, at *7 (S.D.N.Y. Mar. 29, 2019) (citing *Stutman v. Chemical Bank*, 95 N.Y.2d 24, 28-29 (N.Y. 2000)). In contrast to claims under Section 349, when a plaintiff alleges "fraudulent activities as predicate acts for a RICO claim, a plaintiff must satisfy the particularity requirements of Rule 9(b)." *Town of Islip v. Datre*, 245 F. Supp. 3d 397, 413 (E.D.N.Y. 2017) (citing *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 172-73 (2d Cir. 1999)). Though the instant complaint appears to sound in fraud, the parties are silent as to whether plaintiff must plead her RICO claim with particularity. As discussed below, however, plaintiff's cause of action under RICO fails even under Rule 8(a)'s more lenient pleading standard and therefore, the court declines to decide

whether RICO claims based on the collection of an unlawful debt must be pleaded with particularity.

**DISCUSSION**

## I.   Section 349

New York state law prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state . . . ." N.Y. Gen. Bus. Law § 349(a).  The elements of a deceptive trade practices claim under Section 349 are: "(1) the act or practice was consumer-oriented; (2) the act or practice was misleading in a material respect; and (3) the plaintiff was injured as a result." *Toth v. 59 Murray Enterprises, Inc.*, No. 15 CIV. 8028 (NRB), 2019 WL 95564, at *13 (S.D.N.Y. Jan. 3, 2019) (quoting *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009)); *see also Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 83-84 (2d Cir. 2015); *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 623 N.Y.S.2d 529, 532-33 (N.Y. 1995)).  "[A]ny person who has been injured by reason of any violation . . . may bring an action" to enjoin the unlawful conduct or to recover actual damages, or both.  N.Y. Gen. Bus. Law § 349(h).  Though it is settled law that a non-consumer may bring a claim under Section 349, "the gravamen of the complaint must be consumer injury or harm to the public interest." *Stadt*

21

*v. Fox News Network LLC*, 719 F. Supp. 2d 312, 319 (S.D.N.Y. 2010).

For the reasons discussed below, the court finds that plaintiff has not sufficiently pleaded a Section 349 claim and therefore, GRANTS the Moving Defendants' Rule 12(b)(6) motions to dismiss the Section 349 claim.

### A.    Consumer-Oriented Conduct

To plead that an act or practice is "consumer-oriented" within the meaning of Section 349, a plaintiff need only show "that the conduct at issue 'potentially affect[s] similarly situated consumers.'" *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 64 (2d Cir. 2010) (quoting *Oswego Laborers'*, 623 N.Y.S.2d at 533)). The unlawful conduct "need not be repetitive or recurring." *N.Y. Univ. v. Cont'l Ins. Co.*, 639 N.Y.S.2d 283, 290 (N.Y. 1995). Mere private contract disputes that are unique to the parties, however, do not fall within the range of conduct proscribed by Section 349. *See, e.g.*, *Richmond v. Nat'l Grid*, 553 F. App'x 56, 57 (2d Cir. 2014); *Schlessinger v. Valspar Corp.*, 723 F.3d 396, 398 (2d Cir. 2013) (Section 349 "is limited to those practices which may tend . . . to deceive consumers.") (internal quotations omitted).

In determining whether or not an act or practice is consumer-oriented, "[t]he critical question . . . is whether the matter affects the public interest in New York." *Securitron*

*Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995).

The meaning of this proposition is twofold.  On the one hand,

Section 349 liability "attaches primarily where a party's

misrepresentations are boilerplate and have the potential to be

repeated in order to deceive numerous similarly situated

buyers."  *Id.* (quoting *Exxonmobil Inter-America, Inc. v.

Advanced Info. Eng'g Servs.*, Inc., 328 F. Supp. 2d 443, 449

(S.D.N.Y. 2004)).  On the other hand, "contracts that are not

'standard-issue,' but are instead designed to provide services

'tailored to meet the [plaintiff's] wishes and requirements' are

not consumer-oriented for § 349 purposes."  *Id.* (citations

omitted).

### B.    Plaintiff Does Not Allege Consumer-Oriented Conduct

Though plaintiff alleges conduct that, if proven,

strikes the court as predatory and egregious, the complaint does

not plead that the alleged "fraudulent equity-stripping scheme"

targeted any consumer other than plaintiff herself.  "[A]

mortgage transaction is not an orthodox or classic example of a

claim brought under [Section 349.]"  *Ng v. HSBC Mortg. Corp.*,

No. 07-CV-5434 RRM/VVP, 2010 WL 889256, at *15 (E.D.N.Y. Mar.

10, 2010); *see also Teller v. Bill Hayes, Ltd.*, 213 A.D.2d 141,

630 N.Y.S.2d 769 (N.Y. App. Div. 2d Dep't 1995) ("The typical

violation contemplated by the statute involves an individual

consumer who falls victim to misrepresentations made by a seller

of consumer goods usually by way of false and misleading advertising."). Thus, New York federal and state courts have been reluctant to extrapolate the injuries of an individual mortgagor into a broader public harm, as required to meet Section 349's consumer-oriented conduct element.

In *Rhodes v. Deutsche Bank Nat'l Tr. Co. for Morgan Stanley ABS Capital I Inc. Tr. 2006-HE3*, No. 07 CV 1544 (ERK), 2007 WL 9723296, at *8 (E.D.N.Y. Aug. 6, 2007), the plaintiff-mortgagor alleged, just like the plaintiff here, "that [the mortgagees] violated [Section 349] by charging him various fees; failing to consider his ability to pay the mortgages; and making various oral assurances about the terms of the mortgages that, he alleges, were not true." 2007 WL 9723296, at *8. Judge Korman explained that "[t]he gravamen of Rhodes's claim is that he was told one thing, but that the terms of the mortgage he signed reflected another," which indicated that the "complained-of conduct was specific to the contractual relationship between Rhodes and the defendants, . . . and not directed at the public at large." *Id.* Judge Korman dismissed plaintiff's Section 349 claim because Rhodes alleged conduct personal to him, "not conduct directed at members of the public generally," and therefore, "concern[ed] the sort of private dispute not within the ambit of the statute." *Id.*

In arriving at this result in *Rhodes*, Judge Korman cited to a decision of the New York State Supreme Court, *Banc of America Commercial Finance Corp. v. Issacharoff*, which is instructive here.  728 N.Y.S.2d 861 (N.Y. Sup. Ct. N.Y. Cty. 2000).  In *Issacharoff*, a lender brought a foreclosure action against a debtor, who, in turn, asserted an affirmative defense and counterclaim that the lender had violated Section 349. The trial court dismissed the affirmative defense and counterclaim because the transaction was not consumer-oriented, explaining that:

> Although this counterclaim essentially concerns a loan, which may be replicated using a standard form with other customers, the allegations of deceptive acts indicate that the conduct at issue was particular to [the borrower] and not a type of standard practice . . . . In other words, the conduct here involved a private contract unique to these parties rather than conduct affecting the consuming public at large.

*Id.* at 867.

Here, the Mortgage Loans and Closings were "'tailored to meet [plaintiff's] wishes and requirements,'" *Securitron*, 65 F.3d at 264, and therefore, "do not implicate acts and practices that would have a broad impact on consumers at large," *Rhodes*, 2007 WL 9723296, at *8.  Plaintiff had full equity in at least half of the Property but felt compelled to seek a loan in order to satisfy her half-sister's aggressive pursuit of her partition rights, as well as accruing tax liabilities.  (Compl. ¶¶ 26, 28-

30.) Plaintiff's inability to obtain financing from a traditional lender ultimately led her down the path of connecting with Defreitas, who represented that she could help plaintiff obtain a mortgage in order to satisfy any obligations to Ms. Vaughan. (*Id.* ¶¶ 30-31.) Defreitas also led plaintiff to believe that, in order to obtain a loan, plaintiff would have to transfer the Property to a corporate entity, J&M, in order to both live in and, derive rental income from, the Property. (*Id.* ¶¶ 33-35.) Thus, at the Closing, plaintiff signed numerous documents as a purported officer of J&M, an entity that she did not create.

As an initial matter, the Mortgage Loans were not like the typical mortgage loans issued to homebuyers. *City of Ann Arbor Employees' Ret. Sys. v. Citigroup Mortg. Loan Tr. Inc.*, 703 F. Supp. 2d 253, 255 (E.D.N.Y. 2010) ("[T]he traditional mortgage model involves nothing more than a prospective home buyer seeking, and obtaining a loan from a lending institution . . . ."). Plaintiff was not a prospective purchaser, but rather, an incumbent owner of the Property. Plaintiff sought to use her equity in the Property to secure financing to fend off her half-sister's competing claim to the Property, a unique circumstance that is not alleged to have been shared by the other, hypothetical mortgagors referenced in the complaint. Plaintiff's half-sister even attended the First Closing, and

nearly half the proceeds of the First Loan were distributed

directly to Ms. Vaughan, plaintiff's half-sister, (*id.* ¶¶ 43-47,

67), whereas traditionally, mortgage loan proceeds are applied

almost exclusively to the purchase price for the subject

property.  In addition, J&M was named as an obligor and

mortgagor of the Mortgage Loans because plaintiff expressed a

desire to live in the Property while renting out its second-

floor apartment.  The complaint does not allege that defendants

similarly caused the creation, and use of, a corporate

intermediary in any other transactions.  Ultimately, the

transactions at issue concerned a single piece of property and a

uniquely situated consumer.  Therefore, it is implausible to

infer that the practices alleged in the complaint could "easily

recur," *M & T Mortg. Corp. v. White*, 736 F. Supp. 2d 538, 571

(E.D.N.Y. 2010), or "potentially affect similarly situated

consumers," *Oswego Laborers', * 623 N.Y.S.2d at 533.

        Plaintiff attempts to characterize the conduct alleged

in the complaint as widespread, specifically by alleging that

Rokosz has issued at least thirteen other mortgage loans in New

York City which, like the Mortgage Loans to plaintiff, required

interest-only payments for one to three years at 12 percent

interest, and also by noting that Defreitas is currently

incarcerated on charges of mortgage fraud.  (*See* Compl. ¶¶ 8,

9.)  But these allegations of other acts by Rokosz and Defreitas

do not indicate whether or not defendants' conduct with respect
to plaintiff was replicated elsewhere, or whether the other
loans issued by Rokosz involved a corporate intermediary, a
critical component of the Mortgage Loans issued to plaintiff.

Further, the authorities plaintiff cites in opposition
are either distinguishable or inapposite, and therefore do not
save her Section 349 claim.  Plaintiff cites to *Polonetsky v.
Better Homes Depot, Inc.*, (*see* Pl.'s Opp. (2nd) 6), a decision
by the New York Court of Appeals which held that plaintiffs had
alleged consumer-oriented conduct where defendants "not only
sold property, but allegedly orchestrated a system of providing
services under which prospective buyers were defrauded or misled
every step along the way ... [and] allegedly steered buyers to
mortgage bankers and attorneys who had connections to Better
Homes[.]"  97 N.Y.2d 46, 53-54 (N.Y. 2001).  The defendants in
*Polonetsky*, however, "us[ed] newspaper advertisements and flyers
handed out at subway stations," and "marketed [their] activities
to prospective New York City home buyers" generally.  *Id.* at 51.
The instant complaint does not allege such widespread targeting
of public consumers.  Likewise, the court in *Barkley v. Olympia
Mortg. Co.*, (*see* Pl.'s Opp. (2nd) 6), held that plaintiffs
adequately pleaded consumer-oriented conduct by alleging that
"defendants orchestrated all-inclusive home sales and steered
plaintiffs to participating lawyers, lenders, and mortgage

brokers." No. 04 CV 875 RJD/KAM, 2007 WL 2437810, at *18

(E.D.N.Y. Aug. 22, 2007). The *Barkley* lawsuit, though, was

brought by eight first-time homebuyers, and therefore, on its

face, is distinguishable from the instant case brought by a lone

incumbent homeowner with unique circumstances.[6]

The court thus finds that plaintiff has not pleaded

that defendants' conduct was consumer-oriented, and accordingly,

GRANTS the Moving Defendants' motions to dismiss the complaint's

Section 349 claim. Moreover, because plaintiff's Section 349

claim is generally deficient, and not just with respect to the

Moving Defendants, the court DISMISSES the complaint's Section

349 claim as it relates to all defendants.

## II.  Civil RICO

The federal RICO statute makes it "unlawful for any

person employed by or associated with any enterprise engaged in,

or the activities of which affect, interstate or foreign

commerce, to conduct or participate, directly or indirectly, in

the conduct of such enterprise's affairs through a pattern of

---

[6]    Plaintiff also cites *Williams v. Aries Fin., LLC*, No. 09-CV-1816
(JG)(RML), 2009 WL 3851675, at *10-11 (E.D.N.Y. Nov. 18, 2009), and
*Schwartzbaum v. Emigrant Mortg. Co.*, No. 09 CIV 3848 SCR LMD, 2010 WL
2484181, at *9 (S.D.N.Y. Apr. 22, 2010), *report and recommendation adopted in
part, rejected in part*, No. 09 CIV. 3848 (SCR), 2010 WL 2484116 (S.D.N.Y.
June 16, 2010), for the contention that real estate transactions fall within
the scope of consumer-oriented conduct. (Pl.'s Opp. (2nd) 6.)  The court
need not weigh in on such a broad proposition.  The only concern is whether
the transactions alleged in this complaint are consumer-oriented.  While
*Williams* and *Schwartzbaum* both found the conduct alleged was consumer-
oriented, neither decision discussed the court's reasoning for those
conclusions, and therefore, neither case assists the court with respect to
determining whether the conduct alleged by plaintiff here was consumer-
oriented.

racketeering activity or collection of unlawful debt." 18
U.S.C. § 1962(c). "Any person injured in his business or
property by reason of a violation" of the RICO statute may
pursue a civil action for damages. *Id.* § 1964(c).

An "enterprise" includes a group of individuals
associated in fact although not a legal entity. *Id.* § 1961(4).
As a threshold matter, a plaintiff asserting a civil RICO claim
must adequately allege the existence of either a legal
enterprise or an association-in-fact enterprise. A plaintiff is
thereafter required to demonstrate three elements: "(1) a
substantive RICO violation under § 1962, (2) injury to the
plaintiff's business or property, and (3) that such injury was
by reason of the substantive RICO violation." *Sykes*, 780 F.3d
at 83 (citation omitted). The required elements of the RICO
statute "must be established as to each individual defendant."
*DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001) (citing
*United States v. Persico*, 832 F.2d 705, 714 (2d Cir. 1987),
*cert. denied*, 486 U.S. 1022 (1988)).

For the reasons discussed below, the court finds that
plaintiff has not sufficiently pleaded the existence of an
association-in-fact enterprise, and therefore, the court GRANTS
the Moving Defendants' motions to dismiss Count Six of the
complaint.

## A.    Association-in-fact Enterprise

An association-in-fact enterprise is defined as a "'group of persons associated together for a common purpose of engaging in a course of conduct.'" *Boyle v. United States*, 556 U.S. 938, 944 (2009) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).  The Supreme Court has clarified that three characteristics are required for an association-in-fact enterprise: (1) a purpose, (2) relationships among the enterprise's associates, and (3) longevity sufficient to permit said associates to pursue the enterprise's purpose. *Id*.  At a minimum, "for an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." *First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 174 (2d Cir. 2004).  "The 'enterprise' . . . is an entity separate and apart from the pattern of activity in which it engages.  The existence of an enterprise at all times remains a separate element which must be proved." *United States v. Turkette*, 452 U.S. 576, 583 (1981). When multiple defendants comprise the purported enterprise, the plaintiff "must show, as to each individual defendant, that he participated in" the enterprise's affairs. *Lynn v. McCormick*, No. 17-CV-1183 (CS), 2017 WL 6507112, at *6 (S.D.N.Y. Dec. 18,

2017), *aff'd*, 760 F. App'x 51 (2d Cir. 2019) (citing *D. Penguin Bros. v. City Nat. Bank*, 587 F. App'x 663, 668 (2d Cir. 2014)).

Courts in the Second Circuit look to the "the hierarchy, organization, and activities of the association to determine whether its members functioned as a unit." *Moss v. BMO Harris Bank, N.A.*, 258 F. Supp. 3d 289, 298 (E.D.N.Y. 2017) (citing *First Capital Asset Mgmt.*, 385 F.3d at 174) (internal quotations omitted)). On the other hand, "[f]ormal hierarchy, role differentiation, regular meetings, or established procedures are not required; rather, an informal entity may constitute an enterprise as long as 'the group . . . function[s] as a continuing unit and remain[s] in existence long enough to pursue a course of conduct.'" *Delgado v. Ocwen Loan Servicing, LLC*, No. 13-CV-4427 NGG RML, 2014 WL 4773991, at *16 (E.D.N.Y. Sept. 24, 2014) (citing *Boyle*, 556 U.S. at 948); *see also D. Penguin Bros.*, 587 F. App'x at 667 (an adequately pleaded "enterprise requires proof of an ongoing organization, formal or informal, and . . . that the various members function as a continuing" unit) (citation omitted).

B.   **The Complaint Fails to Allege an Enterprise**

Plaintiff alleges that defendants have formed an association-in-fact enterprise whose purpose is "to target distressed homeowners with equity in their homes, issue hard money loans with such onerous terms and costs that default and

immediate deed transfer are guaranteed, all while stripping the home of equity to the benefit of members" of the enterprise. (Compl. ¶ 212.)  The complaint then purports to describe in detail how the "enterprise" functions:

> This [purpose] is accomplished by Defendant Defreitas utilizing her connections in the community to connect a struggling homeowner with Defendant Rokosz and Defendant Fishbein; Defendant Fishbein arranges the financing; Defendant Rokosz issues hard money loans directly to the homeowner or has the homeowner transfer title to a sham corporation which then becomes the borrower and the homeowner is promised he or she will be the sole shareholder and remain the effective owner, and must personally guarantee the hard money loan; Defendant Rokosz employs associate Defendant Legum to serve as the attorney for the transaction and "escrow agent" in furtherance of the scheme; Defendant Hurley provides legal services as the homeowner as part of the scheme; Defendant Defreitas arranges for significant proceeds to be paid to a purported construction company; Lockdeco, to perform repairs that are never actually completed, in furtherance od the scheme; proceeds are also diverted to Defendant Betty J. Hingle, who notarizes closing documents; and one or more of the Defendants arranges for significant proceeds to go to associate Defendant Telsey, who appears to accept significant proceeds through two corporations, Royce LLC and Jackie Marketing LLC, in furtherance of the scheme.

(*Id.* ¶ 213.)

Upon closer scrutiny, though, the so-called "enterprise" is a creature of wordplay.  Rather than describing the functions of an "enterprise," the complaint rehashes allegations about the Mortgage Loans and Closings at issue, but uses the present continuous tense to suggest an ongoing, repetitive course of conduct.  Plaintiff's opposition uses a

similar ploy to reinforce the continuous nature of the "enterprise" by characterizing isolated acts as recurring organizational activity. (*E.g.*, Pl.'s Opp. (1st) 18 ("Rokosz would not have a struggling, mislead [*sic*] homeowner to lend to, whose default he could ensure for purposes of the equity-stripping scheme, were one not brought to him by Defendants Defreitas and/or Fishbein.").)

The complaint fails to state a cognizable RICO "enterprise" because the allegations give the court no basis to infer that the defendants formed "'an *ongoing* organization, formal or informal,' let alone a coherent 'entity separate and apart from the alleged fraudulent scheme.'" *Moss*, 258 F. Supp. 3d at 304 (citation omitted). Nothing in the complaint actually supports the inference that the defendants associated with one another or engaged in the "fraudulent equity-stripping scheme" either before or after their transaction with the plaintiff. Plaintiff merely alleges that defendants directly and indirectly crossed paths on one occasion with respect to the Mortgage Loans at issue. In other words, according to the complaint, the defendants collectively associated with each other just one time, not on an ongoing basis. The complaint thus fails to plead that the defendants' association was anything more than a one-off transaction, and therefore did not have the longevity necessary to constitute an enterprise, much less an enterprise

whose affairs were conducted through the collection of unlawful debt. *See Boyle*, 556 U.S. at 944.

It also follows that because defendants' association with one another was pleaded as a one-time event, there is no basis to infer that they "acted on behalf of the *enterprise* as opposed to on behalf of themselves in their individual capacities." *Id.* (emphasis in original; brackets and citation omitted); *see also D. Penguin Bros.*, 587 F. App'x at 668 (RICO enterprise did not exist because complaint failed to create plausible inference that defendants stole plaintiffs' funds to "advance the [] agenda of their purported 'enterprise'" or any other shared purpose); *cf. United Food & Comm. Workers Unions & Emp'rs Midwest Health Benefits Fund v. Walgreen Co.,* 719 F.3d 849, 851 (7th Cir. 2013) ("RICO is not violated every time two or more individuals commit one of the predicate crimes listed in the statute.").[7]

Because the failure to adequately allege the existence of a RICO association-in-fact enterprise is fatal to plaintiff's federal RICO claim, the court finds it unnecessary to address the other elements of this claim, and GRANTS the Moving

---

[7] The allegation that Legum was "named" on six of Rokosz's mortgage loans in earlier years does not warrant the inference that Legum and Rokosz were part of an ongoing RICO enterprise organization whose purpose was to strip homeowners of their home equity through the collection of unlawful debt. (*See* Compl. ¶¶ 119-20.) Similarly, the allegation that Defreitas was arrested for mortgage fraud, (*see id.* ¶ 9), does not warrant the inference that any one of the alleged enterprise's associates were involved in her offenses.

Defendants' Rule 12(b)(6) motions on this count.  As with the court's decision to dismiss plaintiff's Section 349 claim, the deficiency in plaintiff's RICO claim is not specific to any one defendant.  Therefore, the court DISMISSES the complaint's federal RICO claim as it relates to all defendants.

**CONCLUSION**

For the foregoing reasons, the Moving Defendants' motions to dismiss plaintiff's Section 349 and federal RICO claims are GRANTED.  The court DISMISSES Counts Five and Six of the complaint as it relates to all defendants.  The parties shall proceed to discovery and are hereby referred to Magistrate Judge Gold for all pre-trial matters.

**SO ORDERED.**

Dated:    January 2, 2020
          Brooklyn, New York

                                    /s/
                        _____
                        **Kiyo A. Matsumoto**
                        United States District Judge