UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

CARLA BARKER,

        Plaintiff,

        -against-

IZIA ROKOSZ, JANELLE DEFREITAS,
STEVEN G. LEGUM, FRANK RICHARD
HURLEY, GREGG TELSEY, ROYCE LLC,
LOCKDECO A/K/A LODECO, "JOHN DOE
#1" through "JOHN DOE #100," said names
being fictitious and unknown, the parties intended
being persons or corporations, if any, having
participated in the enterprise described in the
complaint,

        Defendants.

**19 Civ. 00514 (KAM) (SMG)**

**<u>FIRST AMENDED
COMPLAINT AND
JURY DEMAND</u>**

Plaintiff Carla Barker, for her Amended Complaint, alleges upon personal knowledge as to herself, the investigation of her counsel, and information and belief as to all other matters as follows:

**<u>PRELIMINARY STATEMENT</u>**

1.     Carla Barker, a 52-year-old Afro-Caribbean home health aide, is at risk of losing her home of over 35 years because of a deceptive equity-stripping scheme. Defendants Izia Rokosz, Janelle Defreitas, Steven G. Legum, Gregg Telsey, and Royce LLC fraudulently induced Ms. Barker to transfer title to her home to an LLC and enter into illegal and unconscionable high-cost mortgage loan transactions with the intent to evade consumer protection laws and strip the property of equity.

1

2.	Defendants enticed Ms. Barker to transfer her home to a shell corporation and enter into two mortgage loan transactions that created a single lien of $450,000 (the transactions are collectively referred to as the "Subject Loan").  The Subject Loan, which required interest-only payments for one year at a nominal 12 percent interest rate, was not only padded with excessive and hidden fees paid directly or indirectly to the Defendants, but was priced illegally and made without regard to Ms. Barker's ability to repay.

3.	With an actual interest rate of 37.87 percent, the Subject Loan is a high-cost mortgage loan that violates: the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq.*; the Home Ownership Equity Protection Act ("HOEPA"), 15 U.S.C. § 1639; New York Banking Law § 6-*l*; and New York's prohibition against usury.

4.	Since 2011, Defendant Rokosz has originated at least 26 other hard money mortgage loans with similar terms.  Defendant Legum acted as Defendant Rokosz's attorney and collected fees in at least 22 of these other transactions. Defendant Telsey and his entity, Defendant Royce LLC, acted as Defendant Rokosz's agents and collected fees in at least 13 of these other transactions involving Defendant Legum.

5.	Most, if not all, of these other mortgage loans orchestrated by Defendants Rokosz, Legum, and Telsey carried usurious interest rates.  Like Ms. Barker, many of these other homeowners were required to transfer title to newly created sham business entities so that Defendants could circumvent consumer protection laws.  Although the nominal interest rates ranged from 12 to 14 percent, the actual interest rates of these other mortgage transactions ranged from 17.61 to 45.69 percent because of deceptive finance charges.

6.	The deceptive and acts and practices of Defendants Rokosz, Legum, Telsey, Royce LLC, Defreitas, and Lockdeco in carrying out this scheme violated General Business Law § 349.

In furtherance of their scheme, Defendants Rokosz, Legum, Telsey, and Royce LLC conducted or participated in the conduct of an association-in-fact enterprise's affairs through collection of unlawful debt, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1691, *et seq.*

7. By negligently representing Ms. Barker in the two mortgage loan transactions, Defendant Frank Richard Hurley committed legal malpractice.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, 15 U.S.C. § 1640(e), and 18 U.S.C. § 1964. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because they are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the U.S. Constitution.

9. This Court has jurisdiction to render the declaratory judgment Plaintiff seeks pursuant to 28 U.S.C. § 2201.

10. Venue lies in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) because the property that is the subject of the action is situated in Brooklyn, New York.

## PARTIES

11. Plaintiff Carla Barker is a natural person who maintains her principal residence at 611 East 48th Street, Brooklyn, New York 11203 (the "Subject Property"), located in the East Flatbush neighborhood of Brooklyn.

12. Defendant Izia Rokosz is a natural person who maintains a principal residence at 50 Meadow Lane, Lawrence, New York 11559. Defendant Rokosz regularly originates mortgage loans with high-cost terms. Since 2011, Defendant Rokosz has originated at least 27 mortgage loans with similar high-cost terms, including interest-only payments for 356 days to three years at

3

nominal 12 to 14 percent annual interest rates. Defendant Rokosz is the lender who originated the Subject Loan, which is comprised of the First Loan, dated February 6, 2017, and the Second Loan, dated February 16, 2017. Defendant Rokosz has been in the business of hard money lending for approximately 40 years.

13. Defendant Janelle Defreitas is a natural person who is currently incarcerated, but, upon information and belief, maintains a principal place of business at 609 East 40th Street, Brooklyn, New York 11203. In 2017, the New York Attorney General and Kings County District Attorney's Office indicted Defendant Defreitas on charges related to a complex mortgage fraud and money-laundering scheme. According to the New York State Department of Correction and Community Supervision Inmate Information Database, Defendant Defreitas is incarcerated for certain charges from that indictment, including grand larceny, residential mortgage fraud, conspiracy, and scheme to defraud. Defendant Defreitas helped arrange the Subject Loan.

14. Defendant Steven G. Legum is a natural person who, upon information and belief, resides in or around Mineola, New York. Defendant Legum is an attorney admitted to practice in the State of New York, with a principal place of business located at 170 Old Country Road, Mineola, New York 11501. Defendant Legum served as Defendant Rokosz's agent and attorney for the Subject Loan and at least 22 other mortgage transactions since 2011.

15. Defendant Frank Richard Hurley (also known as F. Richard Hurley or Richard Hurley) is a natural person who, upon information and belief, resides in or around Brooklyn, New York. Defendant Hurley is an attorney admitted to practice in the State of New York, with a principal place of business located at 30 Vesey Street, 15th Floor, New York, New York 10007. Defendant Defreitas arranged for Defendant Hurley, who practices criminal law, to represent Ms. Barker at the closings for the Subject Loan.

16. Defendant Gregg Telsey is a natural person who resides at 91 Sealy Drive, Lawrence, New York 11559. Since approximately 2004, Defendant Telsey has been employed as a mortgage loan originator at various licensed mortgage banks. Defendant Telsey is also, and throughout all relevant times herein has been, a neighbor and personal friend of Defendant Rokosz. Defendant Telsey is an agent of Defendant Rokosz and helped arrange the Subject Loan and at least 14 other mortgage loans originated by Defendant Rokosz.

17. Defendant Royce LLC ("Royce") is a domestic limited liability company registered with the New York State Department of State under ID No. 2673038 with a principal place of business located at 9729 4th Avenue, Brooklyn, New York 11209. Defendant Telsey is, and throughout all relevant times herein has been, the sole member and owner of Defendant Royce. Defendant Royce has no employees and conducts no business; it exists solely as a receptacle for payments Defendant Telsey receives in connection with certain real estate transactions. Defendant Royce received proceeds from the Subject Loan.

18. Defendant Lockdeco, also known as Lodeco, is an entity doing business in the State of New York, but is not registered with the New York State Department of State. Upon information and belief, Defendant Lockdeco's principal place of business is located at 115-53 Mexico Street, Saint Albans, New York 11412. Defendant Lockdeco received proceeds from the Subject Loan.

**FACTUAL ALLEGATIONS**

19. Plaintiff Carla Barker is a 52-year-old home health aide and mother of two. She immigrated to the United States from Guyana with her Afro-Caribbean family when she was young. She is a high school graduate and cancer survivor.

20. The Kings County District Attorney's office referred Ms. Barker to Mobilization for Justice, Inc. ("MFJ") as a possible victim of mortgage fraud in need of free civil legal services.

21. Ms. Barker has lived in the Subject Property, which is her primary residence, for more than 35 years. It is a two-family home.

22. In 1983, Ms. Barker's mother, Claudine Langevine, purchased the Subject Property to be a home for herself, Ms. Barker, and Ms. Barker's stepfather and stepbrother. Ms. Barker has lived in the Subject Property ever since, later raising her own son and daughter in the same home.

23. Ms. Langevine purchased the Subject Property with a $64,600 mortgage, which was refinanced into a $75,000 mortgage in 1993. Ms. Barker is proud that her immigrant family from Guyana achieved the American dream of homeownership.

24. In 2004, Ms. Langevine passed away from cervical cancer. In her will, Ms. Langevine devised the Subject Property to Ms. Barker and Ms. Barker's half-sister, Sandra Vaughan.

25. In or around November 2004, Ms. Langevine's will was probated and the Subject Property was deeded to Ms. Barker and Ms. Vaughan. Ms. Barker remained in the Subject Property, making all mortgage payments and maintaining her family home. Ms. Vaughan lived in another state and did not assist with mortgage payments or costs related to the property.

26. By 2006, Ms. Barker paid off her mother's small mortgage.

27. In 2008, Ms. Vaughan brought a partition action against Ms. Barker. Ms. Barker was unable to defend this action because she was undergoing chemotherapy and was unable to work. As a result, Ms. Vaughan obtained a default judgment against Ms. Barker.

28. For many years thereafter, Ms. Vaughan pressured Ms. Barker to pay her for her portion of the Subject Property. She would frequently call Ms. Barker to pressure her to take out

a loan to buy her portion of the Subject Property. On several occasions, Ms. Vaughan, or her attorney or other agents, also came to Ms. Barker's home unannounced to show the Subject Property to potential buyers.

29. By this time, Ms. Barker had also fallen behind on the property taxes due to her battle with cancer. In addition to pressure from Ms. Vaughan, Ms. Barker also became concerned about property tax liens placed against her home.

30. Ms. Barker attempted to obtain a mortgage loan from traditional mortgage lenders, but she was denied because she was not working at the time.

31. In 2016, Ms. Barker confided in June Whyte, the daughter of her late mother's best friend, about her fears of losing her home to a forced partition sale. Ms. Whyte referred Ms. Barker to Defendant Janelle Defreitas for help. Ms. Barker told Defendant Defreitas about her desire to save her home.

32. Defendant Defreitas told Ms. Barker that she could help her obtain a mortgage to pay off Ms. Vaughan. Defendant Defreitas knew that Ms. Barker, still recuperating from cancer, had little or no income because she only sporadically worked odd jobs due to her poor health.

33. Defendant Defreitas further advised Ms. Barker that she could use the proceeds from a mortgage to repair the second unit of her home so that she could rent it out and have a steady source of income. She also told Ms. Barker that she could find her a contractor to complete the work.

34. In late 2016 or early 2017, Defendant Defreitas informed Ms. Barker that she had found her a mortgage lender.

35. Defendant Defreitas drove Ms. Barker to Queens to meet with Robert Fishbein, describing Fishbein as the person they had "to go through first" for the loan. Before the meeting,

Defendant Defreitas instructed Ms. Barker not to speak, and to let Defendant Defreitas do all the talking. During the meeting, Fishbein and Defendant Defreitas spoke as if they were familiar with each other. Ultimately, Fishbein informed them that he could arrange financing for Ms. Barker to buy out her sister. He also said that he would eventually be able to help Ms. Barker obtain a Federal Housing Administration ("FHA") insured mortgage administered by the United States Department of Housing and Urban Development. Neither Fishbein nor Defendant Defreitas explained the terms of the financing for the Subject Loan to Ms. Barker at this meeting.

36. Fishbein has been employed as a loan originator and/or branch manager at various licensed mortgage banks since approximately 2002.

37. Fishbein is also, and throughout all relevant times herein has been, the sole member and owner of Jackie Marketing LLC ("Jackie Marketing"), a domestic limited liability company registered with the New York State Department of State under ID No. 4073191. As described in more detail herein, Fishbein is an associate of Defendants Telsey, Legum, and Rokosz.

38. Around the time of his meeting with Defendant Defreitas and Ms. Barker, Fishbein began relaying information gathered from Defendant Defreitas to Defendants Telsey and Legum regarding a mortgage loan to be secured by Ms. Barker's property. In response, on behalf of Defendant Rokosz and themselves, Defendants Telsey and Legum began to coordinate with Fishbein to arrange the Subject Loan.

39. Defendant Legum learned from Defendant Telsey that the purported plan was for Ms. Barker to rehabilitate the property to increase its value and refinance the Subject Loan from Defendant Rokosz with an FHA-insured loan. Defendant Rokosz also believed that once the property was repaired, Ms. Barker would be able to get traditional financing to repay the Subject Loan.

40. FHA-insured loans require that the borrower occupy the property as his or her principal residence and require underwriting.

41. Neither Fishbein nor any of the Defendants ever requested documents or information from Ms. Barker concerning her current income, expected income, employment, credit history, or financial resources or assets besides her home.

42. Also around this time, Defendant Defreitas informed Ms. Barker that as a condition of obtaining the Subject Loan, and because Ms. Barker planned to rent out the second-floor apartment, she was required to transfer the Subject Property to a corporation. Defendant Defreitas falsely explained that the person who receives a loan cannot both live in the property and be the owner of the property. She reassured Ms. Barker that Ms. Barker would retain control of the corporation, and thus remain the owner of her house.

43. In actuality, transferring title to the Subject Property into a newly formed business entity was a condition of financing imposed by Defendants Rokosz, Telsey, and Legum, which had in turn been communicated to Defendant Defreitas by Fishbein.

44. In or around late 2016 or early 2017, Defendant Defreitas drove Ms. Barker to Queens to meet with Jaipaul Persaud. Defendant Defreitas informed Ms. Barker that Mr. Persaud would draw up the paperwork to set up a corporation into which the Subject Property could be transferred, J&M Property Holdings, Inc (J&M Holdings"). However, when they arrived at Mr. Persaud's office, Defendant Defreitas instructed Ms. Barker to wait in the car while she went into the office. Defendant Defreitas went inside for a long time. Ms. Barker never received any incorporation documents, either to sign, review, or keep for her records.

45. According to a document filed with the New York State Department of State, Defendant Defreitas signed a "Certificate of Incorporation" for J&M Holdings as the

9

"Incorporator." Mr. Persaud filed the document on January 13, 2017. Defendant Defreitas emailed Fishbein the Certificate of Incorporation and a filing receipt the same day.

46. Also in or around late 2016 or early 2017, Defendant Defreitas introduced Ms. Barker to Defendant Frank Richard Hurley, advising that Defendant Hurley would be Ms. Barker's lawyer at the mortgage closing. Defendant Defreitas took Ms. Barker to meet Defendant Hurley at a local restaurant instead of an office. This was a short meeting in which Defendant Defreitas did most of the talking for Ms. Barker. Defendant Hurley agreed to represent Ms. Barker in what Defendant Defreitas described as a refinance, but Ms. Barker never signed a retainer.

47. Ms. Barker did not see or communicate with Defendant Hurley again before the Subject Loan closing. Defendant Hurley did not attempt to contact Ms. Barker by letter, email, mail, or phone prior to the first loan closing.

48. Defendant Hurley's specialized area of law is criminal law, not real estate.

49. Before representing Ms. Barker at the loan closings in this action, Defendant Hurley had experience with fewer than 10 loan closings and had no prior experience in a loan closing involving a non-bank lender.

50. In or around early 2017, Defendant Telsey and Defendant Rokosz came to Ms. Barker's house. Ms. Barker believed that Defendant Telsey was an appraiser so she allowed him inside to inspect her house. At that time or thereafter, Defendant Telsey gave Ms. Barker a business card identifying himself as an officer of Royce LLC.

51. In or around early 2017, Defendant Defreitas advised Ms. Barker of a date, time, and location for the closing. Defendant Defreitas did not inform Ms. Barker of the name of the lender or who else would be at the closing.

**First Loan Closing**

52.     On February 6, 2017, Ms. Barker attended the loan closing at the office of Defendant Steven Legum, located at 170 Old Country Road in Mineola, New York.

53.     At the closing, Ms. Barker first learned the identity of the lender: Defendant Izia Rokosz.  Defendant Rokosz was not at the closing, but his attorney, Defendant Legum, was.

54.     Defendants Defreitas, Hurley, and Telsey were also at the closing, along with Betty Hingle, a title agent.

55.     Ms. Barker's half-sister and co-owner of the property, Ms. Vaughan, was also at the closing, along with her lawyer and her son.

56.     Prior to arriving at the closing, Defendant Hurley had not seen any of the loan closing documents. Defendant Hurley had not requested copies of any of the loan documents from Defendant Legum or discussed any of the proposed loan terms with Defendant Legum.

57.     Prior to arriving at the closing, Defendant Hurley was unaware that Ms. Barker had been instructed to create J&M Holdings or that the loan would be issued to J&M Holdings. Defendant Hurley only learned of the existence of J&M Holdings, and that the loan was to be to J&M Holdings, at the closing.

58.     Prior to arriving at the first loan closing, Defendant Hurley was also unaware that there was a plan to complete a second loan closing. Defendant Hurley learned about the plan to complete a second loan closing at the first loan closing.

59.     At the start of the first loan closing, Defendant Hurley told Ms. Barker to sign a letter, dated February 6, 2017.  When he presented the letter, Defendant Hurley stated that the purpose of the letter was because he did not want Ms. Barker to sue him "in the event of anything happening."

60. Defendant Hurley did not give Ms. Barker a copy of the letter at the closing. Defendant Hurley did not read the letter to Ms. Barker, explain the contents of the letter to Ms. Barker, or instruct her to read the letter before signing it. Defendant Hurley never orally conveyed to Ms. Barker the information contained in the February 6, 2017 letter. Ms. Barker did not read the letter before signing it.

61. The letter advised Ms. Barker not to borrow from this private lender because the loan was a "hard money loan" and most borrowers cannot afford such loans. The letter further stated that Ms. Barker would release Defendant Hurley of any liability if there was a future lawsuit.

62. After having Ms. Barker sign this document, Defendant Hurley proceeded to represent her at the closing.

63. At the closing, Defendant Legum distributed various documents to Defendant Hurley to pass to Ms. Barker to sign. At no point during the closing did Defendant Hurley explain to Ms. Barker any of the documents he instructed her to sign or discuss with her the potential consequences of signing them.

64. Defendant Legum then provided Defendant Hurley with the deed transferring the Subject Property to J&M Holdings, which Defendant Legum had prepared. Defendant Hurley instructed Ms. Barker to sign the deed, which she signed on behalf of J&M Holdings.

65. Thereafter, Ms. Vaughan signed the deed transferring her share of title to Ms. Barker.

66. Defendant Legum also provided Defendant Hurley with the First Loan documents, which Defendant Legum had prepared, and Ms. Barker signed them in her individual capacity and as an officer of J&M Holdings.

67.     Defendant Hurley did not know or calculate the interest rate or Annual Percentage Rate (APR) of the loan at or prior to the first closing, and he never advised Ms. Barker of the interest rate or APR of the loan.  Defendant Hurley did not know if the loan was usurious and did not discuss whether it was with Ms. Barker.

68.     At the closing, Defendant Hurley asked Defendant Legum to explain the meaning of various documents because he did not fully understand the loan documents or the structure of the transaction.  Other than conferring with Defendant Legum, Defendant Hurley did not take any additional steps to understand the loan documents.

69.     At one point, Defendant Hurley asked to speak privately with Ms. Barker and escorted her into a separate room.  When the two were alone, Defendant Hurley told Ms. Barker that he "didn't like the numbers" that were provided.  Ms. Barker did not understand what he meant and waited for him to clarify, but before he could continue, Defendant Defreitas entered the room and interrupted them.  Defendant Defreitas told Defendant Hurley not to tell Ms. Barker anything and that his job was to have her sign the documents.  Defendant Hurley did not attempt to continue to speak to Ms. Barker after Defendant Defreitas's interruption. Defendant Hurley and Ms. Barker went back to the conference room where Defendant Hurley instructed Ms. Barker to sign the remaining documents.

70.     Defendant Hurley never told Ms. Barker that he was advising her not to go through with the loan closing.  If Defendant Hurley had advised Ms. Barker not to borrow from this private lender, she would not have gone through with the loan closing.

71.     With the expectation that she would be reasonably compensated in return, Defendant Defreitas promised Ms. Barker that she would make all mortgage payments on the

Subject Loan while she helped Ms. Barker obtain an FHA-insured loan and help Ms. Barker repair her second unit to generate rental income.

72. Defendant Hurley also reassured Ms. Barker that she would be able to refinance with an FHA loan, even though Defendant Hurley did not know the requirements for obtaining an FHA loan or whether Ms. Barker would be able to obtain an FHA loan.

73. In addition to the Note and Mortgage, Defendant Legum also provided Defendant Hurley with the following documents at the closing for the First Loan: a Promissory Note, an Escrow Agreement, an Assignment and Security Agreement, a Guarantee, and a Corporate Resolution. Defendant Hurley, without explaining any of the terms of these documents, instructed Ms. Barker to sign them. Ms. Barker was not provided an opportunity to read the documents, they were not explained to her, and she did not fully understand what they were or their legal ramifications.

74. Relying on the reassurances of Defendant Hurley, her lawyer, and Defendant Defreitas, whom she trusted, Ms. Barker signed each First Loan document presented to her.

75. Ms. Barker also signed a Promissory Note for $10,000 that was payable to Fishbein and Defendant Telsey. The $10,000 due and owing to Fishbein and Defendant Telsey was for additional proceeds that Fishbein and Defendant Telsey expected to receive in connection with the Subject Loan. The Promissory Note, which was prepared by Defendant Legum at the request of Defendant Telsey, declared that the funds advanced were for the purpose of closing the contemporaneously issued First Loan, but expressly identified Carla Barker (rather than J&M Holdings) as the borrower of the First Loan. The Promissory Note also provided that any default under its terms would be deemed a default of the First Loan, a term included by Defendant Legum at the request of Defendant Telsey. Ms. Barker was instructed to sign the Promissory Note in her

individual capacity as the obligor. Defendant Rokosz was not made aware of the existence of the Promissory Note.

76. The Escrow Agreement required a sum of $45,792.68 to be posted to Defendant Legum as the authorized Escrow Agent. The Escrow Agreement provided that, in the event of default, Defendant Legum could, upon direction of Defendant Rokosz, and without notice to Ms. Barker, utilize the "escrow funds" to make certain payments toward interest, principal, insurance, maintenance, assessments, and taxes. Ms. Barker was instructed to sign the Escrow Agreement as the President of J&M Holdings.

77. Although a signature purporting to be Defendant Rokosz's appears on the Escrow Agreement, Defendant Rokosz did not sign the Escrow Agreement. Upon information and belief, Defendant Legum signed Defendant Rokosz's name on the Escrow Agreement.

78. The Assignment and Security Agreement required Ms. Barker, as President and Secretary of J&M Holdings, to assign all interest and stock in J&M Holdings to Defendant Rokosz, the assignee. The agreement authorized Defendant Rokosz, as the assignee, to execute a UCC financing statement and sign Ms. Barker's name on any documents required for filing. Per the agreement, the assignment was to be held in escrow by Defendant Legum, to be released to Defendant Rokosz if Ms. Barker defaulted on the loan. Ms. Barker was not made aware of these terms. Ms. Barker was instructed to sign the Assignment and Security Agreement in her personal capacity and as the Secretary and sole shareholder of J&M Holdings.

79. The Guarantee provided that Ms. Barker agreed to be bound to the loan terms as a personal obligor. Again without any explanation, Ms. Barker was instructed to sign the Guarantee in her personal capacity.

80. The Corporate Resolution provided that all shareholders, officers, and directors of J&M Holdings unanimously agreed to borrow $330,000 from Defendant Rokosz and to provide a security interest to him in the Subject Property. Ms. Barker was instructed to sign the Corporate Resolution both as President and Secretary of J&M Holdings.

81. At the conclusion of the First Loan closing, Ms. Barker did not receive any copies of any of the documents signed at the closing.

82. The First Loan agreement that Ms. Barker signed on February 6, 2017 was in the amount of $330,000. Ms. Barker was never informed of the specific terms of the First Loan, including the actual finance charges and actual APR, nor provided with any documentation reflecting the terms of the First Loan at the closing. The First Loan was issued without any regard to Ms. Barker's ability to repay.

83. The First Loan provided for a nominal 12 percent annual interest rate, a one-year term, and interest-only payments for the term of the loan, with no prepayment allowed before six months, and a final balloon payment due within one year for $330,000.

84. Of the $330,000 initial principal amount, $150,000 was paid to Sandra Vaughan to settle the partition dispute, $71,126.85 was paid to New York City to satisfy property tax liens, and $150 was paid to satisfy a debt owed to the State of New York. Ms. Barker did not directly receive any loan proceeds.

85. The remaining proceeds were distributed to the following individuals or entities, as follows:

| | |
|---|---|
| EastCor Land Services (title company) | $36,573.80 |
| Royce LLC | $2,980.00 |
| Jackie Marketing LLC | $3,460.00 |
| Lodeco (construction company) | $14,416.67 |
| Steven Legum | $3,000.00 |
| Richard Hurley | $1,500.00 |

| | |
|---|---|
| Betty Hingle | $1,000.00 |
| Retained in Escrow | $45,792.68 |
| Total of Remaining Proceeds | **$108,723.15** |

86. Defendant Rokosz and Defendant Legum required title insurance and the services of a title company in order to close the loan.

87. Betty Hingle received $1,000.00 for her services as a closing agent, as required to close the loan with title insurance.

88. Defendant Royce received $2,980.00 for Defendant Telsey's purported broker fee.

89. Jackie Marketing received $3,460.00 for Fishbein's purported broker fee.

90. The funds retained in "escrow," totaling $45,792.68, were distributed to Defendant Legum pursuant to the Escrow Agreement.

91. EastCor Land Services ("EastCor"), a title company with a principal place of business at 9 Park Place, 1st Floor, Great Neck, New York, handled title services for the loan closing. Ms. Barker did not retain EastCor for its title services and did not know what it was at closing. The following fees were included in the $36,573.80 amount paid to EastCor:

| | |
|---|---|
| Escrow Fee | $100.00 |
| Tax-Mortgage Lender | $825.00 |
| Recording Fee Deed | $125.00 |
| Deed | $225.00 |
| Recording Fee Deed | $125.00 |
| Mortgage Recording | $250.00 |
| Recording Fee Mortgage | $125.00 |
| RPTT | $125.00 |
| Satisfaction of Judgment | $75.00 |
| Recording Fee Satisfaction of Judgment | $75.00 |
| Satisfaction of Tax Lien | $300.00 |
| Recording Fee Tax Lien Satisfaction | $300.00 |

92. Of the above itemized fees, the City of New York's Automated City Register Information System (ACRIS) reflects that only $452.00 of recording fees were paid to a government entity.

93.     Ms. Barker did not retain the services of Defendant Lockdeco, also known as Lodeco, the purported contractor that Defendant Defreitas arranged to conduct repair work on Ms. Barker's property.   Prior to the closing, Ms. Barker never communicated with Defendant Lockdeco.

94.     Defendant Lockdeco is not licensed by the New York City Department of Consumer Affairs as a home improvement contractor.

95.     Ms. Barker never met with a certified loan counselor concerning the First Loan. Defendant Rokosz did not advise Ms. Barker to meet with a certified loan counselor. If a certified loan counselor had explained the loan terms to her, Ms. Barker would not have gone through with the closing.

96.     Defendant Rokosz never notified Ms. Barker of her right to rescind the mortgage loan.

97.     Prior to the closing of the First Loan, Defendants Rokosz, Legum, Telsey, and Royce were aware that there would be a second loan closing for a second loan.  Defendants Legum, Telsey, and Royce planned to collect proceeds from each loan closing.

98.     In several email exchanges on February 9, 2017, Defendants Legum and Telsey discussed with Fishbein whether Defendant Legum should prepare a new mortgage and note for a second loan and an agreement to consolidate the two loans, or should prepare a new mortgage for the total loan amount and surrender the mortgage and note for the first loan.

**Second Loan Closing**

99.     After the First Loan closing, Defendant Defreitas informed Ms. Barker that she would have to return to Defendant Legum's office to sign additional documents.

18

100.   Ms. Barker did not see or communicate with Defendant Hurley between the first and second closing.  Upon information and belief, Defendant Hurley did not attempt to contact Ms. Barker between the first and second loan closing.

101.   Prior to arriving at the second closing, Defendant Hurley had not seen any of the second loan closing documents.  Upon information and belief, Defendant Hurley had not requested copies of any of the second loan closing documents from Defendant Legum or discussed any of the proposed second loan terms with Defendant Legum.

102.   On February 16, 2017, ten days after the first closing, Ms. Barker returned to Defendant Legum's office to sign additional mortgage documents.  Defendants Defreitas, Hurley, and Legum were once again present.  Ronald Ifraimov, the title closer, was also present along with Fishbein, who helped arranged the closing and was a payee of the $10,000 Promissory Note dated February 6, 2017.  Defendant Telsey was not present.

103.   Ms. Barker was under the impression that she was signing additional documents for the First Loan.  However, unbeknownst to Ms. Barker, she executed documents taking out a Second Loan in the amount of $120,000, which was then consolidated with the First Loan to create the Subject Loan of $450,000.   No one, including Defendant Hurley, advised Ms. Barker that she was entering into an additional loan agreement.

104.   At the second loan closing, Defendant Legum again provided documents to Defendant Hurley for Ms. Barker to sign.

105.   During the second closing, Defendant Hurley dictated a three-sentence statement to Ms. Barker and instructed her to sign it without advising her to read it.   Defendant Hurley never explained the contents of the statement to Ms. Barker, or confirmed that she understood it, before

19

instructing her to sign. Defendant Hurley did not give Ms. Barker a copy of the dictated statement at the second closing.

106. Defendant Hurley instructed Ms. Barker to sign updated copies of the Escrow Agreement, Assignment and Security Agreement, Guarantee, and Corporate Resolution, all dated February 16, 2017. Each agreement provided for the same general terms as each respective original agreement but recognized the additional $120,000 obligation and total consolidated obligation of $450,000. Again, no one, including Defendant Hurley, explained any of the documents to Ms. Barker at this second closing. Being financially unsophisticated and inexperienced with mortgages, Ms. Barker did not understand any of the terms of these documents. Ms. Barker signed them anyway, given the presence and participation of Defendant Defreitas and Defendant Hurley, people she otherwise trusted and believed were acting in her best interest.

107. Defendant Hurley did not know or calculate the interest rate or APR of the Subject Loan at or prior to the second closing, and he never advised Ms. Barker of the interest rate or APR of the loan. Defendant Hurley did not know if the Subject Loan was usurious and did not discuss whether it was with Ms. Barker.

108. The Escrow Agreement dated February 16, 2017, also provided for an additional $14,400 to be retained in "escrow," in addition to the $45,792.68 already retained in "escrow"—totaling $60,192.68 in "Escrow Funds." Again, the Escrow Agreement provided that, in the event of default, Defendant Legum as Escrow Agent could, upon direction of Defendant Rokosz and without notice to Ms. Barker, utilize the "escrow funds" to make certain payments toward interest, principal, insurance, maintenance, assessments, and taxes.

109. The Second Loan was again issued by Defendant Rokosz, with the same loan terms as the First Loan: a one-year term, with interest-only monthly payments at a nominal 12 percent

interest rate, with no prepayment allowed before six months, and a final balloon payment due within one year for $120,000. Once again, the loan was issued without any regard for Ms. Barker's ability to repay.

110. Ms. Barker did not receive any loan disbursements. The proceeds of the Second Loan were distributed to the following individuals or entities:

| | |
|---|---|
| Izia Rokosz (interest accrued 2/6 to 2/16) | $1,193.42 |
| EastCor Land Services, Inc. | $3,715.88 |
| Royce LLC | $5,733.33 |
| Jackie Marketing LLC | $11,466.67 |
| Lodeco | $78,140.70 |
| Steven Legum | $3,500.00 |
| Richard Hurley | $1,500.00 |
| Ronald Ifraimov | $350.00 |
| Retained in Escrow | $14,400.00 |
| Total: | **$120,000.00** |

111. Defendant Rokosz and Defendant Legum again required title insurance and the services of a title company in order to close the loan.

112. Defendant Rokosz collected interest on the First Loan of $1,193.42.

113. Ronald Ifraimov received $350.00 for his services as a closing agent, as required to close the loan with title insurance.

114. Defendant Royce received $5,733.33 for Defendant Telsey's purported broker fee.

115. Jackie Marketing received $11,466.67 for Fishbein's purported broker fee.

116. The funds retained in "escrow," totaling $14,400.00, were distributed to Defendant Legum pursuant to the Escrow Agreement. In addition to the amount already retained by Defendant Legum, the total amount of "Escrow Funds" amounted to $60,192.68.

117. The following fees were included in the $3,715.88 amount paid to EastCor:

| | |
|---|---|
| Tax-Mortgage Lender | $300.00 |
| Mortgage Recording | $250.00 |
| Mortgage Recording Fee | $125.00 |

118. Of the above itemized fees, ACRIS shows only $72.00 of recording fees paid to a government entity.

119. At the closing, Ms. Barker did not receive copies of any of the documents she signed.

120. At no time before, during, or after this closing on February 16, 2017, was Ms. Barker advised about meeting with, nor did Ms. Barker meet with, a certified loan counselor concerning the Second Loan or any loan. If she had met with a housing counselor and that counselor had explained the terms of the loan to her, Ms. Barker would not have gone through with the closing.

121. At no time before, during, or after this closing on February 16, 2017, did Ms. Barker receive any notice about her right to rescind the mortgage.

122. Defendant Hurley never told Ms. Barker that he was advising her not to go through with the second loan closing. If Defendant Hurley had advised Ms. Barker not to go through with the second loan closing, she would not have signed the closing documents.

**Post Closings**

123. Between the First Loan and Second Loan, comprising the Subject Loan, a total debt of $450,000 was borrowed against the Subject Property.

124. As a first-time mortgage borrower who was financially unsophisticated, Ms. Barker was not familiar with nor did she understand any of the loan terms underlying the Subject Loan.

125. More than half of the loan proceeds were collected by the Defendants, Fishbein (through Jackie Marketing), and the title company. Ms. Barker did not directly receive any of the loan proceeds.

126. Defendant Defreitas claimed Defendant Lockdeco would perform significant construction on the Subject Property, including roof, plumbing, electrical, and insulation repairs. Instead, Lockdeco completed minimal drywall installation and began certain preparation work that remained unfinished, which created holes and left exposed electrical wiring in certain areas. Defendant Lockdeco did not complete any significant construction or repair work.

127. Defendant Lockdeco provided Ms. Barker with a business card stating that the company performs the following services: roofing, tiling, painting, masonry, siding, and plumbing.

128. Ms. Barker never received an invoice for any work performed by Defendant Lockdeco. Upon information and belief, Defendant Defreitas initially claimed to be the owner of the Subject Property in communications with Lockdeco.

129. Defendant Defreitas sued Lockdeco in Kings County Supreme Court in August 2017 (Index No. 515459/2017) for breach of contract and unjust enrichment, seeking $42,106.01. According to the complaint filed in that case, Defendant Defreitas hired Lockdeco on or about February 6, 2017, for a house repair project and paid Lockdeco an initial sum of $14,416.67 and an additional sum of $78,140.70 10 days later, for a total of $92,557.37, the total amount disbursed to Lockdeco at the two closings. Also according to the complaint, Lockdeco reimbursed Defendant Defreitas $50,451.36 of those funds.

130. Upon information and belief, Defendant Defreitas is seeking a default judgment against Lockdeco and its two principals.

131. Ms. Barker spoke with one of the principals of Lockdeco while Lockdeco employees were at her home one day. The Lockdeco principal advised Ms. Barker that Defendant Defreitas had given Lockdeco checks, and they had given cash back to Defendant Defreitas.

132. Ms. Barker did not receive copies of any of the documents she executed at either closing on February 6, 2017 or February 16, 2017.

133. Upon information and belief, Defendant Hurley did not retain copies of any of the closing documents at or immediately after either of the loan closings and later requested copies of the loan documents from Defendant Legum.

134. After the closings, Ms. Barker repeatedly called Defendant Hurley to request copies of her loan documents. When Ms. Barker was finally able to reach Defendant Hurley, he agreed to meet with her at a café and told her that he had just returned from a cruise. At that meeting, Ms. Barker was finally able to obtain some of the documents from the loan closings.

135. The itemization of disbursement proceeds that Defendant Hurley provided to Ms. Barker after the closing included a number of loan proceeds that were never received by Ms. Barker, were not paid entirely to satisfy Ms. Barker's prior debts, and were not paid to third parties for purposes that were defined or communicated to Ms. Barker. None of the documents referenced Ms. Barker's right to rescission.

**Defendants' Attempts to Collect the Debt**

136. In or around April 2017, at the instruction of Defendant Rokosz, Defendant Telsey again visited Ms. Barker at her home. During this visit, Defendant Telsey informed Ms. Barker that she was behind on her mortgage payment. Defendant Telsey insisted that Ms. Barker had to sign over all the paperwork for the house to Defendant Rokosz, who was now going to own the house.

137. This was the first time that Ms. Barker learned that Defendant Defreitas had not made the payments on her mortgage as she had repeatedly stated she would. Ms. Barker had not received any mortgage statements from Defendant Legum or from anyone else notifying her that

she was behind on mortgage payments. Ms. Barker had reasonably believed that Defendant Defreitas was making those mortgage payments while she helped Ms. Barker refinance with an FHA loan.

138. In May 2017, Defendant Telsey texted Ms. Barker asking her to call him. His text messages also instructed Ms. Barker to pay for the property insurance and provide proof of payment to himself and Defendant Legum.

139. Desperate for answers, Ms. Barker called Defendant Legum to request information about the mortgage. Defendant Legum informed her on the phone that she was in default. Recalling that some amount of money was set aside, Ms. Barker asked if any of those funds could be used to help her with payments owed or to pay the construction company to finish the work it started on her house, so she could begin receiving rental income for one of the units in her two-family home. Defendant Legum denied her request.

140. Ms. Barker never received any mortgage statements.

141. By letter dated May 18, 2017, Defendant Legum informed Ms. Barker for the first time in writing that she was in default of the mortgage, and that, as a result, he was transferring the shares of J&M Holdings to Defendant Rokosz.

142. In the summer of 2017, two men came to Ms. Barker's home. She was in the backyard garden and had left the front door unlocked. A neighbor saw the two men enter Ms. Barker's home and alerted her. Ms. Barker confronted the two men, whom she had never met before, inside her home. To her shock and dismay, they told her that she did not own the house and that she would have to leave in eight days. When the men refused to leave, Ms. Barker left to seek the help of her neighbor, a corrections officer. By the time she returned shortly thereafter, the two men had left her property.

143. In November 2017, Defendant Rokosz attempted to evict Ms. Barker from the Subject Property. J&M Holdings, through petitions verified by Defendant Rokosz, commenced two eviction proceedings against Ms. Barker, each under the caption *J&M Properties Holdings Inc. v. Carla Barker*, and bearing Kings County Landlord Tenant index numbers 95190/2017 and 95191/2017.

144. The petitioner in those cases, J&M Holdings, maintained that Defendant Rokosz was the President of J&M Holdings and the sole shareholder.

145. By having Ms. Barker transfer ownership to J&M Holdings and insisting that she sign the Assignment and Security Agreement, Defendant Rokosz did not have to pursue a residential foreclosure action to obtain ownership of the property, and thus denied Ms. Barker the legal protections that the New York State legislature enacted to protect homeowners in foreclosure.

146. Ms. Barker, represented by MFJ, moved to dismiss these cases in Housing Court on procedural and substantive grounds. On July 10, 2018, the housing court dismissed both actions. J&M Holdings noticed an appeal, but has yet to perfect it.

147. Although the eviction proceedings have been dismissed, Ms. Barker still does not feel safe in her own home. Throughout the eviction proceeding, multiple individuals came to her home claiming they had purchased her property.

148. In or around July 2018, someone placed a "For Sale" sign on her property. Ms. Barker took it down.

149. In or around October 2018, a man with a key to Ms. Barker's home unlocked the bottom lock and tried to enter, but was unable to because of a deadbolt. Through the door, the man told Ms. Barker that he had been informed the house was available for rent.

150. Each of these incidents has scared Ms. Barker and made her feel unsafe.

151. Prior to taking out the Subject Loan, Ms. Barker never experienced this type of harassment.

152. Ms. Barker is ashamed that she was scammed into potentially losing her family home and experiences bouts of depression. .

153. On January 25, 2019, Ms. Barker filed the instant lawsuit.

**Defendants' Related Practices Involving Other Borrowers**

154. In April 2017, the Kings County District Attorney's Office and the New York Attorney General's Office arrested and indicted Defendant Defreitas, along with June Whyte, the family friend who referred Ms. Barker to Defendant Defreitas, Jaipal Persaud, the man who incorporated J&M Holdings, and others. All were arrested and charged with mortgage fraud and money laundering for incidents from 2012. According to the indictment, Defendant Defreitas acquired title to multiple properties in Brooklyn and Queens as a result of the scheme. Defendant Defreitas remains incarcerated for certain charges from that indictment, including grand larceny, residential mortgage fraud, conspiracy, and scheme to defraud.

155. Since 2011, Defendant Rokosz has issued at least 26 other mortgage loans with terms similar to the Subject Loan.

156. Less than a handful of the other mortgage loan transactions were purchase mortgages.

157. Defendant Legum acted as Defendant Rokosz's attorney in 22 of these other mortgage loans.

158. Between November 2013 and October 2016, Defendant Telsey helped to arrange at least 13 other mortgage loans originated in full or in part by Defendant Rokosz in which Defendant Legum served as the attorney for the transactions. Like the Subject Loan, Defendant

27

Telsey received proceeds from each of these 13 other mortgage loan transactions through his entity, Defendant Royce.

159. In or around 2014, Fishbein became acquainted with Defendant Telsey, who soon made Fishbein aware of his association with a private lender, Defendant Rokosz, who was willing to originate mortgage loans to borrowers who would agree to terms including nominal annual interest rates of at least 12 percent. In addition to the Subject Loan, Fishbein helped Defendant Telsey arrange at least nine of the other mortgage loans originated in full or in part by Defendant Rokosz in which Defendant Legum served as the attorney for the transactions. Like the Subject Loan, Fishbein received proceeds from each of these nine other mortgage loan transactions through his entity, Jackie Marketing.

160. Including the Subject Loan, between November 2013 and February 2017, Defendants Legum, Telsey, and Royce together helped arrange at least 14 mortgage loan transactions originated by Defendant Rokosz, receiving proceeds from each loan. Fishbein and Jackie Marketing also helped arrange and received proceeds from at least 10 of those 14 mortgage loan transactions, including the Subject Loan.

161. All 14 of these loans were similarly structured: they involved loan terms of between 356 days and two years, nominal interest rates of 12 or 13 percent per annum, and a balloon payment of the entire principal sum due on the date of maturity.

162. If the borrowers are unable to pay the full balance by the date of maturity, they are generally permitted to "continue" the loan by making minimum monthly payments of interest only, until they can pay the entire balance.

163. In at least 10 of these 14 mortgage loans, an amount of the loan proceeds was withheld as "escrow" by Defendant Legum as the "escrow agent." The escrow amounts ranged

from six to 12 percent of the principal plus the equivalent of one year of property taxes and the equivalent of one year of property insurance premiums. These "escrow" funds are not returned or credited to the borrowers unless and until the borrowers pay the full balance due on the loan. The borrowers may only opt to have the "escrowed" funds deducted from the balance owed if they can concurrently satisfy the entire balance that remains if the funds are credited. In every instance, the "escrow" funds are disbursed from the loan proceeds, meaning the borrowers must pay interest on the "escrow" funds and repay the balance of the "escrow" funds.

164. Upon information and belief, in all transactions known to have involved an "escrow" holdback of at least six percent of the loan principal, the borrowers were unable to pay off the loan by the date of maturity. Those borrowers who defaulted during the initial loan term forfeited the "escrow" funds. Those borrowers who were permitted to continue the loan (as described above) by continuing to make interest-only minimum payments also forfeited the "escrow" funds because they did not repay the loan by the date of maturity. In each transaction involving an "escrow" holdback, the "escrow" funds were never returned to the borrower or otherwised used for their benefit. Accordingly, the "escrowed" amounts in these instances constituted interest on the loans.

165. In each of the transactions in which Fishbein participated, Fishbein brought the prospective borrower to the attention of Defendants Telsey, Legum, and Rokosz. Fishbein then served as the intermediary between the borrower and title company, on the one hand, and Telsey, Legum, and Rokosz, on the other, at least until the point at which the loans closed. Fishbein communicated with Defendants Telsey and Legum, while Rokosz generally only communicated with Defendants Telsey and Legum. In each of these transactions, Defendant Telsey arranged the

29

loan as an agent of the lender. The loan proceeds collected by Defendants Telsey and Royce constituted interest on the respective loans.

166. In the four transactions in which Fishbein did not participate, Defendant Telsey brought the prospective borrower to the attention of Defendants Rokosz and Legum, and served as the intermediary between the borrower and Defendants Rokosz and Legum.

167. In either scenario, when the prospect of a new loan arose during this time period, Defendants Telsey and Rokosz would generally go together to visit the property that would secure the loan to evaluate its condition and estimate its value. Telsey often also shared comparative properties and their values with Rokosz. For each potential transaction, Defendants Rokosz and Telsey sought to evaluate the loan-to-value ratio, or the amount of the requested loan relative to the value of the property. If Defendant Rokosz found the loan-to-value ratio acceptable, the loan could proceed.

168. Defendants did not request or review the borrowers' financial information. They did not request or review credit reports for individual borrowers or assess the financial health of any corporate borrowers. None of the Defendants reviewed the borrowers' ability to repay nor sought analysis of the borrowers' ability to repay from any source. The sole concern was whether the loan-to-value ratio was low enough to allow repayment by recourse to the property.

169. Beyond this basic parameter, Defendants Telsey and Legum, and when involved, Fishbein, retained substantial control over the terms and structure of the loans. These terms included the amount of proceeds each would receive, whether to withhold any of the proceeds as "escrow" and, if so, how much to withhold, and whether to require the borrower to create a sham corporation or limited liability company and transfer title to the property into the entity.

30

170. In helping to determine the terms and before allowing a loan to close, Defendant Legum assessed the relative debt obligations and possible encumbrances related to a given property by requesting and analyzing title reports. Defendant Legum also prepared the closing documents, including the Assignment of Security Agreements and Escrow Agreements. Upon information and belief, at the loan closings, Defendant Legum sometimes signed as Defendant Rokosz.

171. Once a mortgage loan closed, Defendant Telsey was primarily responsible for ensuring that the borrower made payments, including paying taxes on the property and maintaining property insurance. Defendant Telsey communicated with borrowers by phone and email, and visited the borrowers in person to demand payment. These efforts were coordinated with Defendant Legum and were ultimately at the direction of Defendant Rokosz.

172. At least six of Defendant Rokosz's other mortgage loans with similar terms to the Subject Loan were made to corporations or limited liability companies (LLCs) organized within two to 17 days of the loan closing, rather than individuals.

173. In 2014, Defendant Rokosz issued at least four mortgages for one-to-four family properties with similar terms to the Subject Loan.

174. In 2015, Defendant Rokosz issued at least five mortgages for one-to-four family properties with similar terms to the Subject Loan.

175. In 2016, Defendant Rokosz issued at least one mortgage for one-to-four family properties with similar terms to the Subject Loan.

176. In 2017, in addition to the Subject Loan, Defendant Rokosz issued at least three other mortgages for one-to-four family properties with similar terms to the Subject Loan.

177. In 2018, Defendant Rokosz issued at least four other mortgage loans with similar terms to the Subject Loan, one of which was issued for a one-to-four family property.

178. In 2019, Defendant Rokosz issued at least two other mortgage loans with similar terms to the Subject Loan, one of which was issued for a one-to-four family property.

### A. *1036 Heatherfield Road, Valley Stream, New York*

179. On November 22, 2013, Defendant Rokosz issued a $150,000.00 mortgage loan to Wilma and Fitz Joseph, secured by their one- to two-family home located at 1036 Heatherfield Road in Valley Stream, New York. The loan was for a one-year term, carried a nominal 12 percent annual interest rate, and required interest-only $1,500.00 monthly payments and a final balloon payment of $150,000.00 due on November 21, 2014.

180. Defendant Telsey brought the borrowers to the attention of Defendants Rokosz and Legum; Defendant Legum represented Defendant Rokosz in the transaction; and Defendant Telsey communicated with the borrowers on behalf of himself and Defendants Rokosz and Legum. Prior to the loan closing, Defendant Telsey explained to Mr. Joseph that the term of the loan could be extended as long as the Josephs continued to make minimum monthly interest-only payments of $1,500.00.

181. Defendant Telsey received $6,000.00 of the loan proceeds for what he identified to the Josephs as a "broker" fee, an amount disbursed to Defendant Royce, and Defendant Legum received loan proceeds in his personal capacity. Upon information and belief, Defendant Telsey did not render any services enumerated under 3 NYCRR § 4.3(b) in connection with this loan. As a condition of the loan, the equivalent of six months of interest-only monthly payments ($9,000.00), one year of property tax payments (which, upon information and belief, equaled approximately $13,555.70, the amount of property taxes assessed for 1036 Heatherfield Road in

2013), and one year of homeowner's insurance payments ($2,461.00) were withheld from the loan proceeds as "escrow," with Defendant Legum designated as the "escrow agent," as additional security for the loan.

182.    As of January 2020, no satisfaction of the Josephs' mortgage has been recorded. Upon information and belief, the Josephs did not make the $150,000.00 balloon payment due on November 21, 2014, and they continue to make monthly interest payments of at least one percent of the loan balance each month.    Upon information and belief, none of the approximately $25,016.70 held as "escrow" by Defendant Legum has been made available to the Josephs or has otherwise been used to their benefit.

183.    The approximately $25,016.70 of loan proceeds withheld as "escrow" controlled by Defendant Legum and the $6,000.00 of loan proceeds received by Defendant Telsey, through Defendant Royce, constituted interest on this loan.    Under New York's usury laws, the actual interest rate on this loan was at least 37.17 percent.

**B.   _231-15 126th Street, Queens, New York_**

184.    On November 24, 2014, Defendant Rokosz, along with his associate, David Bergman, issued a $225,000.00 mortgage loan to Vincent Muhammad, secured by the one- to two-family residence owned by Mr. Muhammad located at 231-15 126th Street in Queens, New York. Upon information and belief, Mr. Muhammad resided at the property.    This loan was for a one-year-and-one-month term, carried a nominal 12 percent annual interest rate, prohibited prepayment, and required 13 monthly interest-only payments of $2,250.00 – the first 12 of the 24th of each month, beginning on December 24, 2015, and the 13th on December 23, 2015 – with a final balloon payment of $225,000.00 also due on December 23, 2015.

33

185. Fishbein brought Mr. Muhammad to the attention of Defendants Telsey, Legum, and Rokosz, and Bergman. Throughout the transaction, Fishbein communicated directly with Mr. Muhammad, and Defendants Telsey and Legum communicated with Fishbein on behalf of themselves and as agents of Defendant Rokosz and Bergman.

186. As a condition of the loan, Fishbein and Defendant Telsey collected a $500.00 upfront "retainer" fee from Mr. Muhammad to be paid to Defendant Legum. As a condition of the loan, at least $27,000.00, representing 12 months of $2,250.00 payments, was withheld from the loan proceeds as "escrow" as additional security for the loan, with Defendant Legum acting as the "escrow agent." As a condition of the loan, Defendant Telsey received $9,000.00 of the loan proceeds, an amount disbursed to Defendant Royce, and Fishbein received $9,000.00 of the loan proceeds, an amount disbursed to Jackie Marketing. Upon information and belief, neither Defendant Telsey nor Fishbein rendered any services enumerated under 3 NYCRR § 4.3(b) in connection with this loan. As a condition of the loan, Defendant Legum also received additional proceeds directly from the loan in his personal capacity.

187. On January 6, 2016, Defendant Telsey contacted Fishbein regarding Mr. Muhammad, asking whether Mr. Muhammad intended to "continue" the loan or to pay it off. According to Defendant Telsey, Mr. Muhammad was technically in default on the loan. Defendant Telsey told Fishbein that Mr. Muhammad should make a monthly payment or he would be "on the road to a big mess." On January 18, 2016, Defendant Legum wrote Mr. Muhammad declaring that Mr. Muhammad had defaulted on the loan.

188. On May 13, 2016, on behalf of Defendant Rokosz and Bergman, Defendant Legum filed a residential foreclosure action against Mr. Muhammad in the Supreme Court of the State of New York, County of Queens, Index No. 705729/2016. In this action, Defendant Rokosz and

Bergman alleged that Mr. Muhammad defaulted when he failed to pay the $225,000.00 principal when it became due on December 23, 2015. Rokosz and Bergman further alleged that $255,620.54 was due and owing to them as of May 13, 2016, which included $5,057.99 for real estate taxes, $1,696.80 in property insurance payments, and "pursuant to the terms of the mortgage note, interest continu[ing] to accrue at a rate of $112.05 per day."

189. The documents filed on behalf of Defendant Rokosz and Bergman in the foreclosure action, including affirmations by Defendant Legum regarding amounts owed to Defendant Rokosz and Bergman, do not reference the $27,000.00 held by Defendant Legum in "escrow." A report of amount due filed by the referee in the foreclosure action on December 10, 2018, did not deduct the $27,000.00 held in "escrow" by Defendant Legum from the principal balance.

190. Mr. Muhammad defaulted in the foreclosure action and a judgment of foreclosure and sale of 231-15 126th Street was issued on July 9, 2019. Upon information and belief, none of the $27,000.00 held as "escrow" by Defendant Legum was ever made available to Mr. Muhammad or otherwise used to his benefit.

191. The $27,000.00 in loan proceeds held as "escrow" controlled by Defendant Legum; the $9,000.00 in loan proceeds received by Defendant Telsey, through Defendant Royce; and the $9,000.00 received by Fishbein, through Jackie Marketing, all constituted interest on this loan. Under New York's usury laws, the actual interest rate on this loan was at least 34.45 percent.

C. *226A Palmetto Street, Brooklyn, New York*

192. On November 24, 2014, the same day that Defendant Rokosz and Bergman issued a mortgage loan to Mr. Muhammad, they also issued a $175,000.00 mortgage loan to Darryl Green, secured by Mr. Green's one- to two-family home located at 226A Palmetto Street in Brooklyn,

New York. The loan issued to Mr. Green was for a one-year-and-one-month term, carried a nominal 12 percent annual interest rate, prohibited prepayment, and required 13 interest-only monthly payments of $1,750.00 – the first 12 due on the 24th of each month, beginning on December 24, 2014, and the 13th due on December 23, 2015 – and a balloon payment of $175,000.00, also due on December 23, 2015.

193. Like Mr. Muhammad, Fishbein also brought Mr. Green to the attention of Telsey, Legum, Rokosz, and Bergman. Throughout the transaction, Fishbein communicated directly with Mr. Green, and Defendants Telsey and Legum communicated with Fishbein on behalf of themselves and as agents of Defendant Rokosz and Bergman.

194. As a condition of the loan, Fishbein and Defendant Telsey collected a $500.00 upfront "retainer" fee from Mr. Green to be paid to Defendant Legum. As a condition the loan, upon information and belief, Legum also received additional proceeds from the loan in his personal capacity. As a condition of the loan, Defendant Telsey received $7,000.00 of the loan proceeds, an amount disbursed to Defendant Royce, and Fishbein received $3,500.00 of the loan proceeds, an amount disbursed to Jackie Marketing. Upon information and belief, neither Defendant Telsey nor Fisbein rendered any services enumerated under 3 NYCRR § 4.3(b) in connection with this loan.

195. A satisfaction of Mr. Green's mortgage dated June 10, 2016, has been publicly recorded. Upon information and belief, Mr. Green did not make the $175,000.00 payment due on December 23, 2015, but was permitted to make monthly interest payments of at least one percent of the loan balance until the balance could be satisfied in full.

196. The $7,000.00 of loan proceeds received by Defendant Telsey, through Defendant Royce, and the $3,500.00 of the proceeds from this loan received by Fishbein, through Jackie

Marketing, constituted interest on this loan. Under New York's usury laws, the interest rate of this loan was at least 17.61 percent.

**D.** ***149-07 Hook Creek Boulevard, Queens, New York***

197. On April 14, 2015, Fishbein emailed Defendant Telsey that he had become aware of a woman who had obtained the winning bid to a foreclosed property located at 149-07 Hook Creek Boulevard, but whom no conventional bank would provide a mortgage until title to the property was clear. According to Fishbein, the woman was seeking a hard money loan in order to buy the property, which she would then quickly refinance. Defendant Telsey quickly responded that he would go by to look at the property.

198. On July 8, 2015, Defendant Rokosz originated a $325,000.00 mortgage loan to Kamla Anthony, secured by the one- to two-family residence located at 149-07 Hook Creek Boulevard in Queens, New York. Kamla Anthony resided at 149-07 Hook Creek Boulevard from the point at which the loan was issued. This loan provided for a one-year term, carried a nominal 12 percent annual interest rate, prohibited prepayment for the first six months of the loan term, required interest-only monthly payments of $3,250.00, and required a final balloon payment of $325,000.00 on July 7, 2016.

199. Throughout the transaction, Fishbein communicated directly with Ms. Anthony, and Defendants Telsey and Legum communicated with Fishbein on behalf of themselves and as agents of Defendant Rokosz.

200. As a condition of the loan, Defendant Telsey received $9,750.00 of the loan proceeds, an amount disbursed to Defendant Royce, and Fishbein received $4,875.00 of the loan proceeds, an amount disbursed to Jackie Marketing. As a condition of the loan, Defendant Telsey also required Ms. Anthony to pay $500.00 in certified funds or a bank check to Defendant Royce

upon signing a letter of intent for the loan. Upon information and belief, neither Defendant Telsey nor Fishbein rendered any services enumerated under 3 NYCRR § 4.3(b) in connection with this loan. As a condition of the loan, upon information and belief, Defendant Legum also received proceeds from the loan in his personal capacity.

201. As a condition of the loan, the equivalent of 12 months of $4,875.00 payments ($39,000.00), one year of property taxes (upon information and belief, approximately $4,161.00, which is the amount of property taxes assessed for 149-07 Hook Creek Boulevard for the 2014-2015 tax year), and one year of homeowner's insurance premiums were withheld from the loan proceeds as "escrow," with Defendant Legum as the designated "escrow agent," as additional security for the loan.

202. Defendant Rokosz continues to receive monthly interest payments of at least one percent of the balance on the loan. Because Ms. Anthony did not "exit" the loan within the one-year loan term, she forfeited the "escrow" funds of approximately $43,161.00 that were set aside.

203. Upon information and belief, when Ms. Anthony's monthly payment did not automatically process on the established due date, Defendant Telsey came to Ms. Anthony's home to demand payment.

204. The approximately $43,161.00 of loan proceeds withheld as "escrow" controlled by Defendant Legum; the $10,250.00 of the loan proceeds received by Defendant Telsey through Defendant Royce; and the $4,875.00 of the loan proceeds received by Fishbein through Jackie Marketing all constitute interest on this loan. Under New York's usury laws, the interest rate of this loan was at least 33.33 percent.

**E. _580 Linden Boulevard, Brooklyn, New York_**

205.     On September 10, 2015, Defendant Telsey informed Defendant Legum that he had picked up Defendant Legum's "retainer" for a new hard money deal for Defendant Rokosz involving 580 Linden Boulevard. The prospective terms included a one-year loan term, nominal 13 percent annual interest, interest-only payments, and an "escrow" amount equivalent to one year of payments on the loan. Defendant Telsey further informed Defendant Legum that he would provide a bullet list of the commissions as soon as he put everything together.

206.     On September 30, 2015, Defendant Rokosz issued a $375,000.00 mortgage loan to Terry Barnett, secured by the one- to two-family residence located at 580 Linden Boulevard in Brooklyn, New York. The loan provided for a one-year term, required 13 percent nominal annual interest upfront, prohibited prepayment, and required a balloon payment of $375,000.00 on October 1, 2016. According to the mortgage and note, the $375,000.00 principal was to be advanced in four separate installments based on the completion of phases of construction work at 580 Linden Boulevard.

207.     Defendant Telsey brought Mr. Barnett to the attention of Defendants Rokosz and Legum; Defendant Legum represented Defendant Rokosz in the transaction; and Defendant Telsey communicated with the borrower on behalf of himself and Defendants Rokosz and Legum.

208.     As a condition of the loan, at least $48,750.00 of the loan proceeds were withheld as "escrow," with Defendant Legum designated as the "escrow agent," as additional security for the loan. As a condition of the loan, Defendant Telsey received proceeds from the loan, disbursed to Defendant Royce LLC. Upon information and belief, as a condition of the loan, Defendant Legum received additional proceeds directly from the loan in his personal capacity.

39

209. On multiple occasions during the life of the loan, Defendants Telsey and Rokosz went to the property together to evaluate the progress of the construction work being conducted, and to disburse portions of the principal directly to the contractor.

210. Upon information and belief, Mr. Barnett did not make the $375,000.00 payment due on October 1, 2016, but he was permitted to make minimum monthly interest payments of at least 1.08 percent of the balance until the loan could be paid in full.

211. On April 20, 2018, Mr. Barnett sold the property located at 580 Linden Boulevard to another individual. A satisfaction of the mortgage, dated April 19, 2018, has been publicly recorded. Upon information and belief, none of the "escrowed" funds were made available to Mr. Barnett or otherwise used to his benefit, at least up until the point at which he sold the property.

212. The $48,750.00 in proceeds from this loan withheld as "escrow" controlled by Legum constituted interest. Under New York's usury laws, the interest rate for this mortgage loan was at least 29.89 percent.

**F. _135 East Graham Avenue, Hempstead, New York_**

213. At 12:15 p.m. on September 30, 2015, Fishbein emailed Defendant Telsey a residential contract of a sale for a property located at 135 East Graham Avenue in Hempstead, New York, to be purchased by Shawn Hescott. At 5:19 p.m. the same day, Defendant Telsey emailed Defendant Rokosz, laying out details of a potential deal regarding 135 East Graham Avenue, including a one-year loan, a loan-to-value ratio of approximately 35 to 40 percent, six months of payments held as "escrow," and six months of payments to be paid at closing.

214. On November 2, 2015, Defendant Rokosz issued a $110,000.00 mortgage loan to Shawn Hescott, secured by Mr. Hescott's one- to two-family home located at 135 East Graham Avenue. The loan was for a one-year term, carried a nominal 12 percent annual interest rate,

required monthly interest-only payments of $1,100.00 (with the first six months payments paid upfront), and required a final balloon payment of $110,000.00 on November 1, 2016.

215. Fishbein brought Mr. Hescott to the attention of Defendants Telsey, Legum, and Rokosz; and throughout the transaction, Fishbein communicated directly with Mr. Hescott, while Defendants Telsey and Legum communicated with Fishbein on behalf of themselves and as agents of Defendant Rokosz.

216. As a condition of the loan, at least $6,600.00 of the loan proceeds were withheld as "escrow" as additional security for the loan, with Defendant Legum designated as the "escrow agent." As a condition of the loan, a $1,000.00 upfront "retainer" fee was paid by Mr. Hescott to Defendant Legum. Upon information and belief, as a condition of the loan, Defendant Legum also received additional proceeds directly from the loan in his personal capacity. As a condition of the loan, Defendant Telsey received at least $1,000.00 of the loan proceeds, an amount disbursed to Defendant Royce, and Fishbein also received proceeds from the loan in an amount disbursed to Jackie Marketing. Upon information and belief, neither Defendant Telsey nor Fishbein rendered any services enumerated by 3 NYCRR § 4.3(b) in connection with this loan.

217. Upon information and belief, Mr. Hescott did not make the $110,000.00 payment due on November 1, 2016, but was permitted to continue making minimum monthly interest payments of at least one percent of the loan balance until the balance was fully paid.

218. A satisfaction of the mortgage loan to Mr. Hescott, dated January 12, 2017, has been publicly recorded. Upon information and belief, none of the "escrow" funds held by Legum were made available to Mr. Hescott or otherwise used to his benefit, at least until Mr. Hescott satisfied his mortgage.

41

219. At least $6,600.00 of loan proceeds withheld as "escrow" controlled by Defendant Legum and the at least $1,000.00 in proceeds from the loan received by Defendant Telsey, through Defendant Royce, constituted interest on the loan. Under New York's usury laws, the interest rate for this loan was at least 19.66 percent.

## G. *225 Malcolm X Boulevard, Brooklyn, New York*

220. In 1986, Harold Walcott purchased 225 Malcom X Boulevard in Brooklyn, New York, as a family home, with a $12,000.00 mortgage. In 2005, during the subprime lending crisis, Mr. Walcott refinanced with a $262,500.00 mortgage.

221. Several years later, after falling behind on his mortgage payments due to unsteady work and inconsistent rental income, Mr. Walcott feared losing his home to foreclosure. Fishbein brought Mr. Walcott to the attention of Defendants Telsey, Legum, and Rokosz. Throughout the transaction, Fishbein communicated with Defendants Telsey and Legum on behalf of Mr. Walcott to arrange the deal, while Defendants Telsey and Legum communicated with Fishbein on behalf of themselves and as agents of Defendant Rokosz.

222. On December 15, 2015, Defendant Rokosz issued an $800,000.00 mortgage loan to Mr. Walcott, secured by a 3-family property with a store located at 225 Malcolm X Boulevard in Brooklyn, New York. The loan provided for a 359-day term, carried a nominal 12 percent annual interest rate, and required 12 interest-only payments of $8,000.00 with a final balloon payment of $800,000.00 due on December 9, 2016.

223. As a condition of the loan, $105,600.00 of the loan proceeds, representing the equivalent of 12 interest-only payments ($96,000.00), one year of property taxes ($6,600.00), and one year of property insurance payments ($3,600.00), were withheld as "escrow," with Defendant Legum designated as the "escrow agent," as additional security for the loan. As a condition of the

loan, Defendant Telsey received at least $1,000.00 of the loan proceeds, an amount disbursed to Defendant Royce; Fishbein received proceeds from the loan, in an amount disbursed to Jackie Marketing; and Defendant Legum received proceeds from the loan directly in his personal capacity. Mr Walcott was unaware that any loan proceeds were set aside for "escrow."

224. Throughout the life of the loan, Mr. Walcott's monthly interest-only mortgage payments were made payable directly to Defendant Legum and sent to his office. Mr. Walcott was unaware that Defendant Rokosz was the actual lender of the loan.

225. Mr. Walcott did not make the $800,000.00 payment due on December 9, 2016.

226. In or around March 2017, in order to avoid losing his home to Defendants Rokosz and Legum, Mr. Walcott refinanced again with the help of the same real estate broker who led him to Fishbein and Defendants Telsey, Legum, and Rokosz. Mr. Walcott borrowed $945,000.00 to pay off Defendants Rokosz and Legum, including the $105,000.00 of "escrow" funds that inflated the principal balance. The "escrow" funds held by Defendant Legum were never made available to Mr. Walcott or otherwise used for his benefit.

227. Mr. Walcott has defaulted on this subsequent mortgage loan and is now facing foreclosure.

228. The $105,600.00 in loan proceeds withheld as "escrow" controlled by Defendant Legum and the at least $1,000.00 in proceeds received by Defendant Telsey, through Defendant Royce, constituted interest on this loan. Under New York's usury laws, the interest rate for this loan was at least 31.39 percent.

### H. *66 Wilmington Drive, Melville, New York*

229. On May 10, 2016, Defendant Rokosz and Bergman issued a mortgage loan in the amount of $150,000.00 to Robert Erdely, Monica Erdely, and Mindy R. Bass, secured by a one-

to two-family residence located at 66 Wilmington Drive in Melville, New York. Upon information and belief, Mindy Bass resides at this residence. The loan provided for a two-year loan term, carried a nominal 12 percent annual interest rate, required all interest ($36,000.00) to be paid upfront, and required a final balloon payment of $150,000.00 on May 9, 2018.

230. Fishbein brought the Erdelys and Ms. Bass to the attention of Defendants Telsey, Legum, and Rokosz; and throughout the transaction, Fishbein communicated directly with the Erdelys and Ms. Bass, while Defendants Telsey and Legum communicated with Fishbein on behalf of themselves and as agents of Defendant Rokosz.

231. As a condition of the loan, at least $18,000.00 of the loan proceeds were withheld from the borrowers as "escrow" as additional security for the loan, with Defendant Legum acting as the "escrow agent." As a condition of the loan, Defendant Telsey received $2,500.00 of the loan proceeds, an amount disbursed to Defendant Royce; Fishbein received $3,000.00 of the proceeds, an amount disbursed to Jackie Marketing; and Defendant Legum received $1,750.00 of the loan proceeds in his personal capacity. Upon information and belief, neither Fishbein nor Telsey rendered any services enumerated under 3 NYCRR § 4.3(b) in connection with this loan.

232. No satisfaction of the mortgage loan issued to the Erdelys and Ms. Bass has been publicly recorded. Upon information and belief, the Erdelys and Ms. Bass did not make the $150,000.00 payment due on May 9, 2018, but they have been permitted to make monthly interest payments of at least one percent of the loan balance until the balance is paid in full.

233. On October 31, 2016, Defendant Telsey forwarded an email to Bergman and Defendant Rokosz from Robert Bass, the husband of Mindy Bass, which included proof that $0.00 was due and owing for property insurance on 66 Wilmington Drive.

234.     Upon information and belief, none of the $18,000.00 held as "escrow" by Defendant Legum has been made available to the Erdelys and/or Ms. Bass, or has otherwise been used to benefit them.

235.     Upon information and belief, the following consisted of interest on this loan: at least $18,000.00 of loan proceeds withheld as "escrow" controlled by Defendant Legum; the $2,500.00 in loan proceeds received by Defendant Telsey, through Defendant Royce; and the $3,000.00 in loan proceeds received by Fishbein, through Jackie Marketing.  Under New York's usury laws, the interest rate on this loan was at least 21.84 percent.

## I.  *26 Kossuth Place, Brooklyn, New York*

236.     At 11:57 a.m. on June 1, 2016, Defendant Telsey emailed Fishbein the projected numbers for three new deals regarding 138-37 228 Street, 2350 Pacific Street, and 26 Kossuth Place. Defendant Telsey indicated that 26 Kossuth Place was in Bushwick, but did not specify the location of the other addresses. Defendant Telsey stated that each deal would involve a 12 percent interest-only loan, 12 months of payments held as "escrow," and not less than a six-month prepayment penalty which would become a one-year prepayment penalty if the borrower went over six months before exiting the loan.  Defendant Telsey further stated that each transaction would involve putting the property into a newly formed limited liability company, but specified that the 138-37 228 Street and 26 Kossuth Place properties were, in actuality, being transferred to family members.  Defendant Telsey also estimated the principal of each loan.  At 12:04 p.m., Defendant Telsey forwarded this email to Defendant Rokosz, attaching lists of comparative properties and their values.

237.     On June 8, 2016, Defendant Telsey emailed Fishbein again about 26 Kossuth Place. He reminded Fishbein that they originally wanted $68,000.00 withheld as "escrow," $32,000.00

in proceeds to be disbursed to himself and Fishbein, and $27,000.00 in closing costs, based on an estimated $540,000.00 principal amount. However, because Defendant Rokosz wanted to limit the principal balance to $500,000.00, Defendant Telsey recommended restructuring the fees as follows: $60,000.00 withheld as "escrow," $30,000.00 in proceeds to be disbursed to Defendant Telsey and Fishbein, and $25,000.00 in closing costs.

238. On June 15, 2016, Fishbein emailed Defendant Legum, copying Defendant Telsey, informing them that the new corporation for Rosalyn Campbell was attached. Attached to this email were Articles of Incorporation for 26 Kossuth Place LLC, which were signed by Rosalyn Campbell as the Organizer and the LLC's agent. Ms. Campbell's address on this document is listed as 3180 Pine Valley Way, E Stroudsburg, Pennsylvania 18302. Also attached to the email was a filing receipt from the New York Department of State showing that the entity had been created the same day. Also attached was a notice from the U.S. Internal Revenue Service addressed to 26 Kossuth Place, Rosalyn Campbell as Sole Member, 3180 Pine Valley Way, E Stroudsburg, PA 18302, indicating that 26 Kossuth Place LLC had been assigned an employer identification number. Fishbein concluded his email by asking whether Defendant Legum required a survey of 26 Kossuth Place.

239. Two days later, on June 17, 2016, the one- to two-family residence located at 26 Kossuth Place in Brooklyn, New York, was deeded to 26 Kossuth Place LLC. The deed was signed as "26 Kossuth Place LLC by Rosalyn Campbell, Managing Member." Upon information and belief, Defendant Legum prepared this deed.

240. The same day, Defendant Rokosz and Bergman issued a $500,000.00 mortgage loan to 26 Kossuth Place. Defendant Rokosz and Bergman were represented in this transaction by Defendant Legum. The loan provided for a 356-day term, a nominal 12 percent annual interest

rate, and required 12 interest-only payments of $5,000.00 with a final balloon payment of $500,000.00 due on June 6, 2017.

241.   Fishbein brought Ms. Campbell to the attention of Defendants Telsey, Legum, and Rokosz, and Bergman. Throughout the transaction, Fishbein communicated directly with Ms. Campbell, while Defendant Telsey and Legum communicated with Fishbein on behalf of themselves and as agents of Defendant Rokosz and Bergman.

242.   As a condition of the loan, at least $63,400.00 of the loan proceeds were withheld as "escrow" as additional security for the loan, with Legum acting as the designated "escrow agent." As a condition of the loan, Rosalyn Campbell was required to personally guarantee the loan.  Also as a condition of the loan, an assignment of all stock and interest in 26 Kossuth Place LLC was placed in escrow, with Legum acting as the escrow agent.  The escrow agreement provided that all stock and interest in 26 Kossuth Place LLC may be released to Defendant Rokosz and Bergman if the borrower defaulted on the loan.  As a condition of the loan, Defendant Telsey received at least $1,000.00 of the loan proceeds, in an amount disbursed to Defendant Royce; Fishbein received proceeds from the loan, in an amount disbursed to Jackie Marketing; and Defendant Legum received proceeds from the loan in his personal capacity.

243.   Monthly payments on the loan were made via personal checks from the account of Rosalyn and Nigel Campbell, which listed the Campbells' address as 843 White Farm Drive, Hopkins, South Carolina 29061.  On September 14, 2016, 26 Kossuth Place was deeded from 26 Kossuth Place LLC to Rosalyn Campbell.

244.   The borrower did not make the $500,000.00 balloon payment due on June 6, 2017, but has been permitted to make monthly interest payments of at least one percent of the loan balance until the balance can be paid in full.  Rosalyn Campbell continues to make monthly

payments on the loan. Upon information and belief, none of the at least $63,400.00 held in "escrow" by Defendant Legum has been made available to Rosalyn Campbell or 26 Kossuth Place LLC or has otherwise been used to either's benefit.

245. The following consisted of interest on this loan: at least $63,400.00 in loan proceeds withheld as "escrow" and controlled by Defendant Legum; and at least $1,000.00 in proceeds received by Defendant Telsey, through Defendant Royce. Under New York's usury laws, the actual interest rate for this loan was at least 29.28 percent.

## J. *15 Oriole Way, Dix Hills, New York*

246. On August 11, 2016, Fishbein emailed Defendant Telsey regarding a woman named Ann and a property located at 15 Oriole Way in Dix Hills, New York. Fishbein stated that Ann needed $125,000, and that, as discussed, she would borrow $160,000 in order to pay off $25,000 in back taxes and $6,000 in credit card debt. Fishbein further stated that the loan would have a $25,000 personal reserve that had nothing to do with the lender's reserve, and that he and Defendant Telsey would each receive a $5,000 commission. Fishbein estimated that property taxes were $6,000 per year and that the property insurance was $1,500.

247. The next day, Defendant Telsey responded that the lender liked the deal. Four minutes later, Defendant Telsey emailed Defendant Rokosz regarding 15 Oriole Way, attaching a list of comparative properties and their values, and stating the terms of the loan, including: $170,000.00 principal balance; 12 percent interest; and one year of interest, taxes, and insurance held in "escrow."

248. On August 31, 2016, Fishbein forwarded an email to Defendant Telsey from Tristone Land Services, LLC ("Tristone"), a title company, indicating when Tristone expected to

complete the requested title report for 15 Oriole Way. Defendant Telsey responded, "Remember it has to be in an llc and it must be in good standing."

249. At 11:23 a.m. on September 21, 2016, a representative of Tristone emailed Fishbein to inform him that title to 15 Oriole Way was "clear to close." Fishbein immediately forwarded this email to Defendants Telsey and Legum, asking them to advise him if they needed anything else. Defendant Legum responded that he had not yet received a title report or particulars about the loan. After being sent a title report on the same email thread, Legum responded at 12:57 p.m. asking "Who is the owner/borrower? My clients will not lend to an individual. They will only lend to a corporation or llc."

250. At 5:33 p.m., Fishbein's agent, Christine Torelli, emailed a representative of Tristone, attaching documents related to a corporation created in 2007 called Lakwan Corp. which listed Ann Marie Rainford as the responsible party. Torelli requested that Tristone order a certificate of good standing for the corporation. At 5:34 p.m., Torelli emailed Defendants Legum and Telsey the same corporate documents, stating that the documents had been forwarded to the title company and that a letter of good standing had been ordered, which she would forward upon receipt.

251. At 5:38 p.m., Defendant Telsey separately replied to Defendant Legum, writing: "Izzy is lender[.] $170k[.] 1 yr prepay[.] 12% int only[.] In a Corp held by you[.] Makes monthly payments[.] Yr 2 full int, taex [*sic*] & ins held by you in escrow to be refunded if paid id [*sic*] no legal action (same format)."

252. At 9:32 p.m., a representative of Tristone responded to Torelli's email asking what purpose the certificate of good standing was for and why it was needed. At 9:35 p.m., Fishbein replied: "Lender's attorney wants it. Hard money deal [A]nn Rainford."

253.     The next day, on September 22, 2016, a Tristone representative emailed Fishbein and Torelli, informing them that Lakwan Corp. was inactive and that a certificate of good standing would not be issued.

254.     On October 4, 2016, Gently LLC, a limited liability corporation, was created by or on behalf of Ann Marie Rainford.

255.     Ms. Rainford was required by Defendants Rokosz, Legum, Telsey, and Royce, and Fishbein, to transfer title to the property to a corporate entity in order to receive a mortgage loan from Defendant Rokosz.

256.     On October 10, 2016, Ann Marie Rainford deeded the one-family residence located at 15 Oriole Way to Gently LLC for $10.00.   Upon information and belief, Defendant Legum prepared the deed.

257.     Also on October 10, 2016, Defendant Rokosz issued a $170,000.00 mortgage loan to Gently LLC, secured by the one-family residence located at 15 Oriole Way. Defendant Legum represented Defendant Rokosz in the transaction.  The closing documents were executed by Ann Marie Rainford as Managing Member of Gently LLC and were prepared by Defendant Legum. The loan provided for a one-year term, a nominal 12 percent annual interest rate, and interest-only monthly payments of $1,700.00 with a balloon payment of $170,000.00 due on October 9, 2017.

258.     Ms. Rainford has lived at 15 Oriole Way for almost 16 years.  The home has been in her husband's family since 1969.  Prior to taking out this mortgage loan from Defendant Rokosz, Ms. Rainford owned the home free and clear of any mortgage debt.

259.     Fishbein brought Ms. Rainford to the attention of Defendants Telsey, Legum, and Rokosz. Throughout the transaction, Fishbein communicated directly with Ms. Rainford, and

Defendants Telsey and Legum communicated with Fishbein on behalf of themselves and Defendant Rokosz.

260. As a condition of the loan, $35,300.00 of the loan proceeds were withheld as "escrow" as additional security for the loan, with Legum acting as the "escrow agent." Ms. Rainford was told that this money would be used to fund a lawsuit against her if she did not pay the loan back.

261. As a condition of the loan, Ms. Rainford was required to personally guarantee the loan. Also as a condition of the loan, an assignment of all stock and interest in Gently LLC was placed in escrow, with Legum as the designated escrow agent. The escrow agreement provides that all stock and interest in Gently LLC may be released to Defendant Rokosz if the borrower defaults on the loan. As a condition of the loan, Defendant Telsey received $5,000.00 of the loan proceeds, an amount disbursed to Defendant Royce; Fishbein received $5,000.00 of the loan proceeds, an amount disbursed to Jackie Marketing; and Defendant Legum received $2,500.00 of the loan proceeds in his personal capacity.

262. Ms. Rainford did not make the $170,000.00 payment due on October 9, 2017, but was permitted to continue making monthly interest payments of at least one percent of the balance until the balance is paid in full. Ms. Rainford fell behind on these forbearance payments last year and now owes approximately $200,000.00 on the loan. Just last month, Defendant Rokosz offered Ms. Rainford $150,000.00 for her home, which is worth approximately $545,000.00, in lieu of entering foreclosure.

263. None of the $35,300.00 held in "escrow" by Defendant Legum has been made available to Ann Marie Rainford or Gently LLC or has otherwise been used to either's benefit.

51

264. The $35,300.00 of loan proceeds withheld as "escrow" controlled by Defendant Legum; the $5,000.00 in proceeds received by Defendant Telsey, through Defendant Royce; and the $5,000.00 in proceeds received by Fishbein, through Jackie marketing, all constituted interest on this loan. Under New York's usury laws, the interest rate for this loan was at least 45.69 percent.

**Further Transactions Involving Defendants Rokosz, Legum, and Telsey**

265. On July 14, 2014, Defendant Rokosz issued a $150,000.00 mortgage loan to Tomar Hayim, secured by the property located at 1479 East 2nd Street in Brooklyn, New York. Defendant Legum acted as Defendant Rokosz's attorney in the transaction, and Defendant Telsey received proceeds from the loan. The loan was for a one-year-and-one-month term, carried a nominal 12 percent annual interest rate, and required monthly interest-only payments of $1,500.00 and a balloon payment of $150,000.00 on August 31, 2015. As of January 2020, no satisfaction for this mortgage has been publicly recorded.

266. On June 18, 2015, Defendant Rokosz issued a $310,000.00 mortgage loan to 561 Wyona Inc., secured by the one- to two-family property located at 561 Wyona Street in Brooklyn, New York. Defendant Legum acted as Defendant Rokosz's attorney in the transaction, and Defendant Telsey received $12,400.00 of the loan proceeds, through Defendant Royce. The loan was for a one-year-and-one-month term, carried a nominal 12 percent annual interest rate, and required a final balloon payment of $310,000.00 due on July 14, 2016. At the time the mortgage loan was issued, a truck driver who resided in North Carolina, Allan S. Jones, was the principal of 561 Wyona Street Inc. Upon information and belief, Mr. Jones has continued to reside in North Carolina since this mortgage was issued. A modification of the mortgage was publicly recorded on September 1, 2019, indicating that the principal owed as of that date was $226,800.00.

267. On August 18, 2015, Defendant Rokosz and Bergman issued a $250,000.00 mortgage loan to Mandel Miltz, secured by the one- to two-family property located at 1007 East 59th Street in Brooklyn, New York. Fishbein brought the borrower to the attention of Defendants Telsey, Legum, and Rokosz, and Bergman. Defendant Legum acted as Defendant Rokosz's attorney in the transaction. Defendant Telsey, through Defendant Royce, received at least $1,000.00 of the loan proceeds. The loan was for a one-year term, carried a 12 percent nominal interest rate, and provided for a balloon payment of $225,000.00 due on August 18, 2016.

268. When Defendant Telsey contacted Defendant Legum on September 10, 2015, regarding the 580 Linden Boulevard deal, *see infra*, ¶ 205, he also referenced a new hard money deal for Defendant Rokosz involving 1726 Stephen Street in Ridgewood, New York, with prospective loan terms that included a one-year loan term, nominal 12 percent annual interest, interest-only payments, and an "escrow" amount equivalent to one year of payments on the loan. Defendant Telsey informed Defendant Legum that he would pick up Defendant Legum's "retainer" for the deal and follow up with a bullet list of the commissions.

269. When Defendant Telsey contacted Defendant Legum on September 10, 2015, regarding the 580 Linden Boulevard and 1726 Stephen Street deals, *see infra*, ¶¶ 205, 260, he also informed Defendant Legum that he had called off a deal involving "Hollis" until further notice.

270. When Defendant Telsey emailed Fishbein the projected numbers for the transaction involving 26 Kossuth Place on June 1, 2016, *see infra*, ¶ 232, he also provided the projected numbers for two new deals involving 138-37 228 Street and 2350 Pacific Street. Defendant Telsey did not specify the location of these addresses. Defendant Telsey stated that both deals would involve a 12 percent interest-only loan, 12 months of payments held as "escrow," and not less than a six-month prepayment penalty, which would become a one-year prepayment penalty if the

borrower went over six months before exiting the loan. Defendant Telsey further stated that both transactions would involve putting the property into a newly formed LLC, but specified that the 138-37 228 Street property was, in actuality, being transferred to a family member. Defendant Telsey also estimated the prospective principal of each loan. Defendant Telsey then forwarded this email to Defendant Rokosz, attaching lists of comparable properties and their values.

271. On May 18, 2017, Defendant Rokosz issued a $270,000.00 mortgage loan to BKMP Ventures, Inc, secured by a two-family property located at 873 East 54th Street in Brooklyn, New York. The loan was for a one-year term, carried a 12 percent nominal interest rate, and required a balloon payment of $270,000.00 due on May 18, 2018. Defendant Telsey and Fishbein helped arrange the loan, and split $15,600.00 of the loan proceeds, disbursed to their respective entities, Defendant Royce and Jackie Marketing. An "escrow" amount of $42,200.00 was set aside. BKMP Ventures, Inc. was created on May 2, 2017, only 16 days before the loan closing.

272. On August 21, 2017, Defendant Rokosz and Bravo Fund LLC issued a $350,000.00 mortgage loan to Mackenzie Real Esate LLC, secured by a one- to two-family property located at 116 Mackenzie Street in Brooklyn, New York. The loan was for a one-year term, carried a 12 percent nominal interest rate, and required a balloon payment of $350,000.00 due on August 20, 2018. Defendant Legum acted as Defendant Rokosz's attorney for the transaction. In addition to $3,500.00 in loan proceeds that were presumably disbursed to Defendant Legum for his legal fees, Defendant Legum also directed $1,050.00 of the loan proceeds to himself for creating the LLC. Mackenzie Real Estate LLC was created on August 18, 2017, only three days before the loan closing.

273. On June 8, 2018, Defendant Rokosz issued a $300,000.00 mortgage loan to Pretty Woman Universe, LLC, Trustee for the RNGNAB Revocable Trust, secured by a condominium unit and parking space located at 412 Kings Highway, Unit 8B, in Brooklyn, New York. The loan was for a one-year term, carried a 12 percent nominal interest rate, and required a balloon payment of $300,000.00 due on June 6, 2019. Defendant Legum acted as Defendant Rokosz's attorney for the transaction. Pretty Woman Universe, LLC, was created on May 22, 2018, only 17 days before the loan closing.

274. On April 9, 2019, Defendant Rokosz and Bergman issued a $250,000.00 mortgage loan to 2027 East 68 LLC, secured by a two-family property located at 2027 East 68th Street in Brooklyn, New York. The loan was for a one-year term, carried a 12 percent nominal interest rate, and required a balloon payment of $250,000.00 due on April 8, 2020. Defendant Legum acted as Defendant Rokosz's attorney for the transaction. 2027 East 68 LLC was created on April 2, 2019, only seven days before the loan closing.

**FIRST CLAIM FOR RELIEF**
(TILA)
(Against Defendant Rokosz)

275. Plaintiff restates, realleges, and incorporates by reference all foregoing paragraphs as if fully set forth herein.

276. The Truth in Lending Act ("TILA") requires creditors to provide disclosures about the cost of credit in covered transactions. The right of rescission may apply if a creditor fails to provide such disclosures.

277. The Subject Loan transaction is subject to TILA. Because Defendant Rokosz did not provide the disclosures required under TILA, Ms. Barker has a statutory right to rescind the Subject Loan and is entitled to recover actual and statutory damages.

278. TILA's disclosure requirements apply to creditors in consumer credit transactions. *See* 15 U.S.C. § 1638.

279. A creditor refers to a person who both: (1) regularly extends consumer credit payable by agreement in more than four installments or for which the payment of a finance charge is or may be required; and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness. 15 U.S.C. § 1602(g). A creditor also refers to any person who originates two or more mortgages considered "high-cost mortgages," as defined by TILA, in any 12-month period. 15 U.S.C. § 1602(g).

280. A consumer credit transaction is one in which the party to whom credit is offered or extended is a natural person and the money or property which are the subject of the transaction are primarily for personal, family, or household purposes. 15 U.S.C. § 1602(i).

281. If TILA applies, the creditor must provide a series of disclosures meant to inform the borrower of the cost of credit for the transaction, including the following terms, among others: the identity of the creditor, amount financed, finance charge, finance charge expressed as an annual percentage rate, total of payments, payment schedule, amount of late fees, and other statements of the borrower's rights. 15 U.S.C. § 1638(a). Such disclosures must be made before the credit is extended. 15 U.S.C. § 1638(b).

282. Under TILA, the creditor must also provide the borrower, prior to closing, two copies of a notice of her right to rescind the loan contract, which are "clearly and conspicuously in writing, in a form that the consumer may keep." 12 C.F.R. § 1026.17(a)(1); *accord* 15 U.S.C. § 1635(a); 12 C.F.R. § 1026.15(b).

283. If, as a result of the consumer credit transaction, a security interest is or will be retained or acquired in the principal dwelling of the person to whom credit is extended, the

consumer shall have the right to rescind the loan for a certain period of time after the creditor makes the required disclosures. 15 U.S.C. § 1635(a). In the event the creditor fails to comply with TILA's disclosure and notice requirements, a borrower is entitled to rescind a transaction up to three years after the date of consummation of the transaction. 15 U.S.C. § 1635(f).

284. At all relevant times, Defendant Rokosz, in the ordinary course of his business: (1) regularly extends consumer credit payable by agreement in more than four installments; and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable to. 15 U.S.C. § 1602(g). Defendant Rokosz has also originated two or more "high-cost mortgages" in any 12-month period. *Id.* Defendant Rokosz is therefore a "creditor" within the meaning of TILA.

285. At all relevant times, J&M Holdings was a mere sham corporation that one or more Defendants designed to evade consumer protection statutes. The true borrower and purported guarantor for J&M Holdings is Ms. Barker, a natural person. Defendant Rokosz's bad faith attempt to subvert the protections of TILA should be rejected and Ms. Barker, a natural person, should be deemed the true borrower. *See* 12 C.F.R. § 1026.34(b). Because the extension of credit was, for all intents and purposes, extended to a "natural person," the loan must be considered a "consumer credit transaction" within the meaning of TILA and subject to its protections. *See* 15 U.S.C. § 1602(i).

286. Defendant Rokosz did not provide Ms. Barker with any disclosures before the credit transactions took place. 15 U.S.C. § 1638(b)(1). Ms. Barker did not otherwise waive or modify the timing requirements for the disclosures. 15 U.S.C. § 1638(b)(2)(F).

287. The itemization of disbursement proceeds later provided to Ms. Barker included a number of loan proceeds which were not directly distributed to Ms. Barker, were not paid entirely

to satisfy Ms. Barker's prior debts, were not fees or charges properly excluded from the finance charge pursuant to Regulation Z, 12 C.F.R. § 1026.4(c), and were not paid to third parties for purposes that were defined or communicated to Ms. Barker. Defendant Rokosz thus inaccurately disclosed the amount financed, the APR, and the finance charges related to Ms. Barker's mortgage transaction.

288. As a result of the foregoing, Defendant Rokosz failed to provide Ms. Barker with any required disclosures and notices in the manner and time prescribed by TILA. 15 U.S.C. § 1638. The contents of the untimely itemization of disbursement proceeds that Defendant Hurley eventually provided to Ms. Barker after the closing also substantively violated TILA in various ways, including but not limited to, by:

    a. failing to properly and accurately disclose the "amount financed," and thereby violating 15 U.S.C. § 1638(a)(2) and 12 C.F.R. § 1026.18(b);

    b. failing to properly and accurately disclose the "finance charge," and thereby violating 15 U.S.C. § 1638(a)(3) and 12 C.F.R. §§ 1026.18(d) and 1026.4; and

    c. failing to properly and accurately disclose the "annual percentage rate," and thereby violating 15 U.S.C. § 1638(a)(4) and 12 C.F.R. § 1026.18(e).

289. Defendant Rokosz also failed to provide two notices to Ms. Barker regarding her right to rescind the loan contract, in the time and manner required by TILA. 15 U.S.C. § 1635(a); 12 C.F.R. §§ 1026.15(b) and 1026.17(a)(1).

290. Because the Subject Loan created a security interest in Ms. Barker's principal dwelling, the Subject Loan is subject to rescission under TILA. 15 U.S.C. § 1635(a).

291. The first closing date of Ms. Barker's loan was February 6, 2017. Because Defendant Rokosz has failed to provide the required notices and disclosures, Ms. Barker may

exercise her right to rescind the transaction up until and including at least February 5, 2020. 15 U.S.C. § 1635(f); 12 C.F.R. § 1026.23(a)(3)(i).

292. On January 25, 2019, Ms. Barker initiated the instant lawsuit, thereby exercising her right to rescind the Subject Loan transaction.

293. As a result of the foregoing, Ms. Barker has a statutory right to rescind the Subject Loan pursuant to 15 U.S.C. § 1635 and 12 C.F.R. § 1026.23. Ms. Barker therefore requests that this Court enter judgment in her favor and against Defendant Rokosz, by:

    a. ordering the rescission of Ms. Barker's Subject Loan;

    b. ordering Defendant Rokosz to return to Ms. Barker any finance charges and fees paid in connection with Ms. Barker's Subject Loan;

    c. ordering Defendant Rokosz to terminate any security interest in the Subject Property created as a result of the mortgage Subject Loan described herein;

    d. declaring any security interest in the Subject Property created as a result of the Subject Loan described herein as null and void; and

    e. ordering that Defendant Rokosz pay to Ms. Barker the costs of this action, together with reasonable attorney's fees as determined by this Court.

**SECOND CLAIM FOR RELIEF**
(HOEPA)
(Against Defendant Rokosz)

294. Plaintiff restates, realleges, and incorporates by reference all foregoing paragraphs as if fully set forth herein.

295. The Home Ownership and Equity Protection Act ("HOEPA") is an amendment to TILA, designed to address abusive practices in refinances and home equity loans with high interest rates or high fees.

59

296. When a TILA creditor extends a "high-cost mortgage" within the meaning of HOEPA, it is subject to additional disclosure requirements and loan term restrictions. *See* 15 U.S.C. § 1639.

297. The Subject Loan is a "high-cost mortgage" subject to HOEPA. Because Defendant Rokosz did not provide the disclosures or comply with the loan term restrictions required under HOEPA, Ms. Barker has a statutory right to rescind the Subject Loan and is entitled to recover actual and statutory damages.

298. A mortgage loan may be considered a "high-cost mortgage" if it is a first mortgage on the consumer's principal dwelling with an annual percentage rate ("APR") that exceeds, by more than 6.5 percentage points, the average prime offer rate ("APOR"). *See* 15 U.S.C. § 1602(bb)(1)(A)(i)(I); 12 C.F.R. § 1026.32(a)(1)(i).

299. The APOR is the average prime offer rate for a comparable transaction as of the date on which interest for the transaction is set, as published by the Federal Financial Institutions Examination Council ("FFIEC") on behalf of the Consumer Financial Protection Bureau ("CFPB"). *See* 15 U.S.C. § 1639c(b)(2)(B); 12 C.F.R. § 1026.35(a)(2).

300. The APR is the annual percentage rate which will yield a sum equal to the amount of the finance charge when it is applied to the unpaid balances of the amount financed, calculated according to the actuarial method of allocating payments made on a debt between the amount financed and the amount of the finance charge. 15 U.S.C. § 1606(a).

301. A finance charge is the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit. 15 U.S.C. § 1605(a); 12 C.F.R. § 1026.4.

302. Fees charged by a closing agent are finance charges if a lender requires the closing agent's services to close the loan. 12 C.F.R. § 1026.4(a)(2).

303. Fees charged by a mortgage broker (including fees paid by the consumer directly to the broker or to the creditor for delivery to the broker) are finance charges even if the creditor does not require the consumer to use a mortgage broker or even if the creditor does not retain any portion of the charge. 12 C.F.R. § 1026.4(a)(3).

304. If a loan is considered a "high-cost mortgage" within the meaning of HOEPA, it is subject to additional substantive protections, including but not limited to: high-cost mortgage disclosures, prohibition on prepayment penalties, prohibition on balloon payments, underwriting requirements in consideration of ability to repay, protections in home improvement contracts, prohibition against financing of points and fees, and loan counseling requirements. 15 U.S.C. § 1639.

305. A creditor that fails to comply with the high-cost mortgage requirements of HOEPA may be liable for actual damages, statutory damages of up to $4,000, additional statutory damages amounting to the sum of all finance charges and fees paid by the consumer, and reasonable costs and attorney's fees. 15 U.S.C. § 1640(a). Violations of HOEPA are subject to a three-year statute of limitations beginning on the date of the occurrence of the violation. 15 U.S.C. § 1640(e).

306. The Subject Loan is a "high-cost mortgage" within the meaning of HOEPA, in that it is a first mortgage on Ms. Barker's principal dwelling, with an APR that exceeds the APOR by more than 6.5 percentage points. *See* 15 U.S.C. § 1602(bb)(1)(A)(i)(I); 12 C.F.R. § 1026.32(a)(1)(i).

307. The "Average Prime Offer Rates Tables" are publicly available on the FFIEC's website at https://www.ffiec.gov/ratespread/aportables.htm. The APOR for a one-year loan term on February 6, 2017 was 3.52 percent.

308. The Subject Loan included roughly $89,052.10 in upfront finance charges, consisting of the following charges paid directly or indirectly as an incident to the extension of credit: (a) $60,192.68 retained in escrow as a premium or other charge for a guarantee protecting the creditor against the obligor's default; (b) $23,640.00 in broker fees; (c) $1,350.00 in closing agent fees as required by the creditor; (d) $1,193.42 to the creditor as an upfront interest charge; (e) $1,125.00 paid to cover the lender's tax liability; and (f) $1,551.00 in service fees and recording fee overages charged by the title company. *See* 15 U.S.C. § 1605(a); 12 C.F.R. § 1026.4(a).

309. After deducting upfront finance charges from the $450,000.00 amount borrowed, the amount financed is $360,947.90. Of this total, $274,694.32 was disbursed on February 6, 2017, and $86,253.58 was disbursed on February 16, 2017.

310. With a disclosed annual interest rate of 12 percent, and interest-only monthly payments for a 12-month term, the Subject Loan's payment schedule required the following:

 a. Twelve interest-only installments of $4,500.00 due on the seventeenth of each month beginning on March 17, 2017 and ending on February 17, 2018;

 b. One payment of $10,000.00 due on February 26, 2017 under the Promissory Note made in favor of Fishbein and Defendant Telsey; and

 c. One payment for the entire principal balance of $450,000.00 due on February 17, 2018.

311. With the above-described disbursement and payment schedule, the resulting APR of the Subject Loan is at least 37.87 percent for purposes of TILA.

312. In addition to the above-described finance charges, Plaintiff was also charged excessive amounts of attorney's fees payable to Defendant Legum. Defendant Legum was paid $6,500 for the transaction. This payment exceeds a reasonable attorney fee for the document preparation required.

313. The APR easily exceeds the 3.52 percent APOR by more than 6.5 percentage points. Even the nominal stated interest rate of the Subject Loan—12 percent—exceeds the APOR by more than 6.5 percentage points. The Subject Loan is therefore a "high-cost mortgage" within the meaning of HOEPA and is subject to its additional protections. *See* 15 U.S.C. § 1602(bb)(1)(A)(i)(I); 12 C.F.R. § 1026.32(a)(1)(i).

314. Upon information and belief, the terms of the Subject Loan violated HOEPA's additional protections in the following ways, including but not limited to:

    a. failing to provide specific disclosures in conspicuous type size not less than three business days prior to consummation of the transaction in violation of 15 U.S.C. §§ 1639(a), 1639(b);

    b. prohibiting prepayment any time before six months from origination in violation of 15 U.S.C. § 1639(c);

    c. providing for a scheduled payment that is more than twice as large as the average of earlier scheduled payments, by requiring the entire loan balance to become due after one year of interest-only payments in violation of 15 U.S.C. § 1639(e);

    d. extending credit to Ms. Barker without regard to her repayment ability in violation of 15 U.S.C. § 1639(h);

e. making a payment directly to a contractor under a home improvement contract from amounts extended in the Subject Loan, with no written agreement signed by the consumer in violation of 15 U.S.C. § 1639(i);

f. directly or indirectly financing, in connection with the Subject Loan, points and fees in violation of 15 U.S.C. § 1639(m); and

g. failing to obtain a certificate of loan counseling from a counselor approved by the Secretary of Housing and Urban Development pursuant to 15 U.S.C. § 1639(u).

315. As a result of the above-described violations of HOEPA and TILA, Ms. Barker has a statutory right to rescind the Subject Loan with Defendant Rokosz pursuant to 15 U.S.C. § 1635 and 12 C.F.R. § 1026.23.

316. As a result of the above-described violations of HOEPA, Defendant Rokosz is liable for actual damages sustained by Ms. Barker, statutory damages of up to $4,000, additional statutory damages for HOEPA violations amounting to the sum of all finance charges and fees paid by Ms. Barker, and reasonable costs and attorney's fees for this action. 15 U.S.C. §§ 1640(a)(1), (a)(2)(A)(iv), (a)(3) and (a)(4).

317. Accordingly, Ms. Barker requests that this Court enter judgment in her favor and against Defendant Rokosz, by:

a. ordering the rescission of Ms. Barker's loan transactions;

b. ordering Defendant Rokosz to return to Ms. Barker any finance charges and fees paid in connection with Ms. Barker's loan transactions;

c. ordering Defendant Rokosz to terminate any security interest in the Subject Property created as a result of the mortgage loan transactions described herein;

64

d. declaring any security interest in the Subject Property created as a result of the mortgage loan transactions described herein as null and void; and

e. ordering that Defendant Rokosz pay the following damages to Ms. Barker:

i. actual damages sustained as a result of Defendant Rokosz's violations of 15 U.S.C. §§ 1635 and 1639;

ii. statutory damages as described in 15 U.S.C. § 1640(a);

iii. the costs of this action, together with reasonable attorney's fees as determined by this Court; and

iv. additional enhanced damages in an amount equal to the sum of all finance charges and fees paid by Ms. Barker.

**THIRD CLAIM FOR RELIEF**
(New York Banking Law § 6-*l*)
(Against Defendant Rokosz)

318. Plaintiff restates, realleges, and incorporates by reference all foregoing paragraphs as if fully set forth herein.

319. Like TILA and HOEPA, the New York Banking Law ("NY Banking Law") limits and prohibits certain practices with regard to "high-cost home loans." N.Y. Banking Law § 6-*l*. Defendant Rokosz engaged in practices prohibited by Section 6-*l* in connection with the Subject Loan.

320. NY Banking Law applies to "home loans," which are defined as loans in which: (a) the principal amount does not exceed the conforming loan size limit for comparable dwellings as established by the Federal National Mortgage Association; (2) the borrower is a natural person; (3) the debt is incurred by the borrower primarily for personal, family, or household purposes; and

(4) the loan is secured by a mortgage or deed of trust on the borrower's one-to-four family principal dwelling in New York. N.Y. Banking Law § 6-*l*(1)(e).

321. A home loan is a "high-cost home loan" within the meaning of the NY Banking Law if it is a home loan with an APR that exceeds eight percentage points over the yield on treasury securities having comparable periods of maturity. N.Y. Banking Law §§ 6-*l*(1)(d), (g).

322. For purposes of determining APR, New York expressly adopts the federal TILA's definition and calculation guidance. N.Y. Banking Law § 6-*l*(1)(b).

323. A high-cost home loan is subject to the following substantive limitations: no balloon payments; no negative amortization; no increased interest rate; no limitation on advance payments; no lending without regard to repayment ability; and no lending without counseling disclosure. N.Y. Banking Law § 6-*l*(2).

324. The statute of limitations for actions under section 6-*l* is six years from origination of the high-cost home loan. N.Y. Banking Law § 6-*l*(6).

325. The Subject Loan is a "high-cost home loan" within the meaning of the NY Banking Law because it is a "home loan" with terms that exceed a high-cost threshold. N.Y. Banking Law § 6-*l*(1)(d).

326. It is a first lien "home loan" made to a natural person for personal purposes, secured by Ms. Barker's one-to-four family principal residence in the State of New York. N.Y. Banking Law § 6-*l*(1)(e).

327. At all relevant times, J&M Holdings was a mere sham corporation that Defendant Rokosz created to evade consumer protection statutes. The true borrower and purported guarantor for J&M Holdings is Ms. Barker, a natural person. Thus, the loan was, for all intent and purposes, extended to a "natural person" within the meaning of the NY Banking Law. N.Y. Banking Law §

6-*l*(1)(e)(ii). Defendant Rokosz's bad faith attempt to subvert the protections of New York Banking Law Section 6-*l* should be rejected and Ms. Barker, a natural person, should be deemed the true borrower. *See* N.Y. Banking Law § 6-*l*(3) (statute applies "to any person who in bad faith attempts to avoid the application of this section by any subterfuge"). Because the loan was made to a natural person, for personal purposes, and secured by a two-family principal dwelling in the State of New York, it must be considered a "home loan" within the meaning of the NY Banking Law and subject to its protections. *See* N.Y. Banking Law § 6-*l*(1)(e).

328. Furthermore, the Subject Loan exceeds the APR high-cost threshold. The APR exceeds the yield on Treasury securities with a comparable maturity by more than eight percentage points. N.Y. Banking Law §§ 6-*l*(1)(d), (g).

329. In the month including and preceding the Subject Loan origination, the yield on a one-year Treasury security did not rise above 0.89 percent. The APR threshold is thus no higher than nine percent.

330. Because the NY Banking Law adopts the federal TILA's definition and calculation for APR, the APR of the Subject Loan is at least 37.87 percent and clearly exceeds the relevant nine percent APR threshold for a "high-cost home loan." Even the nominal stated interest rate of 12 percent exceeds the APR threshold.

331. The terms of the Subject Loan violated multiple NY Banking Law § 6-*l* protections on high-cost home loans, including but not limited to:

    a. providing for a scheduled payment that is more than twice as large as the average of earlier scheduled payments by requiring the entire loan balance to become due after one year of interest-only payments in violation of N.Y. Banking Law § 6-*l*(2)(b);

b. providing a provision that increases the interest rate after default to "the maximum rate permitted by law" in violation of N.Y. Banking Law § 6-*l*(2)(d);

c. extending credit to Ms. Barker without regard to her repayment ability in violation of N.Y. Banking Law § 6-*l*(2)(k);

d. failing to provide a list of counselors in violation of N.Y. Banking Law § 6-*l*(2)(l)(i);

e. failing to provide a mandated notice no fewer than 10 days before closing in violation of N.Y. Banking Law § 6-*l*(2)(l)(ii);

f. directly or indirectly financing, in connection with the Subject Loan, points and fees in an amount exceeding three percent of the principal amount of the loan in violation of N.Y. Banking Law § 6-*l*(2)(m);

g. making a payment to a contractor under a home improvement contract from proceeds of the Subject Loan, with no written agreement signed by the borrower in violation of N.Y. Banking Law § 6-*l*(2)(n);

h. failing to disclose the approximate amount due for property taxes and hazard insurance in violation of N.Y. Banking Law § 6-*l*(2)(u); and

i. failing to state that the Subject Loan is a high-cost home loan subject to NY Banking Law protections in violation of N.Y. Banking Law § 6-*l*(2-a)(a).

332. Defendant Rokosz attempted to evade NY Banking Law § 6-*l* by forcing Ms. Barker to take out the Subject Loan through a sham corporation. This conduct evinces Defendant Rokosz's intentional violation of NY Banking Law § 6-*l*.

333. Ms. Barker's claims under New York Banking Law § 6-*l* are timely raised within six years of origination of the Subject Loan in February 2017. N.Y. Banking Law § 6-*l*(6).

334.     As a result of the above-described violations of NY Banking Law § 6-*l*, Defendant Rokosz is liable for actual damages sustained by Ms. Barker, statutory damages, reasonable costs and attorney's fees, and injunctive and such other equitable relief as deemed appropriate by this Court.  N.Y. Banking Law §§ 6-*l*(7)-(9).  Because of Defendant Rokosz's intentional violation of the statute, the Subject Loan must be rendered void and Defendant Rokosz shall have no right to collect, receive, or retain any principal, interest or other charges with respect to the Subject Loan, and must return any payments Ms. Barker has made under the loan agreement.  N.Y. Banking Law § 6-*l*(10).  The Subject Loan is further subject to rescission.  N.Y. Banking Law § 6-*l*(11).

335.     Accordingly, Ms. Barker requests that this Court enter judgment in her favor and against Defendant Rokosz, by:

  a.  ordering the rescission of Ms. Barker's Subject Loan;

  b.  declaring the Subject Loan void;

  c.  declaring that Defendant Rokosz has no right to collect, receive, or retain any principal, interest, or other charges with respect to the Subject Loan;

  d.  ordering Defendant Rokosz to return to Ms. Barker any payments made in connection with the Subject Loan;

  e.  declaring any security interest in the Subject Property created as a result of the mortgage loan transactions described herein as null and void;

  f.  ordering that Defendant Rokosz pay the following damages to Ms. Barker:

      i.  actual damages sustained as a result of Defendant Rokosz's violations of N.Y. Banking Law § 6-*l*;

      ii. statutory damages pursuant to N.Y. Banking Law § 6-*l*(7)(b);

iii. the costs of this action, together with reasonable attorney's fees as determined by this Court;

g. granting such other equitable relief as this Court deems just and appropriate.

## FOURTH CLAIM FOR RELIEF
(Usury)
(Against Defendant Rokosz)

336. Plaintiff restates, realleges, and incorporates by reference all foregoing paragraphs as if fully set forth herein.

337. In New York, loan contracts exceeding a rate of 16 percent are deemed usurious and void. N.Y. Gen. Oblig. Law §§ 5-501, 5-511; N.Y. Banking Law § 14-a.

338. The interest rate of the Subject Loan exceeded 16 percent and is, therefore, void *ab initio*.

339. Like TILA, the rate of interest pursuant to New York law is the annual percentage rate yielding a sum equal to the amount of "interest," when applied to the unpaid balances of the amount financed, calculated according to the actuarial method. 3 NYCRR § 4.4.

340. "Interest" is defined as origination fees, points and other discounts, and all other amounts paid or payable, directly or indirectly, by any person, to or for the account of the lender in consideration for making the loan or forbearance. 3 NYCRR § 4.2(a). Thus, New York's definition of "interest" also tracks federal TILA's definition of "finance charge." *See* 15 U.S.C. § 1605(a) ("all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit.").

341. New York's usury remedies may be limited where a lender is a savings bank, a savings and loan association, or a federal savings and loan association. N.Y. Gen. Oblig. Law § 5-511. New York's usury limits also do not apply to loans of $250,000 or more, unless the loan is

secured primarily by an interest in real property improved by a one- or two-family residence. N.Y. Gen. Oblig. § 5-501(6)(a).

342. At all relevant times, Defendant Rokosz was not a savings bank, a savings and loan association, or a federal savings and loan association. N.Y. Gen. Oblig. Law § 5-511.

343. At all relevant times, the Subject Loan was secured by an interest in real property improved by a two-family residence. N.Y. Gen. Oblig. § 5-501(6)(a).

344. Accordingly, New York's prohibition against usurious rates applies to Defendant Rokosz and the Subject Loan.

345. Defendant Rokosz charged an annual percentage rate of at least 37.87 percent, exceeding the usury threshold of 16 percent.

346. Accordingly, Ms. Barker requests that this Court enter judgment in her favor and against Defendant Rokosz, by:

    a. declaring the Subject Loan void; and

    b. declaring that Defendant Rokosz has no right to collect, receive, or retain any principal, interest, or other charges with respect to the Subject Loan.

**FIFTH CLAIM FOR RELIEF**
(New York General Business Law § 349)
(Against Defendants Rokosz, Legum, Telsey, and Royce LLC)

347. Plaintiff restates, realleges, and incorporates by reference all foregoing paragraphs as if fully set forth herein.

348. New York prohibits "[d]eceptive acts, or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349(a).

71

349. Any person "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions." N.Y. Gen. Bus. Law § 349(h).

350. Defendants Rokosz, Legum, Telsey and Royce (hereinafter collectively referred to as the "GBL Lender Defendants") violated section 349 of the New York General Business Law by using deceptive acts and practices in the conduct of their businesses. Accordingly, Ms. Barker is entitled to enjoin such acts and practices and to recover her actual damages.

351. The GBL Lender Defendants' conduct is consumer-oriented within the meaning of GBL § 349.

352. Before the events set forth in this Complaint took place, Plaintiff had no prior relationship with any of the GBL Lender Defendants, who treated her like any other distressed homeowner.

353. Since 2012, Defendant Rokosz has issued at least 26 other mortgage loans with terms similar to the Subject Loan, including nominal 12 to 14 percent annual interest rates, interest-only payments, and 356-day to three-year terms ("Other Mortgage Loans"). At least 19 of these Other Mortgage Loans were to consumers with whom Defendant Rokosz had no prior relationship.

354. Defendant Legum served as Defendant Rokosz's attorney in at least 22 of the Other Mortgage Loans. In addition to preparing the closing documents, Defendant Legum also, *inter alia*, requested and reviewed title reports and retained "escrow funds" that were set aside from the loan disbursements.

355. Defendants Telsey and Royce helped arrange at least 14 of these Other Mortgage Loans. Defendant Telsey found some prospective borrowers for Defendant Rokosz and recruited Robert Fishbein to help pick up deals. Defendant Telsey acted as a conduit between the

prospective borrowers, either directly or through Fishbein, and Defendants Rokosz and Legum to ensure a deal would close.

356. Defendant Telsey, together with Defendant Rokosz, also assessed the value of the secured properties in these Other Mortgage Loans in person.

357. Defendant Royce, the corporate alter ego for Defendant Telsey, accepted loan disbursements.

358. Defendants Legum, Telsey, and Royce were instrumental to Defendant Rokosz's ability to issue the at least 13 Other Mortgage Loans in which they were all involved.

359. At least six of the Other Mortgage Loans were made to LLCs or similar entities rather than individual persons. In each of these transactions, the LLC was organized within two to 17 days of the loan closing with Defendant Rokosz.

360. On at least two occasions, Defendants Telsey and Legum worked with Fishbein to have the prospective natural person borrower establish a sham business entity to act as a corporate borrower.

361. Most of the Other Mortgage Loans were secured by one-to-four family properties.

362. Less than a handful of the Other Mortgage Loans were purchase mortgages.

363. Generally, the sole criteria for issuing the Other Mortgage Loans was a low loan-to-value ratio. The GBL Lender Defendants did not request or review the financials of any of these borrowers, or otherwise assess their ability to repay the loans.

364. Most if not all of the Other Mortgage Loans were usurious.

365. The GBL Lender Defendants' wrongful and deceptive acts have caused injury and damages to Ms. Barker and unless enjoined, will cause further irreparable injury.

366. The GBL Lender Defendants' violations include, but are not limited to:

73

a. inducing Ms. Barker to transfer title to a sham corporation and misrepresenting her ability to retain control of the corporation and title to her home;

b. deceptively requiring Ms. Barker to transfer title to a sham corporation to borrow a hard money loan in order to evade consumer protection laws;

c. misleading Ms. Barker to believe that a sum of the principal balance would be retained in "escrow" to be utilized in the event of default on taxes, insurance, or interest payments, when in fact the "escrow funds" were never used for this purpose, even after Ms. Barker specifically requested that the "escrow funds" be used for their stated purpose;

d. deceptively utilizing "escrow funds" to inflate the principal balance of the loan, inflate the interest-only monthly mortgage payments, and inflate the balloon payment due at the end of the loan term, thereby charging interest and demanding repayment for amounts that are not actually loaned to the borrower;

e. deceptively utilizing "escrow funds" and other hidden finance charges to hide the true interest rate of the loan, totaling 37.87 percent, which rendered the Subject Loan usurious;

f. deceptively requiring Ms. Barker to assign all rights and interests in the sham corporation to Defendant Rokosz, thereby transferring all interest in the Subject Property to Defendant Rokosz, without consideration;

g. fraudulently attempting to collect on the Subject Loan, even though it was usurious and therefore uncollectable as void *ab initio*;

h. using fraudulent, deceptive, and misleading loan documents and agreements to strip Ms. Barker's home of equity;

i. using fraudulent, deceptive, and misleading agreements to obtain title to Ms. Barker's property; and

j. deceptively commencing two New York summary eviction proceedings against Ms. Barker to obtain possession of the Subject Property, instead of pursuing a foreclosure action, and having to comply with robust judicially imposed consumer protections for homeowners.

367. As a direct and proximate result of the GBL Lender Defendants' violations of section 349 of the New York General Business Law, Ms. Barker has suffered compensable harm, including emotional distress.

368. Accordingly, Ms. Barker requests that this Court enter judgment in her favor and against Defendants Rokosz, Legum, Telsey and Royce, by:

a. ordering preliminary and permanent injunctive relief, prohibiting each GBL Lender Defendant from continuing to engage in the fraudulent and deceptive acts alleged herein;

b. ordering each GBL Lender Defendant to pay the following damages to Ms. Barker:

i. compensatory and treble damages in an amount to be determined by this Court; and

ii. the costs of this action, together with reasonable attorney's fees as determined by this Court.

**SIXTH CLAIM FOR RELIEF**
(New York General Business Law § 349)
(Against Defendants Defreitas and Lockdeco)

369. Plaintiff restates, realleges, and incorporates by reference all foregoing paragraphs as if fully set forth herein.

370. New York prohibits "[d]eceptive acts, or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349(a).

371. Any person "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions." N.Y. Gen. Bus. Law § 349(h).

372. Defendants Defreitas and Lockdeco violated section 349 of the New York General Business Law by using deceptive acts and practices in the conduct of their businesses. Accordingly, Ms. Barker is entitled to enjoin such acts and practices and to recover actual damages.

373. Defendants Defreitas's and Lockdeco's conduct is consumer-oriented within the meaning of GBL § 349.

374. Defendant Lockdeco represents that it is a licensed contractor, but it is not in fact licensed by the New York City Department of Consumer Affairs as a home improvement contractor.

375. Upon information and belief, Defendant Lockdeco is an entity doing business in the State of New York, but is not registered with the New York State Department of State. Before the events set forth in this Complaint took place, Ms. Barker had no prior relationship with Defendant Lockdeco, who treated her as any other consumer.

376. Defendant Defreitas was arrested and indicted for a complex residential mortgage fraud scheme, among other charges, in connection with incidents from 2012 to 2015. As a result of the scheme, Defendant Defreitas acquired title to multiple properties in Brooklyn and Queens. Before the events set forth in this Complaint took place, Ms. Barker had no prior relationship with Defendant Defreitas, who treated her as any other consumer.

76

377. Of the $92,557.37 of purported construction funds from the Subject Loan, $50,451.36 was diverted to Defendant Defreitas. Upon information and belief, Defendant Lockdeco retained the remaining sum of $42,106.01.

378. Upon information and belief, Defendants Defreitas and Lockdeco made arrangements so that a portion or all of the $92,557.37 in construction funds would be returned to Defendant Defreitas.

379. Defendants Defreitas's and Lockdeco's violations include, but are not limited to:

a. Defendant Lockdeco deceiving Ms. Barker into believing that it was a legitimate and licensed construction company and initiating repair work on her home, while omitting the fact that it is not a licensed contractor;

b. Defendant Lockdeco falsely stating it would conduct the promised construction work, and instead conducting minimal rudimentary drywall installation and plumbing, and not completing $92,557.37 worth of construction or repairs it had promised it would complete, which is the amount it received from Ms. Barker's loan proceeds;

c. Defendant Defreitas steering Ms. Barker to the GBL Lender Defendants, who did not assess her ability to repay the Subject Loan and required that the title to the property be transferred to a business entity;

d. Defendant Defreitas falsely telling Ms. Barker that she had to establish an LLC to obtain a loan, and helping establish a corporation for Ms. Barker to transfer title to, in order to finalize the hard money illegal loan transaction with the GBL Lender Defendants;

e. Defendant Defreitas falsely telling Ms. Barker that she would receive a federal government sponsored FHA loan to refinance the Subject Loan;

f. Defendant Defreitas falsely promising that for reasonable compensation from Ms. Barker, she would make all mortgage payments on the Subject Loan while she helped Ms. Barker obtain an FHA Loan with the assistance of Robert Fishbein and Jackie Marketing LLC, and/or while she helped Ms. Barker fix up her second unit to generate rental income;

g. Defendants Defreitas and Lockdeco together utilizing deception to ensure that $92,557.37 of the Subject Loan proceeds were diverted directly to Defendant Lockdeco, for the purported purpose of completing construction work on Ms. Barker's home;

h. Together, Defendants Defreitas and Lockdeco utilizing deception to collect $92,557.37 of the Subject Loan proceeds, which Ms. Barker was responsible for repaying with interest.

380. The wrongful and deceptive acts of Defendants Defreitas and Lockdeco have caused injury and damages to Ms. Barker and unless enjoined, will cause further irreparable injury.

381. As a direct and proximate result of Defendant Defreitas's and Defendant Lockdeco's violations of section 349 of the New York General Business Law, Ms. Barker has suffered compensable harm, including emotional distress.

382. Accordingly, Ms. Barker requests that this Court enter judgment in her favor and against Defendant Defreitas and Defendant Lockdeco, by:

a. ordering preliminary and permanent injunctive relief, prohibiting each Defendant from continuing to engage in the deceptive acts alleged herein;

b. ordering each Defendant to pay the following damages to Ms. Barker:

    i. compensatory and treble damages in an amount to be determined by this Court; and

    ii. the costs of this action, together with reasonable attorney's fees as determined by this Court.

**SEVENTH CLAIM FOR RELIEF**
(Civil RICO, 28 U.S.C. § 1962(c))
(Against Defendants Rokosz, Legum, Telsey, and Royce)

383. Plaintiff restates, realleges, and incorporates by reference all foregoing paragraphs as if fully set forth herein.

384. In connection with the Subject Loan transaction, Defendants Rokosz, Legum, Telsey, and Royce have violated the Racketeer Influenced and Corrupt Organizations Act ("RICO") by conducting or participating in the affairs of an enterprise engaged in, or the activities of which affect, interstate commerce, through collection of unlawful debt. As a result, Ms. Barker was injured in her property.

385. Under RICO, it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).

386. "Person" includes any individual or entity capable of holding a legal or beneficial interest in property. 18 U.S.C. § 1961(3).

387. Defendants Rokosz, Legum, Telsey, and Royce (collectively, the "RICO Defendants"), as well as Robert Fishbein and Jackie Marketing LLC, are individuals or entities

capable of holding a legal or beneficial interest in property, and as such are "persons" within the meaning of 18 U.S.C. § 1961(3).

388. "Enterprise" includes any individual, corporation, or other legal entity and any union or group of individuals associated in fact although not a legal entity. 18 U.S.C. § 1961(4).

389. Defendants Rokosz, Legum, Telsey, and Royce have been, along with Robert Fishbein and Jackie Marketing LLC, individuals associated in fact although not a legal entity.

390. Together, between November 2013 and February 2017, Defendants Telsey, Legum, Rokosz, and Royce, often along with Robert Fishbein and Jackie Marketing, worked together to coordinate, enable, and profiteer from hard money mortgage loans, most (if not all) of which were usurious.

391. Beyond the at least 14 such loans issued during this period—averaging more than one every three months—multiple RICO Defendants are also known to have communicated regarding their pursuit of at least four other prospective transactions.

392. Most often, Fishbein, who was recruited by Defendant Telsey, brought a potential borrower to the attention of the RICO Defendants, and communicated directly with the borrower throughout the transaction as an intermediary between the borrower and the RICO Defendants. In turn, Defendants Telsey and Legum communicated with Fishbein on behalf of themselves and Defendant Rokosz. On at least two occasions, Fishbein, Telsey, and Legum worked together to have the prospective borrower create a sham business entity to transfer title to the property into, as a condition of the loan. In some transactions, Defendant Telsey himself brought the borrower to the attention of the RICO Defendants and communicated directly with the borrower and acted as intermediary.

393. Defendants Telsey and Rokosz would together evaluate the value of the property intended to secure the loan and the prospective loan amount, determining whether a transaction should proceed. From this point, Defendants Telsey and Legum, often together with Fishbein, exercised substantial discretion over the particulars of individual transactions, including how much each would take in loan proceeds (which, for Defendant Telsey, were disbursed to Defendant Royce) and whether an amount of the loan proceeds should be withheld as "escrow" and, if so, how much. Defendant Legum would evaluate the relative debt obligations and possible encumbrances for a given property by requesting and analyzing title reports. Defendant Legum prepared the closing documents and acted as the "escrow agent" for the "escrowed" funds. Throughout the lives of the loans, Defendant Telsey ensured that the borrowers made their payments, including paying property taxes and maintaining current property insurance, efforts coordinated with and overseen by Defendant Legum, ultimately on behalf of and in order to keep financing flowing from Defendant Rokosz.

394. In these respects, and as set forth more fully throughout this Amended Complaint, Defendants Rokosz, Legum, Telsey, and Royce, along with Robert Fishbein and Jackie Marketing LLC, have constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

395. The activities of this association in fact enterprise have constituted and/or affected interstate commerce. For example:

 a. $150,000 from the Subject Loan was transferred to an individual residing out of state, Ms. Barker's half-sister Sandra Vaughan, in exchange for Ms. Vaughan transferring her share of the title of the Subject Property to Ms. Barker.

 b. Upon information and belief, Rosalyn Campbell made payments on the mortgage loan issued to 26 Kossuth Place LLC out of a South Carolina bank account. Upon

information and belief, when the loan to 26 Kossuth Place LLC was issued on June 17, 2016, Rosalyn Campbell, who was the purported Managing Member of 26 Kossuth Place LLC, resided in Pennsylvania.

c. As of the date the mortgage loan to 561 Wyona Street was issued, on June 18, 2015, the principal of 561 Wyona Street Inc. was Allan S. Jones, a truck driver who resided (and upon information and belief still resides) in North Carolina.

396. Furthermore, at least some of the activities of this enterprise were conducted via electronic mail and telephone (including through text message).

397. "Unlawful debt" includes a debt which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and which was incurred in connection with the business of lending money at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate. 18 U.S.C. § 1961(6).

398. The Subject Loan constituted "unlawful debt" within the meaning of 18 U.S.C. § 1961(6) in that:

a. it was unenforceable under New York state law because the rate of interest is usurious;

b. it was incurred in connection with the business of lending money at a usurious rate of interest;

c. the usurious rate of the Subject Loan, of at least 37.87 percent, was at least twice the enforceable rate of 16 percent.

399. As of February 2017, Defendant Rokosz and/or the RICO Defendants were engaged in the business of lending money at a usurious rate. As specifically alleged *supra*, at least 10 other loans originated by Defendant Rokosz in which the other RICO Defendants were involved

were usurious.  Upon information and belief, many, if not all, of the additional mortgage loans originated by Defendant Rokosz with similar terms since 2011 have also been usurious.

400.    Defendant Telsey and his entity Defendant Royce LLC participated in the operation or management of the enterprise while understanding the usurious and/or deceptive nature of the enterprise's transactions by, *inter alia*: actively seeking prospective borrowers for Defendant Rokosz to lend to; recruiting Robert Fishbein as an associate and source of prospective borrowers; helping Defendant Rokosz determine which borrowers to lend to; exercising substantial discretion over the terms of individual loans, including how much of the proceeds he would receive; ensuring individual borrowers created sham business entities in which to transfer title to the mortgaged properties; and pursuing collection of the loans in order to sustain the enterprise.

401.    Defendant Legum participated in the operation or management of the enterprise while understanding the usurious and/or deceptive nature of the enterprise's transactions including by, *inter alia*: acting as the "escrow agent" for loan proceeds withheld from borrowers as additional security on mortgage loans; exercising substantial discretion over the terms of individual loans, including how much of the loan proceeds he would receive; distributing loan proceeds to other members of the enterprise; drafting closing documents for the mortgage loans; requiring individual borrowers to create sham business entities in which to transfer title to the mortgaged properties; drafting the deeds transferring title to such entities; creating at least one such sham entity on behalf of a borrower; receiving all stock and interest to such entities into his control as "escrow agent;" and drafting at least one promissory note between a borrower and members of the enterprise other than Defendant Rokosz.

402.    Defendant Rokosz participated in the operation or management of the enterprise while understanding the usurious and/or deceptive nature of the enterprise's transactions by, *inter*

*alia*: determining which mortgage loans to finance, repeatedly financing and collecting on the mortgage loans, and entering into "escrow" agreements designed to withhold loan proceeds from borrowers.

403. Accordingly, Defendants Rokosz, Legum, Telsey, and Royce LLC conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through collection of unlawful debt.

404. Ms. Barker is a natural person, and as such is a "person" within the meaning of 18 U.S.C. § 1961(3).

405. Any person injured in her business or property by reason of a violation of section 1962 may recover threefold the damages she sustains and the cost of the suit, including reasonable attorney's fees. 18 U.S.C. § 1964(c).

406. As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(c), Ms. Barker was injured in her business and property by the loss of all remaining equity that was left in the Subject Property. Such injury to Ms. Barker was reasonably foreseeable or anticipated as a natural consequence of the enterprise's activities.

407. Accordingly, Ms. Barker requests that this Court enter judgment in her favor and against all RICO Defendants, by:

    a. prohibiting each RICO Defendant from continuing to engage in the same type of endeavors alleged herein as related to the enterprise;

    b. ordering Defendants to pay the following damages to Ms. Barker:

        i. compensatory and treble damages in an amount to be determined by this Court;

ii. the costs of this action, together with reasonable attorney's fees as determined by this Court; and

c. ordering Defendants to disgorge all ill-gotten gains in order to deter them from engaging in similar conduct in the future.

## EIGHTH CLAIM FOR RELIEF
### (Legal Malpractice)
### (Against Defendant Hurley)

408. Plaintiff restates, realleges, and incorporates by reference all foregoing paragraphs as if fully set forth herein.

409. In the course of his representation of Ms. Barker in the Subject Loan transaction, Defendant Hurley committed legal malpractice.

410. Upon information and belief, Defendant Hurley is licensed to practice law in the State of New York and subject to New York's Rules of Professional Conduct.

411. An attorney-client relationship existed between Defendant Hurley and Ms. Barker for representation in the Subject Loan transaction.

412. Defendant Hurley's legal practice is mostly criminal defense. Defendant Hurley has handled fewer than 10 loan closings in his career, and had never handled a loan closing with a non-bank lender prior to this transaction.

413. Defendant Hurley failed to exercise the care, skill, and diligence commonly possessed and exercised by a member of the legal profession in representing Ms. Barker in the Subject Loan transaction by:

a. failing to inform Ms. Barker of the risks associated with transferring the deed for her property to an LLC and assigning shares of that LLC to a lender;

b. failing to inform Ms. Barker of the risks associated with Defendant Rokosz's interest-only, one-year loan at the first and second loan closing;

c. reassuring Ms. Barker about her ability to refinance with an FHA loan and failing to inform Ms. Barker of her likely inability to qualify for an FHA loan while she had no income;

d. failing to inform Ms. Barker that the loan from Defendant Rokosz was usurious and therefore void *ab initio*;

e. representing Ms. Barker at a closing for a loan with illegal, usurious loan terms, and after the first loan closing, representing Ms. Barker at a second loan closing with the same illegal, usurious loan terms;

f. failing to request or review any of the loan terms or closing documents from opposing counsel prior to the first or second loan closing;

g. relying on opposing counsel's characterization of the loan documents to explain the loan documents at the loan closing;

h. failing to explain to Ms. Barker the contents of the loan documents, including the mortgages, mortgage notes, promissory note, assignment and security agreements, escrow agreements, corporate resolutions, guarantees, or closing statements; and

i. failing to tell Ms. Barker that she should not go through with signing the loan documents at either the first or second loan closing.

414. Because Defendant Hurley recognized that the loan transaction was suspect and potentially dangerous to Ms. Barker, he drafted a letter to release himself from liability related to the closing, but he never instructed Ms. Barker to read that letter, nor did he read or explain it to her, before instructing her to sign it and the loan closing documents.

415. Defendant Hurley never sought to withdraw from representing Ms. Barker, and proceeded to represent her at both a first and second loan closing.

416. Defendant Hurley's negligence was a proximate cause of the damages sustained by Ms. Barker. If Defendant Hurley had told Ms. Barker not to go through with the loan closings, or explained that the loan was usurious and thus illegal and void, Ms. Barker would not have signed the loan documents at the first or second loan closing. Ms. Barker trusted Defendant Hurley's representation of her interests and relied on his appearance at the closings to indicate that he had reviewed the loan documents and approved of the loan.

417. Had Defendant Hurley explained to Ms. Barker what he meant by the fact that he "didn't like the numbers," or told her not to go through with the loan, Ms. Barker would not have signed the loan documents at the first or second loan closing.

418. But for Defendant Hurley's negligence, Ms. Barker would not have sustained any ascertainable damages.

419. Ms. Barker incurred actual damages of loss of equity in her home as a result of Defendant Hurley's actions or inaction. She has also incurred consequential damages including litigation expenses in an effort to avoid the damage caused by the Defendant Hurley's conduct.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests the following relief jointly and severally as against all Defendants:

a. a judgment declaring that Defendants have committed the violations of law alleged in this action;

b. an order enjoining Defendants from continuing to engage in the illegal practices described above;

c. an order, pursuant to TILA and HOEPA, (i) declaring the Subject Loan rescinded; (ii) voiding any lien and/or security interest obtained by Defendant Rokosz against the Subject Property; and (iii) providing to Plaintiff actual, statutory and enhanced damages, and attorney's fees and costs as determined by this Court;

d. an order, pursuant to NY Banking Law § 6-*l*, (i) declaring the Subject Loan rescinded and void; (ii) declaring that Defendant Rokosz has no right to collect, receive, or retain any principal, interest, or other charges with respect to the Subject Loan; (iii) declaring any security interest in the Subject Property created as a result of the Subject Loan null and void; (iv) providing that Defendant Rokosz return to Ms. Barker any payments made in connection with the Subject Loan; and (v) providing to Plaintiff actual damages, statutory damages, and attorney's fees and costs, to be determined by this Court;

e. an order, pursuant to New York's prohibition against usury, (i) declaring the Subject Loan void; and (ii) declaring that Defendant Rokosz has no right to collect, receive, or retain any principal, interest, or other charges with respect to the Subject Loan;

f. an order, pursuant to NY GBL § 349, (i) enjoining the GBL Defendants from continuing to engage in practices that violate NY GBL § 349; and (ii) providing to Plaintiff actual and/or compensatory damages, statutory damages, treble damages, and attorney's fees and costs, to be determined by this Court;

g. an order, pursuant to RICO, (i) enjoining Defendants from continuing to engage in the same type of endeavors alleged herein as related to the Enterprise; (ii) providing to Plaintiff compensatory and treble damages and attorney's fees and costs, to be

determined by this Court; and (iii) providing that Defendants disgorge all ill-gotten gains;

h.  actual damages and consequential damages for Defendant Hurley's legal malpractice;

i.  such other relief and further relief as may be just and proper.

### JURY DEMAND

Plaintiff requests a jury on all claims so triable.

Dated: March 13, 2020
      New York, New York

Respectfully submitted,

MOBILIZATION FOR JUSTICE, INC.

By: /s/ Belinda Luu
    Belinda Luu
    Adrienne Warrell
    Carolyn E. Coffey, of counsel to
    Jeanette Zelhof, Esq.
    100 William Street, 6th Floor
    New York, NY 10038
    (212) 417-3866
    bluu@mfjlegal.org

RICHMAN LAW GROUP

By: /s/ Randal K. Wilhite
    Randal K. Wilhite
    Kim E. Richman
    8 W 106th Street
    New York, NY 10027
    (718) 705-4579
    rwilhite@richmanlawgroup.com

*Attorneys for Plaintiff*