UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

CARLA BARKER,

        Plaintiff,

                -against-

IZIA ROKOSZ,

        Defendant.

No. 1:19-cv-00514 (KAM) (JRC)

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT**

---

MOBILIZATION FOR JUSTICE, INC.
Belinda Luu
Joseph Rebella
Michael Litrownik
Randal Wilhite
100 William Street, 6th Floor
New York, NY 10038
Tel: (212) 417-3700
bluu@mfjlegal.org
jrebella@mfjlegal.org
mlitrownik@mfjlegal.org
rwilhite@mfjlegal.org

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION ......................................................................................................... 1

STATEMENT OF UNDISPUTED FACTS ................................................................. 2

    A. Ms. Barker's Efforts to Keep Her Family Home. ............................................ 2

    B. The Creation of a Sham Corporation. ............................................................. 3

    C. The High-Cost, Usurious Mortgage Loan ...................................................... 4

    D. Ms. Barker's Foreseeable Default .................................................................. 5

LEGAL STANDARD .................................................................................................... 5

ARGUMENT .................................................................................................................. 6

I.   DEFENDANT ROKOSZ VIOLATED THE TRUTH IN LENDING ACT (TILA) AND THE HOME OWNERSHIP AND EQUITY PROTECTION ACT (HOEPA) IN ISSUING THE SUBJECT LOAN. .................................................................................. 6

    A. The Subject Loan is Subject to TILA and HOEPA Even Though Defendant Structured the Transaction to Avoid TILA and HOEPA Protections. ........................... 8

        1. The Subject Loan Was, In Substance, a Consumer Credit Transaction. ............... 8

            a. Defendant and His Agents Required Ms. Barker to Create a Shell Corporation for the Sole Purpose of Acting as the Borrower of the Subject Loan in Name Only, but They Understood That Ms. Barker Was the True Borrower. ............................................... 9

            b. Ms. Barker Obtained the Subject Loan for the Personal Purpose of Maintaining Ownership Over Her Family Home and Residence. ............ 11

        2. The Subject Loan Exceeded the Relevant Threshold to Be Considered A High-Cost Home Loan and Is Thus Subject to HOEPA. ........................................... 13

            a. Ms. Barker Has Established That She Resides at the Property, and In Response, Defendant Has Failed to Raise a Genuine Issue of Fact.......... 13

            b. On Its Face, the Subject Loan Exceeds the HOEPA Cost Threshold. ....... 14

        3. By Making a High-Cost Mortgage Loan through a Broker, Defendant Established Himself as a "Creditor" ................................................................. 14

    B. Although Required to Comply with TILA and HOEPA, Defendant Violated Both Statutes by Failing to Provide the Requisite TILA and HOEPA Disclosures and Failing to Follow Substantive Protections Mandated by HOEPA .............................. 15

II.   DEFENDANT ROKOSZ VIOLATED NEW YORK BANKING LAW § 6-*l* IN ISSUING
      THE SUBJECT LOAN. ................................................................................................ 17

      A.   Although Defendant Structured the Subject Loan to Avoid Application of Consumer
           Protection Laws, It Is Still a "Home Loan" and Subject to Banking Law § 6-*l*. ........ 17

      B.   Because Defendant Made the Loan Through a Mortgage Broker, He is a "Lender"
           and Covered by the Statute. ....................................................................................... 19

      C.   The Subject Loan is a "High-Cost Home Loan" Because It Exceeds Both the Points
           and Fees Threshold and the APR threshold. .............................................................. 19

           1.   The Points and Fees on the Loan Greatly Exceed the Threshold........................ 20

           2.   The Annual Percentage Rate on the Loan Greatly Exceeds the Threshold. ....... 21

      D.   Both the Terms of the Subject Loan and the Process by which Defendant Made It
           Violate the Protections Provided by Banking Law § 6-*l*. ........................................... 22

      E.   Given Defendant's Intentional Violations of the Statute, Ms. Barker is Entitled to
           Cancellation of the Subject Loan. .............................................................................. 22

III.  THE SUBJECT LOAN VIOLATES NEW YORK STATE'S PROHIBITION ON
      USURY AND IS VOID. ............................................................................................. 23

      A.   With Consideration of the Significant Upfront Charges Associated with the Subject
           Loan, The Interest Rate of the Loan Greatly Exceeded the Legal Limit. ................... 23

           1.   In Addition to Periodic Payments of Interest, The Subject Loan Included a
                Payment of Interest on February 16, 2017. ........................................................ 24

           2.   The Loan Proceeds Withheld as Additional Security and Never Used to Benefit
                Ms. Barker Constituted Interest on the Subject Loan. ....................................... 24

           3.   The Loan Proceeds Paid to Defendant's Agent, with Defendant's Approval,
                Constituted Interest on the Subject Loan. .......................................................... 25

           4.   In Consideration of the Upfront Charges, the Interest Rate Exceeded the
                Statutory Limit. .................................................................................................. 27

      B.   The Subject Loan Is Not a Purchase Money Mortgage and Would Still Be Usurious
           Even It Were. ............................................................................................................. 27

      C.   Because Defendant Did Not Engage in Sufficient Lending Activity to Trigger
           DIDMCA, Ms. Barker's Usury Claim is Not Preempted. .......................................... 28

CONCLUSION ......................................................................................................................... 30

# TABLE OF AUTHORITIES

## Cases

*Adar Bays, LLC v. GeneSYS ID, Inc.*,
    37 N.Y.3d 320 (N.Y. 2021).................................................................................... 28

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ............................................................................................... 6

*Aries Fin., LLC v. 12005 142nd St., LLC*,
    127 A.D.3d 900 (N.Y. App. Div. 2015)................................................................ 18

*Babinsky v. Skidanov*,
    784 N.Y.S.2d 540 (N.Y. App. Div. 2004) ............................................................ 28

*Balsam v. Fioriglio*,
    123 A.D.3d 750 (N.Y. App. Div. 2014)................................................................ 19

*Bliss v. Sherrill*,
    49 N.Y.S. 561 (N.Y. App. Div. 1898)................................................................... 26

*Brooks v. BC Custom Constr., Inc.*,
    No. 18-CV-00717, 2019 WL 3763769 (D. Or. May 21, 2019) ......................... 9, 11

*Carmike Holding I, LLC v. Smith*,
    180 A.D.3d 744 (N.Y. App. Div. 2020)................................................................ 19

*Cohen v. Beaudry*,
    100 N.Y.S.2d 519 (N.Y. Civ. Ct. 1950)............................................................... 26

*Connecticut ex rel. Blumenthal v. U.S. Dept. of Interior*,
    228 F.3d 82 (2d Cir. 2000).................................................................................... 29

*Curtis v. Propel Prop. Tax Funding, LLC*,
    915 F.3d 234 (9th Cir. 2019)............................................................................ 12, 13

*Ford Motor Credit Co. v. Cenance*,
    452 U.S. 155 (1981) ............................................................................................... 9

*Kovian v. Fulton Cnty. Nat'l Bank & Tr. Co.*,
    647 F. Supp. 830 (N.D.N.Y. 1986) ...................................................................... 25

*Krishtul v. VSLP United, LLC*,
    No. 10-CV-0909, 2014 WL 940941 (E.D.N.Y. Mar. 11, 2014) ........................... 12

*L. Smirlock Realty Corp. v. Title Guarantee Co.*,
    70 A.D.2d 455 (N.Y. App. Div. 1979).................................................................. 26

*LSREF3 Sapphire Tr. 2014 v. Barkston Props., LLC*,
    No. 14-CV-7968, 2016 WL 302150 (N.D. Ill. Jan. 25, 2016) ............................... 9

*Macheda v. Household Fin. Realty Corp.*,
    No. 04-CV-0325, 2009 WL 113474 (N.D.N.Y. Jan. 15, 2009) ............................ 11

*Mandelino v. Fribourg*,
    295 N.Y.S.2d 654 (N.Y. 1968) ........................................................................ 27, 28

*Mourning v. Family Publ'ns Serv., Inc.*,

iii

411 U.S. 356 (1973) .................................................................................... 7, 9

*N. Broadway Funding Corp. v. Freed*,
357 N.Y.S.2d 27 (N.Y. App. Div. 1974) ................................................... 23

*N.C. Freed Co., Inc. v. Bd. of Governors of Fed. Reserve Sys.*,
473 F.3d 1210 (2d Cir. 1973) ................................................................ 6, 9

*Sasidharan v. Piverger*,
993 N.Y.S.2d 646 (Table) (N.Y. Sup. Ct. 2014) ...................................... 24

*Schneider v. Phelps*,
359 N.E.2d 1361 (N.Y. 1977) .................................................................. 23

*Schwarz v. Sweitzer*,
202 N.Y. 8 (N.Y. 1911) ........................................................................... 25

*Simsbury Fund v. New St. Louis Assocs.*,
611 N.Y.S.2d 557 (N.Y. App. Div. 1994) ................................................. 24

*Sweeney v. Sav. First Mortg., LLC*,
879 A.2d 1037 (Md. 2005) ....................................................................... 29

*Szerdahelyi v. Harris*,
490 N.E.2d 517 (N.Y. 1986) .................................................................... 28

*Tcherepnin v. Knight*¸
389 U.S. 332 (1967) .................................................................................. 9

*Tower v. Moss*,
625 F.2d 1161 (5th Cir. 1980) ........................................................... 12, 13

**Statutes**

12 U.S.C. § 1735f-5(b) .................................................................................. 28
12 U.S.C. § 1735f-7a ............................................................................... 28, 29
15 U.S.C. § 1602 ........................................................................... 7, 8, 13, 14
15 U.S.C. § 1638 ..................................................................................... 7, 15
15 U.S.C. § 1639 ..................................................................................... 7, 15
Federal Home Loan Bank Act of 1932, P.L. 72-304, 47 Stat. 128............... 29
N.Y. Banking Law § 14-a .............................................................................. 23
N.Y. Banking Law § 590 ............................................................................... 19
N.Y. Banking Law § 6-*l*........................................................................ passim
N.Y. Gen. Oblig. Law § 5-501 ...................................................................... 23
N.Y. Gen. Oblig. Law § 5-511................................................................ 23, 29, 30
N.Y. Gen. Oblig. Law § 5-521 ...................................................................... 23
N.Y. Penal Law § 190.40 .............................................................................. 28

**Rules**

Federal Rule of Civil Procedure 56 ................................................................. 5

**Regulations**

12 C.F.R. § 1026 Supp. I Cmt. (a)-5.............................................................. 20

12 C.F.R. § 1026, App'x. J ................................................................................ 21

12 C.F.R. § 1026, Supp. I Cmt. 2(a)(17)(i)-1.ii(4) ........................................... 29

12 C.F.R. § 1026.4 ............................................................................................. 20

12 C.F.R. §§ 1026.32(a)(1)(i)(A), (a)(3)(i) ...................................................... 14

3 N.Y.C.R.R. § 4.2 ....................................................................................... 25, 27

## Other Authorities

Board of Governors of the Federal Reserve System, *Report to the Congress: Rules on Home-Equity Credit under the Truth in Lending Act* (Nov. 1996) ...................................................... 6

Fannie Mae, Lender Letter 2016-05 (Nov. 23, 2016) ...................................... 18

Federal Home Loan Bank Board, 1980 FHLBB LEXIS 124 (Jerome Plapinger, Special Counsel, FHLBB) (June 30, 1980) ....................................................................................... 29

HUD-Treasury Task Force on Predator Lending, *Curbing Predatory Home Mortgage Lending* (June 1, 2000) ....................................................................................................... 7

Roberta A. Ward, *The Consumer Credit Protection Act: An Analysis of Public Policy Formulation*, THE JOURNAL OF CONSUMER AFFAIRS, Vol. 5, No. 2 (Winter 1971).................... 6

U.S. Department of Housing and Urban Development (HUD), *Let FHA Loan Help You* ............ 4

U.S. Department of Treasury, Daily Treasury Par Yield Curve Rate ........................................... 21

# **INTRODUCTION**

This case seeks redress for Plaintiff Carla Barker, the victim of a predatory home equity-stripping scheme led by Defendant Izia Rokosz, a long-time hard money lender. In or around 2017, Ms. Barker, fearing the loss of her childhood home and unable to obtain conventional mortgage financing, found Defendant through a family connection. Defendant was all too happy to exploit Ms. Barker: he did not evaluate her ability to repay and instead based his decision to lend entirely on Ms. Barker's equity in the home; he imposed extremely onerous loan terms, including requiring substantial upfront fees and finance charges, interest-only monthly payments, and a balloon payment of the entire inflated principal balance after one year; he failed to provide Ms. Barker any required loan disclosures; and he required Ms. Barker to fund a large "escrow" fund, which was held entirely for his own benefit as additional security on the loan. In these and other respects, Defendant violated the Truth in Lending Act, the Home Ownership and Equity Protection Act, New York Banking Law 6-*l*, and New York's prohibition on usury.

Defendant contends that the transaction was a business transaction and Ms. Barker was a sophisticated borrower. These contentions wither under even the slightest scrutiny. The undisputed facts establish that Defendant structured the loan to appear as a business loan by requiring Ms. Barker to transfer her home to a sham business entity to obtain financing. But Ms. Barker in her personal capacity, a high school graduate and home health aide with no experience with mortgage financing, was the true borrower of the loan and was therefore entitled to the protections of a consumer loan. The undisputed facts also establish that given the significant upfront charges that Defendant assessed, the loan far exceeded the maximum interest rate permitted by New York law and is therefore void. For these reasons, the Court should grant Plaintiff's motion for summary judgment.

**STATEMENT OF UNDISPUTED FACTS**

Ms. Barker is an Afro-Caribbean home health aide whose childhood home is a two-family residential dwelling located at 611 East 48th Street, Brooklyn, New York (the "Property").[1] *See* Def. 56.1 Resp. ¶¶1–3, 31.[2] Defendant is a private lender who has been in the lending business for about 40 years and issues hard money loans, which he says generally cost three times as much as conventional bank loans. *Id.* ¶¶ 4–5.

**A.  Ms. Barker's Efforts to Keep Her Family Home.**

In 2004, Ms. Barker and her sister, Sandra Vaughan, inherited the Property from their late mother. *Id.* ¶¶ 32–33. Although Ms. Barker was still residing at the Property at that time, her sister resided in a different state. *Id.* ¶ 33. In 2011, Ms. Vaughan, who was not interested in retaining title to the Property, obtained a judgment of partition against Ms. Barker. *Id.* ¶¶ 34–35. Desperate to buy out her sister's interest and stay in her lifelong home, Ms. Barker sought conventional financing but did not qualify. *Id.* ¶¶ 36–37.

Ms. Barker was eventually led to Robert Fishbein, who contacted Gregg Telsey about Ms. Barker's need for mortgage financing. *Id.* ¶ 44. Mr. Telsey is Defendant's only mortgage broker and finds "deals," or potential borrowers, for Defendant. *Id.* ¶¶ 9–11. Mr. Telsey also drives Defendant to properties and helps to "make a deal" with borrowers on Defendant's behalf, including establishing and negotiating loan terms along with Defendant's attorney, Steven Legum. *Id.* ¶¶ 11, 13–14, 24–25. After speaking with Mr. Fishbein, Mr. Telsey provided Defendant with details about a proposed loan secured by the Property; Defendant understood that "a lady" was

---

[1] Citations to "Plt. 56.1" refer to Plaintiff's Rule 56.1 Statement of Undisputed Material Facts (ECF No. 292). Citations to "Def. 56.1 Resp." refer to Defendant's Responses to Plaintiff's Rule 56.1 Statement. (ECF No. 295).

[2] Defendant does not dispute that the Property is Ms. Barker's childhood home. He only argues that Ms. Barker "stay[ed] elsewhere" at some brief point in time. In any event, any dispute about Ms. Barker's residence in the Property is not genuine. *See supra* Section I.A.2.a.

seeking financing to fix her house. *Id.* ¶¶ 44–46. Defendant and Mr. Telsey then visited the Property, where Ms. Barker was present, to inspect the premises and assess the debt-to-value ratio. *Id.* ¶ 48. Defendant expressed interest in making the proposed loan. *Id.* ¶ 47.

### B. The Creation of a Sham Corporation.

On or before January 9, 2017, Mr. Telsey advised Mr. Fishbein that Defendant was interested in lending to Ms. Barker, and Mr. Fishbein initiated a title order for the Property. *Id.* ¶ 49. However, Defendant prefers to lend to "businesses" and was not willing to issue a loan to Ms. Barker in her individual capacity. *Id.* ¶¶ 51, 55. Mr. Telsey informed Mr. Fishbein that Defendant was interested in making the loan but only if a business entity took title and served as the borrower. *Id.* ¶ 50. This is consistent with Defendant's business practices.[3]

On January 13, 2017, J&M Property Holdings, Inc. ("J&M") was incorporated by Janelle Defreitas. *Id.* ¶¶ 61, 64–65. A family friend had introduced Ms. Defreitas as a real estate agent who could help Ms. Barker. *Id.* ¶¶ 38–39. J&M was formed to take title to the Property and serve as the borrower; it has no other identifiable purpose. *Id.* ¶¶ 67–68.[4] Other than executing closing documents on behalf of J&M, Ms. Barker never engaged in any business as J&M and, at all relevant times, J&M did not hold any assets other than the Property. *Id.* ¶¶ 69–70.

After Defendant assessed the value of the Property and J&M was created, Defendant did not request or review a loan application from J&M or Ms. Barker, nor did he otherwise review J&M's or Ms. Barker's finances or direct any of his agents to do so. *Id.* ¶¶ 71–79. At the loan

---

[3] If an individual seeks financing for an owner-occupied property, like Ms. Barker did, Defendant may require the individual to form a corporation or LLC to serve as the borrower. *Id.* ¶ 56. Notably, from May 13, 2016, to September 5, 2019, in seven of nine mortgage transactions issued by Defendant, the borrowers were corporations or LLCs formed just 1 to 15 business days before the closings. *Id.* ¶ 58.

[4] In disputing that J&M has no identifiable business purpose, Defendant only claims that J&M was formed to take title to the Property. *Id.* ¶ 67.

closings, Mr. Legum (Defendant's attorney) prepared corporate documents for J&M. *Id.* ¶¶ 115, 117. Defendant, Mr. Legum, and Mr. Telsey all understood that the plan for the Subject Loan was to repair the property, increase its value, and then the borrower would be able to obtain a conventional mortgage or FHA[5] loan to repay Defendant. *Id.* ¶ 85.

### C. The High-Cost, Usurious Mortgage Loan

On February 6, 2017, Defendant issued a $330,000 mortgage loan to J&M, secured by the Property. *Id.* ¶ 111. Prior to the closing held on February 6, 2017, Mr. Legum and Mr. Telsey knew and expected that there would be a second closing. *Id.* ¶¶ 109–110. Ten days later, on February 16, 2017, Defendant issued another mortgage loan to J&M, which subsumed the earlier mortgage and included additional security of $120,000, resulting in a single mortgage lien of $450,000, secured by the Property (the "Subject Loan"). *Id.* ¶ 118; Luu Decl., Ex. 38. The Subject Loan provided for a fixed interest rate of 12%. Def. 56.1 Resp. ¶ 121. During the term of the loan, the Subject Loan required Ms. Barker to make monthly interest-only payments totaling $54,000.00. Plt. 56.1 ¶ 122; Luu Decl., Ex. 38. The entire principal balance was due no later than February 17, 2018. Plt. 56.1 ¶ 123; Luu Decl., Ex. 38. Ms. Barker executed a personal guarantee for the loan to J&M. Def. 56.1 Resp. ¶ 117(f).

Most of the proceeds from the Subject Loan were allocated to preserve Ms. Barker's ownership of the Property, including a $150,000 payment to Ms. Vaughan to settle the partition dispute and a $71,126.85 payment to satisfy property tax liens. *Id.* ¶ 127. The following sums were also disbursed from the Subject Loan proceeds: $1,193.42 was withheld as interest payable to Defendant for accrued interest (*id.* ¶¶ 129, 136); $8,713.33 was disbursed to Mr. Telsey for his role

---

[5] FHA loans are mortgages insured by the Federal Housing Administration (FHA) as part of a program that is designed to help people become homeowners. U.S. Department of Housing and Urban Development (HUD), *Let FHA Loan Help You*, available at: https://www.hud.gov/buying/loans (last accessed July 18, 2023).

in the transaction (*id.* ¶¶ 7, 8, 130); and $14,926.67 was disbursed to Mr. Fishbein for his role in the transaction (*id.* ¶¶ 19, 131).

Additionally, a $60,192.68 sum was held by Mr. Legum. *Id.* ¶ 153. Those funds were held pursuant to two "escrow" agreements. *Id.* ¶¶ 115(f), 117(e), 153. Under the escrow agreements, Ms. Barker waived any right to challenge the release of funds to Defendant. *Id.* ¶ 158. Defendant had "the right but not the obligation" to use those funds to make the payments on the Subject Loan or other charges related to the Property. *See id.* ¶¶ 115(f), 117(e); *see also* Luu. Decl. Exs. 58, 67. If any payment was made from the funds, Ms. Barker would have the obligation to immediately replenish those funds as the payment would be "added to the sum then due and owing the Lender." *Id.* The true purpose of the escrowed funds was to provide additional security for Defendant. Def. 56.1 Resp. ¶ 155.

**D. Ms. Barker's Foreseeable Default**

When Ms. Barker defaulted on the Subject Loan, none of the escrowed funds were applied to cure her default. *Id.* ¶ 162. Instead, Defendant directed Mr. Telsey and Mr. Legum to demand payment. *Id.* ¶ 165. Mr. Telsey and Mr. Legum attempted to reach Ms. Barker via text message, a note physically delivered to Ms. Barker at the Property, and letters addressed to Ms. Barker at the Property. *Id.* ¶¶ 166–168. In 2017, Defendant commenced eviction proceedings against Ms. Barker as the President of J&M, demanding that Ms. Barker vacate and surrender the Property, which he claimed she was in possession of. *Id.* ¶ 169; *see also* Luu Decl., Exs. 14,15.

<u>**LEGAL STANDARD**</u>

Summary judgment should be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "By its very terms, this standard provides that the mere existence of *some* alleged factual

dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* dispute of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In assessing materiality, the Court may only preclude summary judgment if there are "disputes over facts that might affect the outcome of the suit under the governing law." *Id.* at 248. In assessing whether a dispute is genuine, the Court must determine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* There are no genuine disputes of material fact remaining in this case.

## **ARGUMENT**

### I. Defendant Rokosz Violated the Truth in Lending Act (TILA) and the Home Ownership and Equity Protection Act (HOEPA) in Issuing the Subject Loan.

There is no genuine dispute that Defendant was required to comply with TILA and HOEPA but failed to comply with both. In fact, Defendant's efforts to evade TILA and HOEPA protections represent exactly the type of predatory abuses that TILA and HOEPA seek to remediate. The purpose of TILA, enacted in 1968 following eight years of Congressional study,[6] is to protect consumers from the "uninformed use of credit" and "to remedy what Congressional hearings revealed to be unscrupulous and predatory creditor practices throughout the nation." *N.C. Freed Co., Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 473 F.3d 1210, 1214 (2d Cir. 1973). These practices often involved "unsophisticated homeowners who used their home as security for loans with high rates or high closing fees, and with repayment terms the homeowners could not possibly meet."[7] As the Supreme Court described, "[b]ecause of the divergent, and at times fraudulent,

---

[6] Roberta A. Ward, *The Consumer Credit Protection Act: An Analysis of Public Policy Formulation*, THE JOURNAL OF CONSUMER AFFAIRS, Vol. 5, No. 2 (Winter 1971) p. 196.

[7] Board of Governors of the Federal Reserve System, *Report to the Congress: Rules on Home-Equity Credit under the Truth in Lending Act* (Nov. 1996), available at: https://www.federalreserve.gov/boarddocs/rptcongress/he_study.pdf (last accessed July 18, 2023).

practices by which consumers were informed of the terms of the credit extended to them, many consumers were prevented from shopping for the best terms available and, at times, were prompted to assume liabilities they could not meet." *Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 363 (1973). In 1994, Congress enacted HOEPA as an amendment to TILA to address "abusive practices in mortgage loan refinancing and home-equity lending."[8]

TILA requires statutorily defined "creditors" in "consumer credit transactions" to provide, before credit is extended, a series of disclosures meant to inform the borrower of the true cost of credit, including, *inter alia*, the amount financed, finance charges, annual percentage rate, payment schedule, and other statements of the borrower's rights. 15 U.S.C. § 1638(a)–(b). HOEPA imposes additional disclosure requirements and substantive limitations on "high-cost mortgages," which are defined as residential mortgage loans with rates above a certain threshold. *See* 15 U.S.C. §§ 1602(bb), 1639. In the present case, there is no dispute that Defendant failed to provide the disclosures required by TILA and that Defendant did not comply with the protections mandated by HOEPA. Defendant instead contends that TILA and HOEPA do not apply because the Subject Loan was not formally made to a natural person. But Defendant's argument rests on an untenably formal reading of the statute. Rather than adhere to such a narrow interpretation of the statute, the Court should follow case law instruction to analyze the underlying substance of the transaction and conclude that the Subject Loan was, in substance, a consumer credit transaction. Although required to comply with both TILA and HOEPA, Defendant complied with neither.

---

[8] A federal taskforce concluded that mounting evidence established that "an unscrupulous subset of these subprime actors—lenders (often those not subject to federal banking supervision), as well as mortgage brokers, realtors, and home improvement contractors—engage in abusive lending practices that strip borrowers' home equity and place them at increased risk of foreclosure." HUD-Treasury Task Force on Predator Lending, *Curbing Predatory Home Mortgage Lending* (June 1, 2000), available at: https://www.huduser.gov/portal/publications/hsgfin/curbing.html (last accessed July 18, 2023).

**A. The Subject Loan is Subject to TILA and HOEPA Even Though Defendant Structured the Transaction to Avoid TILA and HOEPA Protections.**

There are no genuine disputes that the conditions precedent to TILA and HOEPA coverage are met. Defendant was required to comply with TILA and HOEPA because (1) the Subject Loan was a "consumer credit transaction"; (2) the Subject Loan exceeded the rate threshold to be considered a "high-cost mortgage"; and (3) Defendant was a "creditor." Here, although the Subject Loan was formally structured as a loan to a business entity, an analysis of the surrounding circumstances shows that the purported borrower was a mere sham corporation—a hastily-made business entity created at Defendant's instruction and with corporate documents prepared by his own attorney—that served no purpose other than to be the formal borrower of the loan. The true borrower was Ms. Barker in her personal capacity, who was using the loan for personal, family, and household purposes, making the Subject Loan, in substance, a "consumer credit transaction." Furthermore, the cost of the Subject Loan exceeded the HOEPA rate threshold, so the Subject Loan was also a "high-cost mortgage." Finally, by making such a loan through a broker, Defendant established himself as a "creditor" under TILA and was, therefore, required to comply with TILA and HOEPA.

1. The Subject Loan Was, In Substance, a Consumer Credit Transaction.

A consumer credit transaction is one in which (1) the credit is extended to a "natural person" and (2) the money, property, or services which are the subject of the transaction are "primarily for personal, family, or household purposes." 15 U.S.C. § 1602(i). The analysis of whether a transaction is a consumer credit transaction focuses on the substance, not the superficial form, of the transaction. Here, although formally made to a shell corporation for the purposes of avoiding consumer protection statutes, the Subject Loan was substantively a loan made to Ms. Barker for her personal purposes.

a. *Defendant and His Agents Required Ms. Barker to Create a Shell Corporation for the Sole Purpose of Acting as the Borrower of the Subject Loan in Name only, but They Understood that Ms. Barker was the True Borrower.*

Although the Subject Loan was formally made to a business entity, the Court should analyze the undisputed surrounding circumstances of the transaction in light of TILA's remedial purpose and find that the loan was a "consumer credit transaction". Due to the remedial purpose of the statute, the Supreme Court has cautioned against "elevating form over substance" in interpreting TILA. *Ford Motor Credit Co. v. Cenance*, 452 U.S. 155, 158 (1981); *see also Tcherepnin v. Knight¸* 389 U.S. 332, 336 (1967) (declaring that "form should be disregarded for substance and the emphasis should be on economic reality" in interpreting a similar remedial statute). And every Circuit Court, including the Second Circuit, has endorsed a broad reading of TILA to effectuate Congress's remedial goals of protecting consumers. *See, e.g.*, *N.C. Freed*, 473 F.3d at 1214 ("[TILA's] terms must be construed in liberal fashion if the underlying Congressional purpose is to be effectuated.").

As the Supreme Court observed, Congress was aware in enacting TILA that "some creditors would attempt to characterize their transactions so as to fall one step outside whatever boundary Congress attempted to establish." *Mourning*, 411 U.S. at 365. Courts should therefore look at the reality of a given transaction and avoid strict interpretations that would leave consumers "susceptible to the very abuses Congress sought to prevent." *N.C. Freed*, 473 F.3d at 1217. Even a loan between two business entities may nevertheless be subject to TILA coverage "irrespective of what is contained in the documents" where a loan was, "in reality, a residential mortgage loan." *Brooks v. BC Custom Constr., Inc.*, No. 18-CV-00717, 2019 WL 3763769, at *8 (D. Or. May 21, 2019); *see also LSREF3 Sapphire Tr. 2014 v. Barkston Props., LLC*, No. 14-CV-7968, 2016 WL 302150, at *6 (N.D. Ill. Jan. 25, 2016) (finding commercial loan was a consumer credit transaction

because lender required individual borrowers "to form a business entity to serve as the formal recipient of the funds . . . purely for that purpose").

Defendant cannot genuinely dispute that J&M was a mere shell corporation for the true borrower, Ms. Barker. Defendant understood from speaking to Mr. Telsey that "a lady"—not a business entity—was seeking financing to fix her home. Def. 56.1 Resp. ¶ 46. Defendant and Mr. Telsey then visited the Property, where Ms. Barker was present, to inspect the premises and assess the debt-to-value ratio. *Id.* ¶ 48. After Mr. Telsey advised Mr. Fishbein that Defendant was interested in the deal, Mr. Fishbein initiated a title order no later than January 9, 2017. *Id.* ¶ 49. But Defendant would not lend to Ms. Barker in her individual capacity. *Id.* ¶ 51. Mr. Telsey, acting on Defendant's behalf, advised that Defendant was interested in making the loan but only if a business entity took title and served as the borrower. *Id.* ¶ 50. To that end, J&M was incorporated on January 13, 2017, less than a month before the loan closing—after Defendant had already initiated a title order on the Property. *Id.* ¶¶ 49, 61. J&M was formed to take title to the Property and serve as the formal borrower of the Subject Loan and has no other identifiable purpose. *Id.* ¶ 68. Ms. Barker never engaged in any business as J&M, other than executing documents on its behalf at the loan closings. *Id.* ¶ 69. Although Defendant now claims to be the President of J&M, he cannot identify any business purpose for J&M. *Id.* ¶¶ 67, 169; JDTA, Ex. E [Rokosz Depo] Tr. 59:7–13. At all relevant times, J&M did not hold any assets other than the Property. Def. 56.1 Resp. ¶ 70. To facilitate the loan to J&M, Defendant's attorney, Mr. Legum, prepared corporate documents for J&M, including the Corporate Resolutions and the Corrections of Errors. *Id.* ¶¶ 115, 117. When J&M defaulted, Mr. Telsey and Mr. Legum went after Ms. Barker to demand payment. *Id.* ¶¶ 165–168. In 2017, Defendant commenced eviction proceedings against Ms. Barker. *Id.* ¶ 169.

The above is consistent with Defendant's "preference" for "doing business with businesses" and requiring shell corporations to be created to go forward with a loan transaction. *Id.* ¶¶ 55–56, 58. Defendant does not provide a convincing explanation for his preference for lending to "businesses." When pressed for an explanation, Defendant claimed that he "feel[s] sorry to kick somebody out of [their] house," but he nonetheless had no issue with taking assignment of J&M and seeking to evict Ms. Barker from her home in landlord-tenant court (where summary proceedings move quickly and preclude state foreclosure prevention protections). There is only one logical explanation for Defendant's preference for lending to "businesses" in name only: it allows him to evade the very abuses Congress sought to prevent through enacting TILA.

As there is no genuine dispute that J&M was a mere shell corporation required by Defendant to evade the very laws enacted to protect against these abuses, the Court should liberally construe TILA to effectuate Congress's clear intent to protect vulnerable homeowners like Ms. Barker from predatory lenders like Defendant. Like the loan in *Brooks*, the Subject Loan was "in reality, a residential mortgage loan," irrespective of the fact that it was nominally issued to a corporate entity. The Court should therefore find that the Subject Loan was a "consumer credit transaction" under TILA.

> b. *Ms. Barker Obtained the Subject Loan for the Personal Purpose of Maintaining Ownership over her Family Home and Residence.*

There can be no reasonable dispute that Plaintiff borrowed this money to maintain ownership of her family home, which is plainly a personal, family, or household purpose under TILA. To determine whether a loan was primarily for "personal, family, or household purposes," courts "must examine the transaction as a whole and the purpose for which the credit was extended." *Macheda v. Household Fin. Realty Corp.*, No. 04-CV-0325, 2009 WL 113474, at *5 (N.D.N.Y. Jan. 15, 2009). The plain text of the statute allows a commercial purpose, so long as the

*primary* purpose is consumer related. Therefore, it is not enough to point to *some* business or commercial purpose. *See Krishtul v. VSLP United, LLC*, No. 10-CV-0909, 2014 WL 940941 (E.D.N.Y. Mar. 11, 2014) (finding a consumer transaction despite certain factors pointing to a business purpose, because those business factors were a "secondary reason for the transaction"). Generally, a loan obtained to finance expenses for one's home or a family home where one intends to later reside is considered for "personal, family, or household purposes." *See Tower v. Moss*, 625 F.2d 1161, 1166 (5th Cir. 1980) (finding loan issued to cover repairs for borrower's childhood home was for personal, family, or household purposes, even though borrower was renting the property to a third party, because she intended to reside there); *Curtis v. Propel Prop. Tax Funding, LLC*, 915 F.3d 234, 245 (9th Cir. 2019) (finding loan issued to pay for property tax liens for borrower's home was for personal, family, or household purposes).

Here, there is no genuine dispute that the Subject Loan was primarily for personal, family, or household purposes. Ms. Barker is a high school graduate who is not sophisticated in matters of real estate. Def. 56.1 Resp. ¶ 3.She has a longstanding personal and familial relationship to the Property, having lived there as a child and inherited it from her late mother. Def. 56.1 Resp. ¶¶ 32–33. Facing the threat of a partition judgment from her sister, who did not live in the Property and did not want to keep it, Ms. Barker sought to buy out her sister's interest in order to continue to reside[9] in the home. *Id.* ¶ 36. Ms. Barker also sought financing to satisfy property taxes owed on the Property and make needed repairs. *Id.* ¶¶ 127, 137. In two cases with extremely similar facts, courts have concluded that TILA applies. In *Tower*, although the plaintiff did not reside in the property and was renting it to defray the costs of repairs and property expenses, the Fifth Circuit reversed the district court and concluded that TILA protections applied because of "context facts"

---

[9] The fact that Ms. Barker resided in the Property at all relevant times is discussed at length in Section I.A.2.a, *infra*.

establishing that the plaintiff was a "single, relatively uneducated woman in her sixties," had inherited the property along with her sister from their mother, had resided in the house as a child, and fully expected to reside in the home upon retirement. *Tower*, 625 F.2d at 1166. Similarly, in *Curtis*, where the plaintiff sought money to finance property taxes owned on his home, the court determined it was "hard to imagine a transaction more likely to constitute one 'primarily for personal, family, or household purposes.'" *Curtis*, 915 F.3d at 245. Like the plaintiffs in those cases, Ms. Barker's undisputed primary aim was to pay off her debts and keep her family home.

    2.   <u>The Subject Loan Exceeded the Relevant Threshold to Be Considered A High-Cost Home Loan and Is Thus Subject to HOEPA.</u>

The Subject Loan is also covered by HOEPA protections because it is a "high-cost mortgage." A loan is a "high-cost mortgage" if it (1) is a consumer credit transaction (2) secured by a consumer's principal dwelling (3) with a rate exceeding a set threshold. 15 U.S.C. § 1602(bb). As set forth at length in Section I.A.1, *supra*, the Subject Loan is a consumer credit transaction. Additionally, the undisputed facts show that the Subject Loan is secured by Ms. Barker's residence and exceeds the relevant threshold.

    *a.   Ms. Barker Has Established That She Resides at the Property, and In Response, Defendant Has Failed to Raise a Genuine Issue of Fact.*

Defendant cannot genuinely dispute that the Property was Ms. Barker's principal dwelling or that Defendant was aware that Ms. Barker resided in the Property. At the first closing, Ms. Barker provided photo identification listing the Property as her address. The ID was collected and photocopied by Defendant or his agents. Luu Decl., Ex. 45; Def. 56.1 Resp. ¶ 112. While the Subject Loan was in process, Ms. Barker obtained and provided to Defendant an insurance binder listing the Property as Ms. Barker's address and identifying the property as "owner-occupied." Def. 56.1 Resp. ¶ 83. When Defendant's agents, Telsey and Legum, needed to contact Ms. Barker,

they visited or wrote to Ms. Barker at the Property. *Id*. ¶¶ 166, 168. Later, Defendant attempted to evict Ms. Barker in 2017. *Id.* ¶ 169. Through verified petitions, Defendant demanded that Ms. Barker vacate and surrender the Property, which he claimed she was in possession of; he did not file in commercial landlord tenant court. *Id.*; Luu Decl., Exs. 14,15.

In contrast, Defendant's only basis for disputing that Ms. Barker lived at the Property is Mr. Telsey's belief that it did not appear habitable. Def. 56.1 Resp. ¶ 1.[10] But Mr. Telsey never claims to have any actual knowledge as to where Ms. Barker lived. *Id.* Given Ms. Barker's own testimony and corroborating evidence (Luu Decl., Ex. 33), a reasonable jury could not find that Ms. Barker did not maintain the Property as her residence.

> ### b.  On Its Face, the Subject Loan Exceeds the HOEPA Cost Threshold.

For a fixed-rate loan secured by a first lien, a loan exceeds the HOEPA cost threshold when its interest rate exceeds the average prime offer rate (APOR) for a comparable loan transaction by more than 6.5 percentage points. *See* 15 U.S.C. § 1602(bb); 12 C.F.R. §§ 1026.32(a)(1)(i)(A), (a)(3)(i). Here, in the six months prior to the February 6, 2017 closing, the highest APOR for a fixed rate loan with a one-year term was 3.54%. Def. 56.1 Resp. ¶ 125. So, the relevant rate threshold was no more than 10.04% (6.5 percentage points over 3.54%). The Subject Loan had a fixed interest rate of 12%. *Id.* ¶ 121. Accordingly, the Subject Loan exceeded the price threshold to be considered a "high-cost mortgage" and entitled to HOEPA protections.

> ### 3.  By Making a High-Cost Mortgage Loan through a Broker, Defendant Established Himself as a "Creditor."

---

[10] Defendant also points to Ms. Defreitas's testimony that Ms. Barker's son ran away for a couple of weeks. This does not support any inference that Ms. Barker was not living at the Property. In any event, on the very same page of her deposition transcript, Ms. Defreitas confirmed that Ms. Barker was living at the Property (in "squalid conditions"). JDTA, Ex. F [Defreitas Depo] Tr. 78:23–79:2.

The term "creditor" includes "any person who originates 1 or more [high-cost mortgages][11] through a mortgage broker." 15 U.S.C. § 1602(g). As discussed in Section I.A.2, *supra*, the Subject Loan was a high-cost mortgage under HOEPA. Additionally, it is undisputed that the Defendant originated the loan through a mortgage broker. Def. 56.1 Resp. ¶¶ 9, 45–50, 130. Thus, by virtue of making the Subject Loan, Defendant made himself a "creditor," required to comply with TILA.

**B. Although Required to Comply with TILA and HOEPA, Defendant Violated Both Statutes by Failing to Provide the Requisite TILA and HOEPA Disclosures and Failing to Follow Substantive Protections Mandated by HOEPA.**

For all consumer credit transactions, TILA requires a series of disclosures at or before closing. 15 U.S.C. § 1638. For high-cost mortgages, such as the Subject Loan, HOEPA also mandates substantive and procedural precautions. 15 U.S.C. § 1639. Here, Defendant failed to provide substantially all of the disclosures required by 15 U.S.C. § 1638. Def. 56.1 Resp. ¶¶ 105, 108. Additionally, the terms of the Subject Loan itself (*id.* ¶¶ 115, 117) constitute violations of HOEPA's prohibitions on balloon payments (15 U.S.C. § 1639(e)) and increased interest rate post-default (*id.* § 1639(d)). Defendant also violated HOEPA by financing points and fees (Def. 56.1 Resp. ¶ 129; 15 U.S.C. § 1639(m)), failing to provide a pre-closing disclosure notice (Def. 56.1 Resp. ¶ 95; 15 U.S.C. § 1639(a)), lending without pre-closing housing counseling (Def. 56.1 Resp. ¶ 99; 15 U.S.C. § 1639(u)), and directly paying a contractor without use of a jointly payable check or third-party escrow (Def. 56.1 Resp. ¶¶ 140–141; 15 U.S.C. § 1639(i)).

In this case, as the Supreme Court predicted, Defendant has devised a clever way of structuring loan transactions "so as to fall one step outside whatever boundary Congress attempted to establish." Defendant's lending practices assure him supranormal profits with minimal to no risk, while creating an unreasonable risk of foreclosure for homeowners like Ms. Barker. First,

_____

[11] Although the statute cross-reference 15 U.S.C. § 1602(aa), this appears to be a scrivener's error. The definition of "high-cost mortgage" is set forth at § 1602(bb) of the statute.

Defendant's only underwriting criteria was that the Property existed and the debt-to-value ratio was favorable—he did not review Ms. Barker's finances (or J&M Holdings' finances for that matter) nor her ability to repay the debt. Def. 56.1 Resp. ¶¶ 71–79. Second, for a credit risky consumer like Ms. Barker, Defendant required that she establish a shell corporation to take title to the Property and act as the borrower of the Subject Loan. *See supra*, Statement of Facts, Section B. Third, Defendant inflated the principal balance with an "escrow fund" in order to provide himself with additional security and increased rate of return. *See* Def. 56.1 Resp. ¶¶ 153, 155. Finally, for additional security, Defendant required an assignment of all stock and interest in the newly formed sham company as a condition of making the loan. *Id.* ¶¶ 115(g), 117(g). Once Ms. Barker (or the fiction that is J&M) defaulted, Defendant immediately declared default, took over J&M, and attempted to evict Ms. Barker from her lifelong home. *Id.* ¶¶ 165, 169.

The terms themselves were also onerous and created an unreasonable risk of default. The Subject Loan contract required interest-only payments of $4,500 per month for a one-year term, totaling $54,000 in monthly payments on top of a $450,000 balloon payment. Luu Decl., Ex. 38. At the end of one year, Ms. Barker would have paid off none of the principal balance. The significant balloon payment would require either sale of the Property or refinancing, resulting in more fees and stripped equity from her home. Meanwhile, Defendant was positioned to reap a substantial return on his investment with no risk of loss—either Ms. Barker would refinance the loan and pay him back with significant interest and fees attached, or he would take ownership of the property at a deep discount and without the headache of a foreclosure lawsuit.

According to Professor Kathleen C. Engel, Plaintiff's expert witness and a well-regarded scholar of predatory lending, "private lenders can fly under the regulatory radar and make private loans that evade detection and that contain predatory features simply by dressing residential loans

in corporate clothing." Luu Decl., Ex. 17, at 43. Lenders like Defendant who insist on lending to corporations "often prey on the same people that predatory lenders of the past targeted—the vulnerable, the financially inexperienced, the desperate, and those who cannot qualify for conventional loans." *Id.* at 44. After reviewing the record in this case, Professor Engel concluded that the Subject Loan transactions "exhibited characteristics of exploitation and were designed to evade the federal and state consumer protection laws that governed such transactions." *Id.*

II.     **<u>Defendant Violated New York Banking Law § 6-*l* in Issuing the Subject Loan.</u>**

New York's anti-predatory lending law, Banking Law § 6-*l*, is the state analogue to HOEPA. Under Banking Law § 6-*l*, a "home loan" made by a "lender" that exceeds a statutory price threshold is considered a "high-cost home loan." The statute provides numerous procedural and substantive protections for borrowers of high-cost home loans, which if intentionally violated, entitle the borrower to actual damages, statutory damages, and cancellation of the mortgage.

Here, the Defendant deceptively structured the loan to avoid the application of Banking Law § 6-*l*, among other consumer protection statutes. But a review of the substance of the transaction shows that the Subject Loan is a home loan. Because Defendant made the Subject Loan through a mortgage broker, he is a lender and subject to the statute. The Subject Loan also exceeds both of the price thresholds and is, therefore, a high-cost home loan. The terms of the Subject Loan and Defendant's actions in originating the Subject Loan violate the substantive and procedural safeguards mandated by the statute. Finally, Defendant's violation of the statute is intentional, entitling Ms. Barker to cancellation of the Subject Loan.

    **A. Although Defendant Structured the Subject Loan to Avoid Application of Consumer Protection Laws, It Is Still a "Home Loan" and Subject to Banking Law § 6-*l*.**

Banking Law § 6-*l* applies to "home loans," defined as a loan in which (1) the loan has a principal amount at origination that does not exceed the conforming loan principal limit set by Fannie Mae; (2) the borrower is a natural person; (3) the debt is incurred primarily for personal, family, or household purposes; (4) the loan is secured by real estate improved by a one to four unit dwelling; (5) the dwelling is or will be occupied by the borrower as the borrower's principal dwelling; and (6) the dwelling is located in New York State. Banking Law § 6-l(1)(e). Here, there is no question that the loan's principal balance is below the relevant Fannie Mae limit;[12] the loan is secured by real estate improved by a two-unit dwelling (Def. 56.1 Resp. ¶ 31); and the dwelling is located in New York State (*id.* ¶ 1). Defendant protests that the statute is inapplicable because the loan was made to a business entity. However, by its own terms, the statue "shall apply to any person who in bad faith attempts to avoid the application of this section by any subterfuge." Banking Law § 6-*l*(3). A New York appellate court found that this provision applies to a lender who requires that loans be made to business entities rather than natural persons. In that case, the court found that the lender made loans "only to Limited Liability Companies whose owners have transferred their homes to the company" and not to individual borrowers. *Aries Fin., LLC v. 12005 142nd St., LLC*, 127 A.D.3d 900, 901 (N.Y. App. Div. 2015). The court in *Aries* concluded that the defendant violated the statute even though the loan "was made to a limited liability company, and not to 'a natural person.'" *Id.* at 901–02. Here, as discussed at length in Section I.A.1.a, *supra*, Defendant had a similar business plan. Defendant sought to lend only to business entities (Def. 56.1 Resp. ¶ 55), required borrowers to form business entities for the purpose of borrowing money from him (*id.* ¶ 56), and Defendant's borrowers frequently formed corporate entities shortly before

<hr>

[12] The conforming loan limit for a two-unit home in a high-cost area in 2017 was $814,500. *See* Fannie Mae Lender Letter 2016-05 (Nov. 23, 2016) available at: https://singlefamily.fanniemae.com/media/15851/display (last accessed July 18, 2023).

consummation of the loan (*id.* ¶ 58). Moreover, the undisputed facts in this case show that Ms. Barker was instructed by Defendant's representative to create a business entity to act as borrower of the loan and Defendant's own attorney prepared corporate documents to aid consummation of the loan. *Id.* ¶ 50, 115, 117. Defendant's claims that Ms. Barker did not reside in the property or had a business purpose in taking out the loan, which are addressed in Sections I.A.2.a, and I.A.1.b, *supra*, respectively, are not genuine disputes. Accordingly, the Court should find that the loan was substantively a home loan and apply Banking Law § 6-*l*.

### B. Because Defendant Made the Loan Through a Mortgage Broker, He is a "Lender" and Covered by the Statute.

The definition of "lender" includes any entity subject to the mortgage banker licensing requirements. Banking Law § 6-l(1)(i); *see* C*armike Holding I, LLC v. Smith*, 180 A.D.3d 744, 748 (N.Y. App. Div. 2020) (finding that lender was "exempt from the licensing provisions of Banking Law § 590 and was not a lender within the meaning of Banking Law § 6-l"); *Balsam v. Fioriglio*, 123 A.D.3d 750, 752 (N.Y. App. Div. 2014) (same). Banking Law § 590(2)(a)(iii) provides that any individual who makes a mortgage loan[13] "solicited, processed, placed or negotiated by a mortgage broker" shall be subject to licensure requirements. Here, Ms. Barker's loan was made using two mortgage brokers: Mr. Telsey and Mr. Fishbein. Def. 56.1 Resp. ¶¶ 9, 19, 43–49. Accordingly, by making the Subject Loan, Defendant established himself as a "lender" subject to the statute.

### C. The Subject Loan is a "High-Cost Home Loan" Because It Exceeds Both the Points and Fees Threshold and the APR threshold.

---

[13] "Mortgage loan" is defined by Banking Law § 590(1)(a). Any "home loan" is, by necessity, also a "mortgage loan." *Compare* Banking Law § 6-*l*(1)(e) *with* Banking Law § 590(1)(a). As discussed in Section II.A, *supra*, Ms. Barker's loan is a home loan. For the same reasons, it is a mortgage loan.

A "high-cost loan" is a loan that exceeds either (1) a points and fees threshold or (2) an annual percentage rate (APR) threshold. Banking Law § 6-*l*(1)(d),(g). Here, the loan exceeds both the points and fees threshold and the APR threshold.

### 1. The Points and Fees on the Loan Greatly Exceed the Threshold.

For private loans with an original principal balance above $50,000.00, the points and fees limit is five percent of the "total loan amount." Banking Law § 6-*l*(1)(g)(ii). The total loan amount is defined as the original principal amount less points and fees. *Id*. at (1)(h). Points and fees are defined to include, *inter alia*, all compensation paid to a mortgage broker (*id.* at (1)(f)(iii)) and all finance charges aside from interest charges (*id*. at (1)(f)(i)). Here, Ms. Barker paid over $23,640.00 in broker fees. Def. 56.1 Resp. ¶¶ 130–131. This alone is sufficient for the loan to exceed the points and fees threshold.[14] In addition, Ms. Barker has identified a myriad of other fees: money held as further security for the loan (Def. 56.1 Resp. ¶¶ 153, 155; 12 C.F.R. § 1026.4(a)), payment of the lender's mortgage tax (Def. 56.1 Resp ¶ 152; 12 C.F.R. § 1026 Supp. I Cmt. (a)-5), mortgage recording fees that exceeded those paid to the county recorder (Def. 56.1 Resp. ¶¶ 147–149; 12 C.F.R. § 1026.4(e)(1)), closing agent's fees (Def. 56.1 Resp. ¶¶ 134–135; 12 C.F.R. § 1026.4(a)(2)) and an escrow service charge (Def. 56.1 Resp. ¶ 145; 12 C.F.R. § 1026.4(a)). In total, Ms. Barker was charged $88,441.22 in points and fees—over 24% of the total loan amount.[15] Because the loan easily exceeded the points and fees threshold, the loan is a high-cost home loan, and the protections of Banking Law § 6-*l* apply.

---

[14] The total loan amount would be $450,000.00 less $23,640.00 = $426,360.00. Points and fees would thus be 5.55% ($23,640 ÷ $426,360) of the total loan amount using only the broker's fees as points and fees.

[15] The total loan amount would be $450,000.00 less $88,441.22 = $361,558.78. Points and fees would thus be 24.46% ($88,441.22 ÷ $361,558.78) of the total loan amount using all finance charges.

2.  <u>The Annual Percentage Rate on the Loan Greatly Exceeds the Threshold.</u>

For a first lien mortgage, the APR threshold is "eight percentage points over the yield on treasury securities having comparable periods of maturity." Banking Law § 6-*l*(1)(g)(i). Here, the loan is a first lien mortgage with a term of 375 days. Def. 56.1 Resp. ¶¶ 111, 117. Thus, the Treasury security having the most comparable period of maturity is the one-year Treasury security. In the six months prior to the transaction, the yield on one-year Treasury securities never exceeded 0.92%.[16] Accordingly, the relevant APR threshold is 8.92%. APR is "calculated according to the provisions of the Federal Truth-in-Lending Act." Banking Law § 6-*l*(1)(b). Under TILA, APR is calculated according to the methodology described in Appendix J to Regulation Z, which prescribes the following formula for calculating the APR of a closed-end loan:

$$\frac{A_1}{(1+e_1 i)(1+i)^q{}_1} + \frac{A_2}{(1+e_2 i)(1+i)^q{}_2} + \cdots + \frac{A_m}{(1+e_m i)(1+i)^q{}_m}$$
$$= \frac{P_1}{(1+f_1 i)(1+i)^t{}_1} + \frac{P_2}{(1+f_2 i)(1+i)^t{}_2} + \cdots + \frac{P_n}{(1+f_n i)(1+i)^t{}_n}$$

12 C.F.R. § 1026, App'x. J(b)(8). The letters in the above formula represent the nine different variables needed to compute APR. *See* 12 C.F.R. § 1026, App'x. J, § (b)(7)–(8). The left side of the above equation represents each advance made in the loan, discounted based on the time of the disbursement and summed. *Id.* The right side of the equation represents each of the scheduled loan payments, discounted based on the time of the payment and summed. *Id.* The variable "i" represents the loan's APR and is used to balance the sides of the equation. *Id.* The correct APR is the "i" that sets each side of the equation equal to the other. Even if there were no points and fees

---

[16] Historical yield information is available from the Department of the Treasury. Department of Treasury, Daily Treasury Par Yield Curve Rate, available at: https://home.treasury.gov/resource-center/data-chart-center/interest-rates/TextView?type=daily_treasury_yield_curve&field_tdr_date_value=2017 (last accessed July 18, 2023).

on the loan and if Defendant had not charged an upfront interest payment on February 16, 2017, the APR would be 11.71%, well above the above threshold. Rebella Decl. ¶¶ 7-8. Taking the points and fees, as described in Section II.C.1, *supra*, and upfront interest charge (Def. 56.1 Resp. ¶¶ 129, 136) into consideration, the APR on the loan was 34.85%. Rebella Decl. ¶¶ 9–10.

### D. Both the Terms of the Subject Loan and the Process by which Defendant Made It Violate the Protections Provided by Banking Law § 6-*l*.

Banking Law § 6-*l* imposes both substantive and procedural requirements on high-cost home loans. *See generally*, Banking Law § 6-*l*(2). Here, several violations appear on the face of the loan documents themselves: (1) balloon payment (Banking Law § 6-*l*(2)(b)); (2) increased interest rate after default (*id.* § 6-*l*(2)(c)); and (3) failure to designate the loan as a high-cost loan (*id.* § 6-*l*(2-a)(a); Def. 56.1 Resp. ¶ 106). Additionally, Defendant violated the statute by lending without due regard to Ms. Barker's ability to repay (Def. 56.1 Resp. ¶¶ 72, 76; Banking Law § 6-*l*(2)(k)), failing to provide a counseling disclosure, caution notice, and list of counselors (Def. 56.1 Resp. ¶ 105, Banking Law § 6-*l*(2)(l)), excessively financing points and fees (Def. 56.1 Resp. ¶¶ 130–131; Banking Law § 6-*l*(2)(m)), and directly paying a contractor without use of a jointly payable check or third-party escrow (Def. 56.1 Resp. ¶¶ 140–141; Banking Law § 6-*l*(2)(n)).

### E. Given Defendant's Intentional Violations of the Statute, Ms. Barker is Entitled to Cancellation of the Subject Loan.

For intentional violations of the statute, Banking Law § 6-*l*(10) mandates that the loan be cancelled and all payments made be returned. Although the statute does not expressly define "intentional violation," it does provide a process to correct bona fide, unintentional errors, including "clerical, calculation, computer malfunction and programming, and printing errors." *Id.* at (4)(b). That section expressly states that "[a]n error of legal judgment with respect to a person's obligations under this section is not a bona fide error." *Id*. Here, the violation was clearly

intentional. As described in Sections I.B.2.ii and II.A, *supra*, Defendant took great lengths to structure the transaction to avoid application of the law. Defendant's actions were intentional and calculated; he merely thought he had done enough to undermine the law through subterfuge. Accordingly, the Court should cancel the mortgage.

### III.    The Subject Loan Violates New York State's Prohibition on Usury and Is Void.

New York law prohibits as usurious the charging, taking, or receiving of interest on a loan of money at a rate exceeding 16 percent per year. *See* N.Y. Gen. Oblig. Law ("GOL") § 5-501; Banking Law § 14-a.[17] A usurious loan is void *ab initio*. *See* GOL § 5-511(1). Here, the Subject Loan carried significant upfront costs that caused the cost of the loan to exceed 16%.  Although Defendant has claimed that usury does not apply because (1) the Subject Loan was a purchase money mortgage and (2) Plaintiff's usury claim is preempted, neither claim bears scrutiny.

#### A. With Consideration of the Significant Upfront Charges Associated with the Subject Loan, The Interest Rate of the Loan Greatly Exceeded the Legal Limit.

For purposes of usury, "interest" includes not only the nominal rate of interest, but "any and all amounts paid or payable, directly or indirectly, by any person, to or for the account of the lender in consideration for the making of a loan." Banking Law § 14-a. Here, in addition to the monthly payments of interest on the Subject Loan, Defendant also imposed (1) an upfront interest

---

[17] Although the civil usury limit does not generally apply to loans made to business entities, New York's usury laws analyze the substance rather than the form of a transaction. *Schneider v. Phelps*, 359 N.E.2d 1361, 1364 (N.Y. 1977) (finding that usury protections apply "where the loan was in fact, although not in form, made to an individual guarantor to discharge his personal obligations"). Moreover, a business entity may assert usury where (1) the principal asset of the entity is a one- to two-family dwelling, (2) the entity was created within six months of the execution of loan documents, and (3) the loan was secured by the relevant dwelling. GOL § 5-521(2). Similarly, an individual guarantor of such a loan may assert usury directly. *N. Broadway Funding Corp. v. Freed*, 357 N.Y.S.2d 27, 29 (N.Y. App. Div. 1974), *cited with approval in Schneider* at 1366. It is undisputed that J&M was created within six months prior to execution of the Subject Loan, that the Property is a two-family dwelling, and that the Property is J&M's only asset. *See* Def. 56.1 Resp. ¶¶ 31, 61, 70, 111, 115–117.

charge at the second closing, (2) a large payment to be held as further security by Defendant's attorney, and (3) a broker's fee payable to Defendant's agent. Each of these fees are interest under New York's usury laws, and when these fees are included in the interest calculation, the interest rate exceeds 29%, well over the legal limit.

1. <u>In Addition to Periodic Payments of Interest, The Subject Loan Included a Payment of Interest on February 16, 2017.</u>

At the second closing, Defendant withheld $1,193.42 of interest payable to Defendant. *See* Def. 56.1 Resp. ¶¶ 129, 136.[18] As a payment of interest accrued on the loan, it was payable directly to Defendant in consideration of making the loan and therefore counts as interest.

2. <u>The Loan Proceeds Withheld as Additional Security and Never Used to Benefit Ms. Barker Constituted Interest on the Subject Loan.</u>

Loan proceeds placed in "escrow" constitute interest when the funds are not made available to the borrower or used to the borrower's benefit. *See Simsbury Fund v. New St. Louis Assocs.*, 611 N.Y.S.2d 557, 558 (N.Y. App. Div. 1994) (finding interest "on the escrowed funds to which defendant had no access made the agreements usurious" and "the possibility of a nonusurious rate of interest in the event of defendant's full performance . . . [does] not make the subject agreements nonusurious"); *Sasidharan v. Piverger*, 993 N.Y.S.2d 646 (Table) (N.Y. Sup. Ct. 2014) ("[S]ince ACI never received the amount of $63,000 of the $150,000 loaned which was held in escrow . . . this effectively resulted in [a usurious] annual interest"), *aff'd in part*, 44 N.Y.S.3d 85 (N.Y. App. Div. 2016). Here, $60,192.68 of the proceeds from the Subject Loan was held by Defendant's agent as additional security pursuant to two "escrow" agreements. Def. 56.1 Resp. ¶¶ 115(f), 117(e), 153, 155. Under these escrow agreements, the funds held could not effectively be used to Ms. Barker's

---

[18] The $1,193.42 amount represents the interest that had accrued on the first disbursement over the eleven days since the first closing ($1,193.42 = 11/365*12%*$330,000).

benefit. Absent a court order directing release of the funds, the escrow agreements do not provide any mechanism for the release of the escrowed funds to Ms. Barker or J&M.[19] *Id.* ¶ 157. Moreover, Ms. Barker waived any right to contest the release of funds from the escrow fund to Defendant. *Id.* ¶ 158. The escrow agreements provided Defendant "the right, but not the obligation" to use those funds to make the payments on the Subject Loan or property charges. Luu Decl., Exs. 58, 67. In fact, none of the escrowed funds were otherwise made available to or used on behalf of Ms. Barker prior to the commencement of the present action. Def. 56.1 Resp. ¶ 163. Moreover, had Defendant released funds, the escrow agreements provide that "any such payments are then added to the sum then due and owing the Lender." Luu Decl., Exs. 58, 67. So, any money that could have been released to Ms. Barker's benefit would have been immediately offset by a new liability, namely the duty to replenish the "escrow" fund. Because the escrowed funds were not held for the benefit of Ms. Barker, the $60,192.68 in escrowed funds constituted interest on the Subject Loan.

3. The Loan Proceeds Paid to Defendant's Agent, with Defendant's Approval, Constituted Interest on the Subject Loan.

Under New York law, a broker's fee is considered interest if (1) the broker was acting as the agent of the lender and (2) the lender had knowledge of the fee, gave actual or apparent authorization to the agent to take such a fee, subsequently ratified the fee, or otherwise received the benefit of the fee. *See, e.g.*, *Kovian v. Fulton Cnty. Nat'l Bank & Tr. Co.*, 647 F. Supp. 830, 839 (N.D.N.Y. 1986); *Schwarz v. Sweitzer*, 202 N.Y. 8, 10–11 (N.Y. 1911) (affirming usury applied where lender did not learn of the bonus taken by her son, who acted as her agent in arranging a mortgage, until the next day, but subsequently collected interest on the loan); *accord* 3 NYCRR §

---

[19] Such a court order could not have arisen from the escrow agreements themselves, as the escrow agreements imposed no duties upon Defendant or Defendant's agent and included a waiver of Ms. Barker's right to challenge any disbursements from the fund. Luu Decl., Exs. 58, 67

4.2(a). Ignorance of an agent's affairs is not a defense. *See Bliss v. Sherrill*, 49 N.Y.S. 561, 566 (N.Y. App. Div. 1898) (per curiam) (finding lender "could not, without investigation and care, permit her husband to proceed with this property, violate the law, oppress the public by usurious contracts, giving her the benefit of it, and she neglecting and refusing to know anything about it"); *Cohen v. Beaudry*, 100 N.Y.S.2d 519, 526 (N.Y. Civ. Ct. 1950) ("[I]t takes no strained inference to conclude that [the lender], . . . at least by acquiescence, became a party to [his broker's] usurious exactions.")

Here, Defendant cannot genuinely dispute that Mr. Telsey acted as his agent. Agency is a fiduciary relationship in which a party agrees to act on behalf and subject to the control of another party; such relationship "may be established circumstantially or by the course of conduct of the principal's business." *L. Smirlock Realty Corp. v. Title Guarantee Co.*, 70 A.D.2d 455, 464 (N.Y. App. Div. 1979), *aff'd as modified*, 52 N.Y.2d 179 (N.Y. 1981) (internal citations omitted). Here, Mr. Telsey is Defendant's only broker. Def. 56.1 Resp. ¶ 9. In that role, he finds people for Defendant to lend money to; helps "make deals" with borrowers, including establishing and negotiating loan terms, along with Defendant's attorney, on Defendant's behalf; helps Defendant determine how much money from a loan transaction to set aside in "escrow;" drives Defendant to properties that would serve as the collateral for prospective loans; and otherwise works on Defendant's behalf in Defendant's loan transactions. *See id.* ¶¶ 9–11, 13–15, 22. With respect to the Subject Loan, Mr. Telsey worked and communicated on Defendant's behalf and took Defendant to the Property to assess it. *Id.* at ¶¶ 21–22, 44–50, 84, 86. After Ms. Barker defaulted, Mr. Telsey worked on Defendant's behalf to collect. *Id.* at ¶¶ 165–167.

Furthermore, Defendant both had knowledge of and subsequently ratified Mr. Telsey's fee. Mr. Telsey received $8,713.33 from the proceeds of the Subject Loan for his role in the transaction.

*Id.* at ¶¶ 7–8, 17, 130. As Defendant contends that he authorized the disbursement sheets for both loan closings (*see id.* at ¶¶ 115, 117) which reflected the disbursements of loan proceeds to Mr. Telsey (*see* Luu Decl., Exs. 54, 57), he had knowledge of Mr. Telsey's broker fees. Alternatively, Defendant ratified Mr. Telsey's broker fees by seeking to collect on the Subject Loan, including interest calculated as if the fees were amounts financed. Def. 56.1 Resp. ¶ 169; *see also* Luu Decl., Exs. 14, 15. He also gave Mr. Telsey actual or apparent authorization to collect the fees by repeatedly ratifying Mr. Telsey's receipt of fees from loans in which he acted as Defendant's agent. *See Id.* at ¶ 17. Because Mr. Telsey acted as Defendant's agent in the Subject Loan transaction, and Defendant had knowledge of the fees paid to Mr. Telsey out of the Subject Loan, ratified them, and/or authorized Mr. Telsey to collect them, the amounts received by Mr. Telsey should be treated as interest on the Subject Loan.

### 4. In Consideration of the Upfront Charges, the Interest Rate Exceeded the Statutory Limit.

To determine whether the interest charged on a loan secured primarily by an interest in real property improved by an owner-occupied one- or two-family residence has exceeded the usury limit, the rate is "calculated according to the actuarial method (United States rule)" described in Section II.D, *supra*. *See* 3 NYCRR § 4.4. In doing that calculation, the amount financed does not include any charges considered to be interest. *Id*. Here, with the upfront interest, escrow charge and payment to Mr. Telsey counted as interest charges, the interest rate is 29.5%. Rebella Decl. ¶¶ 11–12. As this rate greatly exceeds the statutory maximum of 16%, the Subject Loan is usurious.

### B. The Subject Loan Is Not a Purchase Money Mortgage and Would Still Be Usurious Even If It Were.

Defendant asserts that the Subject Loan is a purchase money mortgage. Generally, a purchase money mortgage is not subject to the civil usury limit. *See Mandelino v. Fribourg*, 295

N.Y.S.2d 654 (N.Y. 1968). However, the Subject Loan is not a purchase money mortgage, as that term is used in the context of usury. For purposes of usury, a purchase money mortgage is a mortgage in which the seller of real property takes back a mortgage to secure money borrowed to acquire the property. *See Szerdahelyi v. Harris*, 490 N.E.2d 517, 520 (N.Y. 1986) (rejecting application of purchase money mortgage exception because "the lender in this case, was neither a seller of real property nor did she take back a mortgage to secure money borrowed to acquire any such property"); *Mandelino*, 295 N.Y.S.2d at 658 ("A contract which provides for a rate of interest greater than the legal rate upon a deferred payment, which constitutes the *consideration for a sale*, is not usurious.") (quotation omitted) (emphasis added). Here, Defendant never owned or sold the Property and thus cannot give a purchase money mortgage as consideration for its sale. Moreover, purchase money mortgages are still subject to the criminal usury limit of 25%, which the Subject Loan exceeded. *See Babinsky v. Skidanov*, 784 N.Y.S.2d 540, 541 (N.Y. App. Div. 2004); N.Y. Penal Law § 190.40. "[L]oans proved to violate the criminal usury statute are subject to the same consequence as any other usurious loans: complete invalidity of the loan instrument." *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 333 (N.Y. 2021). Thus, Defendant's claim that the Subject Loan was a purchase money mortgage is both incorrect and irrelevant to Plaintiff's usury claim.

### C. Because Defendant Did Not Engage in Sufficient Lending Activity to Trigger DIDMCA, Ms. Barker's Usury Claim is Not Preempted.

DIDMCA preempts any state usury law if the lender establishes that it (1) is a "creditor" as defined under TILA and (2) "makes or invests in residential real estate loans aggregating more than $1,000,000 per year." 12 U.S.C. §§ 1735f-7a(a)(1); 1735f-5(b)(2)(D). Although there does not appear to be any case law detailing under which precise circumstances a lender is deemed to have made loans "aggregating more than $1,000,000 per year," the Federal Home Loan Bank

Board[20] (FHLBB) provided guidance shortly after the passage of DIDMCA as to when a lender is said to pass the "million-dollar test." 1980 FHLBB LEXIS 124 (Jerome Plapinger, Special Counsel, FHLBB) (June 30, 1980). Under that guidance, a lender passes the million-dollar test when the lender (1) makes over $1,000,000 of loans in the previous calendar year or (2) makes over $1,000,000 of loans in the current year prior to the loan at issue. *Id.* Although the FHLBB's guidance interpreting DIDMCA is not binding, courts have found the agency's interpretations persuasive. *See, e.g.*, *Sweeney v. Sav. First Mortg., LLC*, 879 A.2d 1037, 1047 (Md. 2005). More generally, if the text of a statute is ambiguous, a court "must look to the statute as a whole and construct an interpretation that comports with its primary purpose and does not lead to anomalous or unreasonable results." *Connecticut ex rel. Blumenthal v. U.S. Dept. of Interior*, 228 F.3d 82, 89 (2d Cir. 2000) (citing *American Tobacco Co. v. Patterson*, 456 U.S. 63, 71 (1982) ("Statutes should be interpreted to avoid untenable distinctions and unreasonable results whenever possible")). Notably, the CFPB follows a similar interpretation in determining whether a lender extends credit with sufficient regularity to be considered a creditor. *See* 12 C.F.R. § 1026, Supp. I Cmt. 2(a)(17)(i)-1.ii(4). The FHLBB's and CFPB's approaches have the benefit of making it clear whether or not the relevant statute applies at the time of the transaction at issue. Any interpretation of the million-dollar test that includes an analysis of lending activity after the loan at issue would have the absurd result of leaving the legal status of the transaction uncertain until the end of the year. Given that usurious loans are void *ab initio* in New York State (GOL § 5-511(1)) as well as many other states (44B Am. Jur. 2d Interest and Usury § 157 (2023)), a loan could be void in June but valid in December. Such a result is plainly unreasonable and easily avoided by adopting the

---

[20] The FHLBB was federal regulatory agency created by the Federal Home Loan Bank Act of 1932. *See* P.L. 72-304, 47 Stat. 128. It was authorized to issue rules and regulations and to publish official interpretations of DIDMCA. 12 U.S.C. § 1735f-7a(f).

FHLBB's interpretation of the million-dollar test. Under the FHLBB's test, Defendant does not pass the million-dollar test. Defendant made $820,000 of loans in 2016 (Def. 56.1 Resp. ¶ 120) and the Subject Loan was the first mortgage loan that Defendant made in 2017 (*id.* ¶ 119). Accordingly, DIDMCA does not preempt New York State's usury law in this case, and the Subject Loan is void *ab initio*.

## **CONCLUSION**

For the foregoing reasons, this Court should:

(1) grant summary judgment in favor of Plaintiff on all claims asserted in Plaintiff's Second Amended Complaint;

(2) cancel the Subject Loan pursuant to Banking Law § 6-*l*(1) and GOL §5-511(1); and

(3) order a hearing to determine damages under Banking Law § 6-*l* and 15 U.S.C. § 1640.

Dated: July 18, 2023
      New York, New York

Respectfully Submitted,

MOBILIZATION FOR JUSTICE, INC.

By:    */s/ Belinda Luu*
       Belinda Luu
       Joseph Rebella
       Michael Litrownik
       Randal Wilhite
       100 William Street, 6th Floor
       New York, NY 10038
       Tel: (212) 417-3700
       Fax: (212) 417-3890
       Email: bluu@mfjlegal.org

       *Attorneys for Plaintiff*