United States District Court
Eastern District of New York

----------------------------------X

Carla Barker,

                Plaintiff,                    **Memorandum and Order**

   - against -                    No. 19-cr-514 (KAM) (JRC)

Izia Rokosz,

                Defendant.

----------------------------------X

Izia Rokosz,

                Counter-Plaintiff,

   - against –

Carla Barker, *et al.*,

                Counter-Defendants.

----------------------------------X

**Kiyo A. Matsumoto, United States District Judge:**

    Plaintiff Carla Barker commenced this action against Defendants Izia Rokosz, Janelle Defreitas, Steven Legum, Frank Richard Hurley, Gregg Telsey, Robert Fishbein, Betty Hingle, Royce LLC, Jackie Marketing LLC, and Lockdeco (a/k/a Lodeco) based on an allegedly unlawful home mortgage loan on which she defaulted.  All the defendants either settled with Barker or have been dismissed from the case except for the lender, Rokosz, who continues to contest liability and also has counterclaimed

to foreclose on Barker's home.  Barker now moves for summary judgment establishing Rokosz's liability with respect to her claims, which she also asserts as defenses to Rokosz's foreclosure counterclaim.  Rokosz cross-moves for summary judgment rejecting Barker's defenses and establishing his entitlement to foreclosure.

For the reasons below, the Court finds no genuine disputes of material fact and grants Barker's motion for summary judgment with respect to all her claims except her usury claim, which is dismissed with prejudice.  The Court further denies Rokosz's motion for summary judgment and dismisses his foreclosure claim with prejudice.

## Background

### I.   Statutory Background

Barker's claims arise under the Truth in Lending Act ("TILA"), an amendment to TILA titled the Home Ownership and Equity Protection Act ("HOEPA"), Section 6-l of the New York Banking Law, and New York's usury statute.

#### A.   TILA and HOEPA

Congress passed TILA, 15 U.S.C. §§ 1601-67f, to "assure a meaningful disclosure of credit terms" so "consumer[s] will be able to compare more readily the various credit terms available" and "avoid the uninformed use of credit."  Pub. L. No. 90-321, 82 Stat. 146; see 15 U.S.C. § 1601(a).  To that end, TILA

requires creditors to disclose certain information when they offer or extend consumer credit, including the amount financed, itemization of the amount financed, finance charge, annual percentage rate, payment schedule, late payment penalty, and interest rate. *See* 15 U.S.C. § 1638. Congress has authorized the Consumer Financial Protection Bureau ("CFPB") to issue rules to implement TILA, 15 U.S.C. § 1604(a), which are known as "Regulation Z," 12 C.F.R. § 1026.1(a).

HOEPA, Pub. L. No. 103-325, 108 Stat. 2190, requires additional disclosures for high-cost mortgage loans and restricts the terms on which such loans can be offered. *See* 15 U.S.C. § 1639. For example, HOEPA forbids increasing the interest rate after default, scheduling balloon payments, paying a contractor directly out of the loan proceeds, and excessively financing points and fees. *See id.* It also requires the lender to provide a pre-closing notice to the borrower and to receive certification from a federally approved counselor that the borrower received counseling with respect to the advisability of the loan. 15 U.S.C. §§ 1639(a), 1639(u).

TILA and HOEPA apply only to "consumer credit transactions." 15 U.S.C. §§ 1638-39. A consumer credit transaction is a transaction where "the party to whom credit is offered or extended is a natural person" and "the money, property, or services which are the subject of the transaction

3

are primarily for personal, family, or household purposes."
15 U.S.C. § 1602(i).  Transactions "involving extensions of
credit primarily for business" or "commercial" purposes and
transactions involving extensions of credit "to organizations"
are exempt from coverage.  15 U.S.C. § 1603(1).

**B.   New York Banking Law**

Like HOEPA, Section 6-l of the New York Banking Law
"imposes limitations and prohibits certain 'practices for high-
cost home loans.'"  *See Aries Fin., LLC v. 12005 142nd St., LLC*,
7 N.Y.S.3d 372, 375 (2d Dep't 2015) (quoting N.Y. Banking Law
§ 6-l(2)).  Section 6-l similarly limits its coverage to
transactions where "[t]he borrower is a natural person."  N.Y.
Banking Law § 6-l(1)(e)(ii).  It also explicitly states that it
"shall apply to any person who in bad faith attempts to avoid
the application of [the statute] by any subterfuge."  N.Y.
Banking Law § 6-l(3).

**C.   Usury**

New York's usury statute forbids charging, taking, or
receiving interest at a rate beyond sixteen percent per year.
N.Y. Gen. Oblig. Law § 5-501(1)-(2); N.Y. Banking Law § 14-a(1).
Usurious contracts are void under New York law.  N.Y. Gen.
Oblig. Law § 5-511(1).

## II.  Factual Background[1]

This case stems from Defendant Izia Rokosz's $450,000 loan to Plaintiff Carla Barker (the "subject loan") through "J&M Holdings, Inc.," a corporation that Rokosz required Barker to form as a condition of issuing the loan.  The subject loan was issued through two closings that occurred on February 6, 2017, and February 16, 2017, and was secured by a mortgage on Barker's home.

It is undisputed that Barker defaulted on the loan.  (ECF No. 312-2, Mem. Law Supp. Pl.'s Mot. Summ. J. ("Pl.'s Mem."), 5.)  It also is undisputed that Rokosz never attempted to comply with TILA, HOEPA, Section 6-l of the New York Banking Law, or New York's usury statute in issuing the loan.  (ECF No. 295, Def.'s Resps. to Pl.'s Statement Undisputed Material Facts ("Def.'s Counter-56.1."), ¶¶ 100, 106-08.)  The central dispute in this case is whether those statutes apply at all because Rokosz's loan to Barker required the creation of a corporation (*i.e.*, an "organization" and not a "natural person") that took title to Barker's home, signed the mortgage, and had its shares assigned to Rokosz.

### A.  The Subject Loan

Since she was eleven years old, Carla Barker, a fifty-six-

---

[1] Except as otherwise noted, the following facts are not in dispute and are based on the parties' statements filed pursuant to Local Civil Rule 56.1.

year-old high school graduate and home health aide, has lived in a two-family residential home in the East Flatbush neighborhood of Brooklyn, New York (the "subject property"). (Def.'s Counter-56.1. ¶¶ 1–3, 31.)  Barker's mother, who owned the home, died without a will in 2004, causing title to the home pass to Barker and her sister, Sandra Vaughan. (*Id.* ¶¶ 32–33.) Vaughan, who lived out of state, sued Barker to partition the home and obtained a judgment against her in 2008. (*Id.* ¶¶ 33–34.)  Feeling pressure from the partition judgment, Barker sought a loan to buy out her sister's interest in the property and remain in the home. (*Id.* ¶ 36.)

In 2016, after undergoing cancer treatment, becoming unemployed, and failing to qualify for traditional financing, Barker discussed her need for a loan with a family friend, who put Barker in touch with Defendant Janelle Defreitas.[2] (*Id.* ¶¶ 37–39; *see* ECF No. 281, 2d Am. Compl. & Jury Demand ("2d Am. Compl."), ¶ 22.)  Defreitas spoke to a mortgage loan officer, Defendant Robert Fishbein, about Barker's need for a loan. (Def.'s Counter-56.1 ¶ 43.)  Fishbein contacted a "residential mortgage loan originator," Defendant Gregg Telsey, about Barker's need for financing. (*Id.* ¶¶ 6, 44.)

Telsey is the sole broker for Defendant Izia Rokosz, a

---

[2] Defreitas was later convicted for her role in a mortgage fraud conspiracy. *See* https://nysdoccslookup.doccs.ny.gov/ (NYSID #18G0949).

private "hard money" lender who has been in the lending business
for over forty years.[3]   (*Id.* ¶¶ 4–5, 10.)   Rokosz lends to people
who want to fix up their property, rent it, and then obtain
standard home loans from banks.   (*Id.* ¶ 54.)   He prefers to lend
to business entities rather than to individual homeowners, and
most of his loans are to such entities.   (*See id.* ¶¶ 55, 57-58.)
If a prospective borrower seeks to finance an owner-occupied
property, Rokosz may require the borrower, as he did with
Barker, to form a business entity to serve as the formal
borrower.   (*Id.* ¶ 56.)   Rokosz requires that all stock in the
business entity be assigned to him and held in escrow as further
security in case the borrower defaults.   (*Id.* ¶ 59.)

When Telsey informed Rokosz that "a lady" wanted a loan to
fix her house, to be secured by Barker's property, Rokosz
expressed interest.   (*Id.* ¶¶ 45–47.)   Telsey took Rokosz to
Barker's home, where she was present, to inspect the premises,
verify the house's existence, and assess the debt-value ratio.
(*Id.* ¶ 48.)   After Telsey advised Fishbein that Rokosz was
interested in lending to Barker, Fishbein initiated a title

---

[3] A "hard money" loan is a loan secured by real property where the lender
approves the borrower based on the value of the collateral rather than based
on the borrower's creditworthiness.   Troy Segal, *Hard Money Loan:
Definition, Uses, and Pros & Cons*, Investopedia (updated May 7, 2024),
https://www.investopedia.com/terms/h/hard_money_loan.asp
[https://perma.cc/NTE2-J9BJ].   They are considered loans of "last resort" and
typically have higher interest rates than traditional mortgages do.   *Id.*
Because such loans are considered riskier than traditional loans, they are
typically issued by individuals and private companies rather than by banks.

order for the property. (*Id.* ¶ 49.)  Telsey then informed
Fishbein that Rokosz was interested in making the loan, but only
if a business entity took title to the property to serve as the
formal borrower. (*Id.* ¶ 50.)  Fishbein advised Defreitas of
that condition, and Defreitas so advised Barker. (*Id.* ¶¶ 52–
53.)  Defreitas then incorporated J&M Property Holdings, Inc.,
on January 13, 2017, to purchase Barker's property from Barker
and Vaughan and to borrow money from Rokosz. (*Id.* ¶¶ 61–65,
68.)  The "J&M" name apparently derived from Defreitas's first
initial and Barker's middle initial. (*See* ECF No. 292-1,
Defreitas Dep. 66:14–19.)  J&M has no identified purpose other
than borrowing funds from Rokosz and has never held any assets
other than Barker's property. (Def.'s Counter-56.1 ¶¶ 67, 70.)

**B.   The Closings and Distribution of the Proceeds**

Defreitas contacted Defendant Frank Richard Hurley, a
criminal defense attorney with no apparent real estate
experience, to represent Barker in the loan closing. (*See id.*
¶¶ 28, 87–88.)  Hurley agreed to represent Barker and understood
she was seeking to refinance the property where she lived. (*Id.*
¶ 88.)  He was not aware of J&M's existence or the structure of
the loans before closing. (*Id.* ¶ 89.)  Neither he nor Barker
were provided any of the closing documents to review before the
closings occurred. (*Id.* ¶¶ 91–97.)  On the day of the first
closing, Hurley sent Barker a letter stating, "DO NOT BORROW

8

FROM THIS PRIVATE LENDER." (ECF No. 302, Pl.'s Counterstatement Material Facts ("Pl.'s Counter-56.1"), ¶¶ 26-27.)

Before the closings, Rokosz did not request, obtain, or review a loan application or any other documents from Barker, either in her individual capacity or in her capacity as J&M's president. (Def.'s Counter-56.1 ¶¶ 71-74.) He also had not reviewed Barker's finances or J&M's finances. (*Id.* ¶¶ 75-76.) Rokosz never provided any notices, disclosures, or other documents setting forth the amount financed, finance charges, points and fees, payment schedule, or annual percentage rate of the loan beyond what was already stated in the closing documents. (*Id.* ¶¶ 97, 100.)

At a February 6, 2017, closing, Rokosz issued a $330,000 mortgage loan secured by Barker's home. (*Id.* ¶ 111.) At the closing, Rokosz's attorney, Defendant Steven Legum, provided the closing documents, which he had prepared, (*id.* ¶¶ 24-25, 84, 113, 115), and explained the documents to Hurley, who interpreted Legum's explanations for Barker, (*id.* ¶ 114). The closing documents included:

- a deed signed by Barker (individually) and Vaughan transferring the subject property to J&M in exchange for ten dollars;

- a corporate resolution signed by Barker (as J&M's president and secretary) authorizing J&M to borrow $330,000 from Rokosz in exchange for a security interest in the subject property;

- a mortgage note signed by Barker (as J&M's president) promising to pay Rokosz a principal sum of $330,000;

- a mortgage signed by Barker (as J&M's president) securing a sum of $330,000 against the subject property;

- an escrow agreement between J&M as borrower (signed by Barker as J&M's president), Rokosz as lender, and Legum as escrow agent;

- a correction of errors statement signed by Barker (as J&M's president and secretary) authorizing Rokosz to execute any new documents or make corrections as he deemed necessary;

- an assignment and security agreement signed by Barker (individually and as J&M's president) and Legum (as escrow agent) assigning all Barker's interest and stock in J&M to Rokosz;

- a fund disbursements sheet signed by Barker (individually) and another party purporting to be Rokosz;[4]

- a promissory note signed by Barker (individually) promising to pay Telsey and Fishbein a principal sum of $10,000 for closing fees and providing that any default under this note would also be a default on the mortgage loan; and

- a guarantee signed by Barker (individually) guaranteeing J&M's obligations in the principal amount of $330,000.

(*Id.* ¶ 115; Pl.'s Counter-56.1 ¶ 17; *see* ECF Nos. 293-41, 293-66, 293-48, 293-37, 293-67, 293-68, 293-54, 293-72, 293-69, 300-4.)

Ten days later, at a second closing on February 16, 2017, Rokosz issued a $120,000 mortgage loan to J&M, also secured by

---

[4] The parties dispute whether Rokosz's signatures on the fund disbursements sheets were genuine.  (*See* Def.'s Counter-56.1 ¶¶ 117.)

Barker's home.  (Def.'s Counter-56.1 ¶ 116.)  The closing documents included a similar corporate resolution, note, mortgage, escrow agreement, correction of errors statement, assignment and security agreement, fund disbursement sheet, and guarantee.  (*Id.* ¶ 117; *see* ECF Nos. 293-56, 293-55, 293-38, 293-58, 293-61, 293-60, 293-57, 293-59.)

The $450,000 total subject loan provided for a fixed interest rate of twelve percent and monthly interest-only payments of $4,500, with the entire principal and interest due after a year.  (Def.'s Counter-56.1 ¶¶ 121-23.)  In the event of a default, Rokosz could increase the interest rate to the maximum rate permitted by law.  (*Id.* ¶ 124.)

The loan proceeds were distributed as follows:

- $150,000 was paid to Vaughan to settle the partition dispute;

- $92,557.37 was paid to Defendant Lockdeco, a purported contractor engaged by Defreitas, for anticipated repair work on the subject property;

- $71,126.85 was paid to New York City to satisfy property tax liens;

- $60,192.68 was retained in escrow by Legum as additional security for Rokosz in case Barker defaulted;

- $40,289.68 was paid to EastCor Land Services for title company services and title insurance;

- $14,926.67 was paid to Fishbein through Defendant Jackie Marketing LLC, a company owned by Fishbein's wife, for Fishbein's involvement in the transaction;

- $8,713.33 was paid to Telsey through Defendant Royce LLC, an entity exclusively owned and controlled by Telsey that he used as an income pass-through vehicle, for Telsey's involvement in the transaction;

- $6,500 was paid to Legum for his legal services on behalf of Rokosz;

- $3,000 was paid to Hurley for his legal services on behalf of Barker;

- $1,193.42 was paid to Rokosz for interest accrued on the loan between the first and second closings;

- $1,000 was paid to Defendant Betty Hingle for her services as a closing agent.

- $350 was paid to Ronald Ifraimov for his services as a closing agent; and

- $150 was paid to New York State for child support;

(Def.'s Counter-56.1 ¶¶ 7-8, 19, 127-37, 139, 143.)  None of this money was paid directly to J&M.

## C. Barker's Default

In April 2017, two months after the closings, Telsey left a note for Barker at the subject property advising her that she missed her first payment.  (*Id.* ¶ 166.)  The next month, Telsey texted Barker asking for proof of insurance.  (*Id.* ¶ 167.)  Two days later, Legum mailed a letter to Barker, dated May 18, 2017, declaring that Barker had defaulted on the subject loan and failed to maintain property insurance.  (*Id.* ¶ 168.)  The letter further advised that Rokosz was accelerating the debt and demanding immediate payment in full.  (*Id.*)  Finally, the letter advised that J&M's shares, which Legum held in escrow, would be

12

released to Rokosz and that Rokosz now owned J&M.  (*Id.*)

In November 2017, J&M filed two eviction petitions against Barker in state court.  (*Id.* ¶ 169.)  The state court dismissed the petitions on July 10, 2018, and Rokosz filed a notice of appeal on July 27, 2018.  (*Id.; see* ECF No. 293-16, Notice of Appeal.)  Rokosz never perfected the appeal, however, and the appeal was dismissed on February 19, 2019.  *See* Order of Dismissal, *J&M Props. Holdings, Inc. v. Barker*, No. 2018-01732-KC (N.Y. App. Term Feb. 19, 2019).

## III.  Procedural Background

### A.  Preliminary Injunction

Several events in 2017 and 2018 prompted Barker to commence this action.  First, in the summer of 2017, two men entered Barker's house through her unlocked door while she was in her backyard and told her that she did not own the house and had to leave.  (ECF No. 2 pp. 102–12, Decl. C. Barker Supp. Order Show Cause, ¶ 38.)  On at least two other occasions in the spring or summer of 2018, men came to Barker's house to tell her they owned the property and that Barker was trespassing.  (*Id.* ¶ 39.)  Then, in July 2018, someone placed a "For Sale" sign on Barker's property.  (*Id.* ¶ 40.)  In October 2018, a man with a key to Barker's house unlocked the bottom lock on her front door and was prevented from entering only by Barker's deadbolt.  (*Id.* ¶ 41.)  Through the door, he told Barker that he was advised the

house was available for rent and that he had rented her upstairs
unit.  (*Id.*)  Finally, on December 22, 2018, a fire broke out in
Barker's home, forcing Barker and her son to temporarily live
with friends and relatives.  (*Id.* ¶ 44.)  After the fire, Barker
worried that her home was not secure from intruders due to her
and her son's absence and the damage the fire did to the house's
windows and doors.  (*Id.* ¶ 45.)  She also feared Rokosz or his
agents would capitalize on her absence to initiate another
housing court proceeding or claim she abandoned her interest in
the property.  (*Id.*)

On January 25, 2019, Barker filed her Complaint and a
proposed temporary restraining order, which the Court signed and
issued with modifications.  (ECF No. 1, Compl. & Jury Demand
("Compl."); ECF No. 2 pp. 1–2, Order Show Cause Prelim. Inj. &
TRO.; ECF No. 5, Order Show Cause Prelim. Inj. & TRO.)  The
parties then stipulated to a preliminary injunction on
February 1, 2019, which remains in force, prohibiting Rokosz or
his agents from exercising any interest in the subject property,
transferring any claimed interest or ownership in J&M, or
attempting to collect the subject loan from Barker.  (*See* ECF
No. 15, Stip. Prelim. Inj.)

## B.   Settlements with Other Defendants

Barker's original Complaint asserted claims against Rokosz
for violations of TILA, HOEPA, Section 6-l of the New York

Banking Law, and New York's usury statute.  (Compl. ¶¶ 126–81.)
She also asserted a claim under Section 349 of the New York
General Business Law against Rokosz, Defreitas, Legum, Hurley,
Telsey, Fishbein, and Hingle and a claim under the Racketeer
Influenced and Corrupt Organizations Act ("RICO") against all
those defendants plus Royce, Jackie Marketing, Lockdeco (a/k/a
Lodeco), and nominal John Doe defendants.  (*Id.* ¶¶ 182–219.)

On February 22, 2019, Barker voluntarily dismissed her
claims against Hingle.  (ECF No. 18.)  Barker settled her claims
against Fishbein and Jackie Marketing and then dismissed her
claims against them on August 23, 2019.  (ECF No. 89.)

The Court dismissed Barker's Section 349 and RICO claims
for failure to state a claim on January 2, 2020.  (ECF No. 119,
Mem. & Order.)  Barker then amended her complaint on March 24,
2021, omitting Hurley as a defendant and re-pleading her
Section 349 and RICO claims.  (ECF No. 174, 1st Am. Compl. &
Jury Demand.)  Rokosz, Legum, Telsey, and Royce answered the
Amended Complaint, (ECF Nos. 178–79, 181), and Rokosz brought a
counterclaim against Barker for foreclosure, joining as counter-
defendants J&M, the New York State Department of Taxation and
Finance, and the New York City Environmental Control Board (ECF
No. 181; *see* Order, June 7, 2021 (granting Rokosz's motion to
join counter-defendants)).

Barker notified the Court on March 17, 2022, that she

15

settled with Telsey and Royce, (ECF No. 243, Mar. 17, 2022, Ltr. from K. Richman & B. Luu), and she dismissed her claims against them on April 12, 2022, (ECF No. 254).  Barker and Legum settled in a conference before Magistrate Judge Cho on May 2, 2022, (Minute Entry, May 2, 2022), and those parties filed their stipulation of dismissal on August 12, 2022, (ECF No. 267).

Meanwhile, Defreitas failed to respond to the Amended Complaint, and the Clerk of Court entered a certificate of her default on March 24, 2022.  (ECF No. 245, Cert. Default.) Because Defreitas had been incarcerated from October 2018 to July 2021 for her role in a mortgage fraud conspiracy, *see* https://nysdoccslookup.doccs.ny.gov/ (NYSID #18G0949), and was proceeding *pro se*, the Court vacated her default on October 11, 2022, (ECF No. 274, Order).  Barker and Defreitas notified Magistrate Judge Cho at a January 26, 2023, hearing that they had settled, (Minute Entry, Jan. 26, 2023), and they filed their stipulation of dismissal on February 2, 2023, (ECF No. 279).

### C.  Barker's Remaining Claims Against Rokosz

On February 6, 2023, Barker filed the operative Second Amended Complaint, which omits her Section 349 and RICO claims and omits Lockdeco and the Does as defendants, thus leaving Rokosz the only remaining defendant.  (*See* 2d Am. Compl.) Rokosz answered the Second Amended Complaint and re-pleaded his foreclosure counterclaim against Barker and the other counter-

16

defendants on March 8, 2023.  (ECF No. 285, Answer with Countercls. ("Answer").)  Barker and Rokosz unsuccessfully attempted to settle several times.  (*See* ECF Nos. 49, 70, 193; Minute Entry, June 28, 2022; Minute Entry, July 26, 2022; Minute Entry, Aug. 22, 2022; Minute Entry, Sept. 21, 2022; Minute Entry, Mar. 17, 2023.)  Finally, on March 31, 2023, the parties submitted a status report stating that they did not believe further settlement efforts would be productive.  (ECF No. 288, Mar. 31, 2023, Ltr. from M. Litrownik & J. Doberman.)

On May 30, 2023, the parties requested a pre-motion conference to move for summary judgment on their respective claims and counterclaim.  (ECF No. 291, May 30, 2023, Ltr. from B. Luu; ECF No. 297, May 30, Ltr. from J. Doberman.)  After a June 15, 2023, pre-motion conference where the Court advised the parties of the risks of pressing forward, (*see* Minute Entry, June 15, 2023), the parties filed the instant cross-motions for summary judgment, which were fully submitted on September 11, 2023, (ECF No. 312, Sept. 11, 2023, Ltr. from B. Luu; ECF No. 316, Sept. 11, 2023, Ltr. from J. Doberman).

## Legal Standard

Summary judgment is proper when there are no genuine disputes of material fact and the undisputed facts entitle the moving party to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A factual dispute is "genuine" if a reasonable jury

could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it might affect the outcome of the case under the governing law.  *Id.*  In resolving a motion for summary judgment, the court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in the non-moving party's favor.  *Bart v. Golub Corp.*, 96 F.4th 566, 567 (2d Cir. 2024).

The party moving for summary judgment has the initial burden to show that there are no genuine disputes of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the non-moving party would have the burden of proof at trial, its burden at the summary judgment stage is only to "point out" that there is insufficient evidence to create a genuine dispute of material fact.  *Id.* at 325.  Where the *moving party* would have the burden of proof at trial, however, its burden at the summary judgment stage is to submit evidence conclusively establishing the absence of any genuine disputes of material fact.  *Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 618 (2d Cir. 1998); *Gov't Emps. Ins. Co. v. Jacobson*, No. 15-cv-7236 (ERK) (RML), 2021 WL 2589717, at *8 (E.D.N.Y. June 24, 2021).  If the moving party meets that burden, the non-moving party must respond by submitting its own evidence sufficient to create a genuine dispute of material fact

18

in order to avoid summary judgment and proceed to trial.  *Souza v. Exotic Island Enters., Inc.*, 68 F.4th 99, 108 (2d Cir. 2023).

## Discussion

Barker moves for summary judgment on her TILA, HOEPA, Section 6-l, and usury claims, (Pl.'s Mem. 30.)  Rokosz does not dispute that he did not comply with the substantive requirements of TILA, HOEPA, Section 6-l, or the usury statute.  (Def.'s Counter-56.1 ¶¶ 71–76, 97–108.)  Rather, he argues that he was not required to do so because those statutes do not apply to the subject loan.  (ECF No. 313, Mem. Law Opp'n Pl.'s Mot. Summ. J. ("Def.'s Opp'n"), 7–24.)  Thus, for Barker to prevail on her motion, she has the burden to produce evidence conclusively establishing a lack of genuine disputes of material fact that the relevant statutes apply.  *See Albee Tomato*, 155 F.3d at 618.

Rokosz cross-moves for summary judgment on his foreclosure claim.  (ECF No. 316-2, Mem. Law Supp. Def.-Counterclaimant's Mot. Summ. J. ("Def.'s Mem."), 18.)  Barker does not dispute that the common law elements of foreclosure, on which Rokosz would have the burden of proof at trial, are satisfied.  (Pl.'s Counter-56.1 ¶¶ 14, 16, 30, 32, 44, 46.)  Rather, she raises her own claims as defenses to Rokosz's foreclosure claim.  (ECF No. 317-1, Mem. Law Opp'n Def.'s Mot. Summ. J. ("Pl.'s Opp'n"), 6–30.)  At trial, Barker would have the burden of proof to establish these defenses.  *See Red Tree Invs., LLC v. Petróleos*

19

*de Venezuela, S.A.*, 82 F.4th 161, 171 (2d Cir. 2023).  Thus, for Rokosz to prevail on his motion, he has the initial burden to "point out" that there is an absence of evidence to support Barker's defenses.  *See Celotex*, 477 U.S. at 325.  If Rokosz clears that threshold, the burden shifts to Barker to produce sufficient evidence to create a genuine dispute of material fact and avoid summary judgment.  *See Souza*, 68 F.4th at 108.

## I.    TILA and HOEPA

Rokosz's primary argument that TILA and HOEPA do not apply to the subject loan is that the subject loan was not a "consumer credit transaction."  (Def.'s Opp'n 7-17.)  He also argues that HOEPA does not apply because the subject loan was not a "high-cost mortgage," that Barker's damages claim is time barred, and that Rokosz was not a "creditor."  (*Id.* 17-19.)

### A.    Consumer Credit Transaction

The relevant provisions of TILA apply only to a "consumer credit transaction."  *See* 15 U.S.C. §§ 1638(a).  HOEPA applies only to a "high-cost mortgage," which itself is a "consumer credit transaction" secured by the consumer's "principal dwelling" where the annual percentage rate of the transaction exceeds a certain threshold.  *See* 15 U.S.C. §§ 1639, 1602(bb).[5]

---

[5] The cross-references in Section 1639(a) are to Section 1602(aa), which originally was the provision of TILA that defined "high-cost mortgage." Since then, Congress renumbered the definitions in Section 1602 such that "high-cost mortgage" is now defined at Section 1602(bb). *See* Pub. L. No. 111-203, 124 Stat. 2107.  The Court considers Section 1639(a)'s continued

Thus, TILA and HOEPA apply to the subject loan only if the subject loan was a "consumer credit transaction."

The adjective "consumer" characterizes a credit transaction as a transaction where "the party to whom credit is offered or extended is a natural person" and "the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes."  15 U.S.C. § 1602(i).  Rokosz contends that the subject loan was not a consumer credit transaction on the grounds that (1) the loan was extended to J&M, which is an "organization" and not a "natural person," and (2) the loan was not made for personal, family, or household purposes.  (Def.'s Opp'n 7–17.)

### 1.  Party to Whom Credit was Offered or Extended

Rokosz argues that J&M's corporate status should "end [the] inquiry" as far as Barker's TILA and HOEPA claims are concerned.  (*See* Def.'s Opp'n 7.)  That would be correct if the undisputed facts established that J&M was "the party to whom credit [was] offered or extended."  *See* 15 U.S.C. § 1602(i).  There is no dispute that J&M is a corporation, (*see* ECF No. 292, Pl.'s Statement Undisputed Material Facts ("Pl.'s 56.1"), ¶ 60), and a corporation is not a "natural person" under TILA, 15 U.S.C. §§ 1602(d), 1602(e).  If "the party to whom credit is offered or

---

reference to Section 1602(aa) to be an error and construes Section 1639(a) instead to refer to Section 1602(bb).

extended" is not a "natural person," the subject transaction is not a "consumer credit transaction," *see* 15 U.S.C. § 1602(i), and the relevant provisions of TILA and HOEPA do not apply to that transaction, *see* 15 U.S.C. §§ 1638-39.  The "party to whom credit is offered or extended" and the "purpose" of the transaction are two distinct elements of TILA's definition of "consumer"; if either is not met, the transaction is not a "consumer credit transaction."  *Am. Express Co. v. Koerner*, 452 U.S. 233, 242 (1981).  Considering the entire factual record, however, there is no genuine dispute that Rokosz "extended credit" to Barker in her personal capacity merely conditioned on a corporate entity receiving the funds and Rokosz holding its shares as further collateral.  There is no evidence in the record that J&M served any purpose beyond an attempt by Rokosz to skirt statutory protections against predatory lending.

Rokosz essentially argues for an evidentiary rule that "the party to whom credit is offered or extended," *see* 15 U.S.C. § 1602(i), is always the party whose name appears on the face of the mortgage.  But TILA's plain text imposes no such rule.  Unlike TILA's definition of "creditor," which instructs courts to ascertain "the person to whom the debt . . . is initially payable" by looking to "the face of the evidence of indebtedness," TILA's definition of "consumer" does not similarly specify what evidence the court should consider to

22

determine "the party to whom credit is offered or extended."
*Compare* 15 U.S.C. § 1602(g) *with* 15 U.S.C. § 1602(i).  The words
"offered" and "extended" are not defined in TILA, *see generally*
15 U.S.C. § 1602, nor do they have settled technical meanings in
the context of credit, *see, e.g.*, *Extension*, *Offer*, *Black's Law
Dictionary* (11th ed. 2019).  Thus, the Court interprets
"offered" and "extended" in accordance with their "ordinary or
natural meaning[s]."  *See United States v. McCray*, 7 F.4th 40,
45-46 (2d Cir. 2021) (quoting *Smith v. United States*, 508 U.S.
223, 228 (1993)).  The most relevant dictionary definition of
both "extend" and "offer" in the credit context is "to make
available."  *See Extend*, Merriam-Webster, https://www.merriam-
webster.com/dictionary/extend [https://perma.cc/3JXC-72RW]
(defining word in context of "*extending* credit to customers");
*Offer*, Merriam-Webster, https://www.merriam-
webster.com/dictionary/offer [https://perma.cc/B8AB-K4GS]; *see
also Extend credit to*, Dictionary.com,
https://www.dictionary.com/browse/extend-credit-to
[https://perma.cc/58AK-N3P6] (defining the idiom "extend credit
to" as to "permit someone to owe money," using the verb "*extend*
in the sense of 'offer' or 'provide'").  Here, Barker and J&M
each reasonably could be viewed as the party to whom credit was
"made available" or "provided" depending on how broadly or
narrowly one defines the relevant transaction, so the phrase

"the party to whom credit is offered or extended" in TILA's statutory definition of "consumer" is "ambiguous as applied to the claims in this case."  *See In re Med Diversified, Inc.*, 461 F.3d 251, 255 (2d Cir. 2006).

Accordingly, the Court looks to TILA's "broader context and primary purpose" for guidance.  *See Clemente v. Lee*, 72 F.4th 466, 472 (2d Cir. 2023) (quoting *Gordon v. Softech Int'l, Inc.*, 726 F.3d 42, 48 (2d Cir. 2013)).  TILA's purpose is to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available" and "avoid the uninformed use of credit."  15 U.S.C. § 1601(a).  As the Senate Committee on Banking and Currency reported in explaining why organizational borrowers are exempt from coverage, "[m]ost businesses or corporations are in a good position to judge the relative worth of alternative credit plans and by and large do not require the special disclosure protections provided by [TILA]."  S. Rep. No. 90-392, at 7 (1967).  And as the Second Circuit elaborated, Congress thought "[c]orporate debtors" were "sufficiently able to satisfy [TILA's] goal of utilizing credit in an 'informed' manner . . . so that mandatory disclosure requirements were not warranted for that genre of credit transaction."  *Am. Airlines, Inc. v. Remis Indus., Inc.*, 494 F.2d 196, 199 (2d Cir. 1974) (quoting 15 U.S.C. § 1601).

This context cuts against finding "the party to whom credit is offered or extended" to be an organization where that organization is created at the lender's behest as a condition of transacting with the individual borrower and serves no discernible function other than evading TILA and other regulations that protect consumers.  The otherwise uninformed consumer who Congress sought to protect by enacting TILA does not somehow become more informed just because the lender requires him or her to interact with the lender through a corporate intermediary.  TILA is premised on a legislative judgment that the ordinary consumer is insufficiently informed to engage in credit transactions without receiving the disclosures that TILA provides.  It makes no sense to hold that the same consumer can make an informed decision about whether to structure a credit transaction to avoid TILA and thereby forego the very disclosures that TILA assumes the consumer needs in order to become informed.  *See Taub v. World Fin. Network Bank*, 950 F. Supp. 2d 698, 703 (S.D.N.Y. 2013) (explaining that "the purpose of TILA is to allow borrowers to compare available credit and billing terms *before* entering into a contract") (emphasis added).  For a court to conclude that credit was "offered" or "extended" to a corporation such that TILA's obligations do not apply, the corporation must serve at least some function beyond simply permitting the lender to avoid the

disclosure obligations.  A contrary reading of TILA would greenlight an obvious method for lenders to circumvent the statute and "eviscerate the protection" that it creates.  *See Rodriguez v. Branch Banking & Tr. Co.*, 46 F.4th 1247, 1257 (11th Cir. 2022) (applying presumption against ineffectiveness to reject bank's interpretation of state banking regulation).

TILA is a remedial statute that courts must construe liberally "from the vantage point of a hypothetical average consumer – a consumer who is neither particularly sophisticated nor particularly dense."  *Karakus v. Wells Fargo Bank, N.A.*, 941 F. Supp. 2d 318, 330 (E.D.N.Y. 2013) (quoting *Palmer v. Champion Mortg.*, 465 F.3d 24, 28 (1st Cir. 2006)).  Accordingly, other courts applying that liberal construction in deciding whether the statute applied to a given transaction have looked to the substance rather than form of the transaction while considering all the surrounding factual circumstances.  *See, e.g., Oas v. Rama Cap. Partners, LLC*, No. 20-cv-1634 (MCS) (ADS), 2020 WL 7786546, at *3 (C.D. Cal. Nov. 18, 2020) (finding defendant's "self-serving efforts to nominally assign the loan a 'business purpose' to circumvent" TILA did not defeat plaintiff's allegations "suggesting that the loan was not used as such"); *Brooks v. BC Custom Constr., Inc.*, No. 18-cv-717 (YY), 2019 WL 3763769, at *9 (D. Or. May 21, 2019) (concluding that plaintiffs stated a TILA claim by alleging that "while the

loan was formally a commercial loan, it was in substance a residential mortgage loan"), *R&R adopted*, 2019 WL 3502907 (D. Or. Aug. 1, 2019); *Sweiss v. Ramadani*, No. 15-cv-8150 (AJS), 2016 WL 492370, at *4 (N.D. Ill. Feb. 9, 2016) ("Viewing the transaction as a whole, the Court finds that the transaction had a primarily consumer nature within the meaning of TILA.").  It would contravene that liberal construction for a court to examine only the mortgage and note in deciding whether a corporation or individual was "the party to whom credit is offered or extended" while ignoring all other relevant factual context.

Rokosz responds that TILA's liberal construction cannot "expand the class of financing recipients Congress has delineated," citing a "plethora of case law" rejecting TILA claims where the borrower was an organization.  (Def.'s Opp'n 7-9.)  As Barker correctly notes in her reply, Rokosz's description of the relevant case law is overstated.  (*See* ECF No. 314-1, Reply Mem. Law Further Supp. Pl.'s Mot. Summ. J. ("Pl.'s Reply"), 4-5.)  Rokosz acknowledges, for example, that at least one other district court allowed a TILA claim to proceed where "the loan was given to . . . a business entity" that the defendant "required them to form . . . to serve as the formal recipient of the funds."  (*See* Def.'s Opp'n 10-11); *LSREF3 Sapphire Tr. 2014 v. Barkston Props., LLC*, No. 14-cv-7968

(JLA), 2016 WL 302150, at *6 (N.D. Ill. Jan. 25, 2016) (assuming for purposes of motion to dismiss that "the loan was only formally a commercial loan and was in substance a personal, consumer loan"). Rokosz attempts to distinguish that case on the ground that it was "decided on the very deferential motion to dismiss standard which credits the plaintiff's factual allegations," (Def.'s Opp'n 11), but that distinction concerns only what evidence is needed to establish a claim, not whether a TILA claim necessarily fails as a matter of law whenever a business entity's name appears on the mortgage irrespective of the circumstances under which the entity was created.[6]

Rokosz correctly notes that another district court and a state trial court confronting similar fact patterns looked no further than the loan documents themselves to determine that TILA's organizational borrower exemption applied. *See B&B Cap. Grp. 26 LLC v. CTG Holding Grp. LLC*, No. 2021-018519-CA-01 (VVD), 2022 Fla. Cir. LEXIS 1169, at *3 (Fla. Cir. Ct. Mar. 7, 2022) (dismissing TILA claim where plaintiffs alleged defendant

---

[6] Rokosz notes that the court in *Sapphire* apparently "declined to spot or address the issue of the non-application of TILA to a loan to a corporate borrower, and it is unknown if the defendant there formally argued it as a basis for dismissal." (Def.'s Opp'n 11.) Although the court did not bifurcate its analysis of the borrower's identity and the loan's purpose, *see Sapphire*, 2016 WL 302150, at *5-6, the defendant unquestionably raised the borrower's identity as a separate argument in its motion to dismiss, *see* Pl.'s Mem. Law at 11, *Sapphire*, No. 14-cv-7968, ECF No. 57 ("Further, Barkston LLC, is considered an 'organization' under 15 U.S.C. § 1602(d) and thus any loan made to Barkston is exempt from statutory protection.") (citing 15 U.S.C. § 1603(1)).

"required" that residential property be transferred to
corporation "in an effort to circumvent TILA"); *Selman v. Manor
Mortg. Co.,* 551 F. Supp. 345, 347 (E.D. Mich. 1982) (concluding
that because subject loan "was concededly to a corporation, at
least in form," plaintiffs did "not state a claim under TILA,"
despite defendants "requir[ing] that they incorporate as a
condition to the loan").  In the "absence of higher authority in
this circuit" or persuasive in-circuit district court decisions
relevant to the interpretive question, however, *see Flynn v.
Morgan Guar. Tr. Co. of N.Y.,* 463 F. Supp. 676, 677 (E.D.N.Y.
1979), and for the reasons already explained, the Court
disagrees that its consideration is so limited.

The other cases Rokosz cites, (*see* Def.'s Opp'n 7-8), are
materially distinguishable because they all concerned loans to
*pre-existing* organizations that served discernible business
functions separate from the loan transactions themselves, *see
Marathon Funding Servs., Inc. v. Berg*, No. 19-cv-828 (JCC),
2020 WL 5759784, at *2 (W.D. Wash. Sept. 28, 2020) (dismissing
TILA claim where "loan was to a corporation for business
purposes"); *Timber Doodle Glade Equity Venture, LLC v. D.E. Shaw
Laminar Lending, Inc.*, No. 06-cv-799 (WDM) (CBS), 2007 WL
2009723, at *1, 5 (D. Colo. July 6, 2007) (rejecting plaintiffs'
"remarkable position" that loan to companies who owned
properties in Aspen, Colorado, was "made 'in actuality'" to

individual plaintiff who used properties as his residence, finding plaintiffs bound by their previous representation to bankruptcy court that "the financing was not for personal use by an individual consumer"); *Prifti v. PNC Bank, N.A.*, No. 01-cv-1163 (LAR), 2001 WL 1198653, at *1 (E.D. Pa. Oct. 9, 2001) (dismissing TILA claim where plaintiff obtained credit for "his business, . . . a retail general merchandising corporation").  None of these authorities support the Court ignoring all factual context beyond the mortgage and note.

The undisputed evidence permits no reasonable inference other than that Rokosz "extended credit," as TILA understands that phrase, to Barker in her personal capacity.  Rokosz became interested in issuing the subject loan to Barker when his broker told him that "a lady" wanted a loan to fix her house.  (Def.'s Counter-56.1 ¶¶ 45-47.)  Rokosz then visited Barker's home while she was there to assess whether he wanted to issue the loan. (*Id.* ¶ 48.)  J&M came into existence only because Rokosz communicated to Barker (through several of his co-defendants) that the loan was conditional on Barker's agreement to form a business entity to take title to her home.  (*Id.* ¶¶ 50-53, 62- 65, 68.)  After Defreitas incorporated J&M, Barker and her sister "sold" the home to J&M for nominal consideration.  (*Id.* ¶ 116; *see* ECF No. 293-41.)  It is undisputed that J&M has no other identified business purpose, served no discernible

bargained-for benefit to Barker, and has never held any assets other than Barker's home.  (*See* Def.'s Counter-56.1 ¶¶ 61, 67, 70.)  Rokosz cited no evidence that J&M had any directors or officers other than Barker herself.  J&M never even received any loan proceeds, as all the funds were paid to third parties except the amount that was paid back to Rokosz himself.  (*Id.* ¶¶ 128-29.)  When Barker defaulted on the subject loan, Rokosz's broker and attorney contacted Barker personally about the default.  (*Id.* ¶¶ 165-68.)  Rokosz then initiated eviction proceedings against Barker personally.  (*Id.* ¶ 169.)

Rokosz suggests alternative inferences, but he fails to support them with evidence.  First, Rokosz argues without citation that "there are very real and legitimate reasons companies like [J&M] are formed all the time," such as "tax planning, estate planning, asset protection, [and] limited liability."  (Def.'s Opp'n 23.)  Even if that may be true of many loan transactions in general, Rokosz offered no evidence that it was true of this specific transaction.  Without at least some deposition testimony or other evidence indicating Barker sought to achieve one of these business goals through J&M's incorporation, he is left with "[c]onclusory allegations, conjecture, and speculation," which are "insufficient to create a genuine issue of fact" and survive summary judgment.  *See Bustamante v. KIND, LLC*, 100 F.4th 419, 432 (2d Cir. 2024)

(quoting *Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95, 99 (2d Cir. 2003)).

Second, Rokosz argues in a footnote that he transacts with business entities rather than with individuals because he "sometimes feels bad exercising lender's remedies against individual borrowers." (Def.'s Opp'n 22 n.11; *see also* ECF No. 292-1 pp. 210–94 ("Rokosz Dep."), 62:2-3 (testifying this is "the only reason" he prefers transacting with businesses).) That explanation makes no sense – at least in the instant case – because Barker for all intents and purposes *was* J&M, and Rokosz offered no explanation why he felt less "bad" exercising his remedies against her in her corporate capacity than in her personal capacity. After all, Rokosz sued Barker in her personal capacity when he attempted to evict her from her childhood home. *See* Order of Dismissal, *J&M Props. Holdings, Inc. v. Barker*, No. 2018-01732-KC (N.Y. App. Term. Feb. 19, 2019).

More importantly, regardless of whether the "sometimes feels bad" explanation makes sense, it is irrelevant. Whatever impact J&M's presence might have had on Rokosz emotionally, there was no reason to create J&M from Barker's perspective other than that Rokosz told her to. Barker did not, for example, take out a loan through a pre-existing, profit-generating business to pay personal debts. *See, e.g.*, *Prifti*,

2001 WL 1198653, at *3.  Nor did she merely use her residence to secure a loan made "to a corporation for business purposes." *See, e.g.*, *Berg*, 2020 WL 5759784, at *2.  Nor is there any suggestion Barker intended to leverage J&M's corporate status to achieve some tax benefit or other business benefit.  *See, e.g.*, *Timber Doodle*, 2007 WL 2009723, at *5.  The only function J&M served from Barker's perspective was to satisfy a lender's condition for her to obtain a personal loan.  The statutory protections TILA and HOEPA offer do not disappear in that circumstance.

### 2.  Primary Purpose

Despite the Court's finding that TILA's "natural person" requirement is satisfied in the instant case, the subject loan still cannot be considered a "consumer credit transaction" unless the "money, property, or services which [were] the subject of the transaction [were] primarily for personal, family, or household purposes."  *See* 15 U.S.C. § 1602(i).  TILA exempts transactions "primarily for business" or "commercial" purposes from coverage.  15 U.S.C. § 1603(1).

The undisputed evidence establishes that the primary purpose of the subject loan was personal.  The subject property is Barker's childhood home, in which she has resided since she was a young girl.  (Def.'s Counter-56.1 ¶¶ 1-2.)  It is a "two-family residential dwelling," (*id.* ¶ 31), but there is no

evidence that any room was ever rented out.  There also is no dispute that Barker sought to use the subject loan proceeds to buy out her sister's interest in the subject property and remain in the home due to pressure from the partition judgment her sister obtained against her.  (*Id.* ¶¶ 34, 36.)  The parties agree that part of the loan proceeds satisfied property tax liens and paid for anticipated repair work on the property. (*Id.* ¶¶ 127, 137.)  Barker's only previous occupation was working as a home health aide.  (*Id.* ¶ 3.)  There is no evidence in the record whatsoever that Barker actually rented out the property or how much profit she would have made had she rented it out.  Based on this record, there is no reasonable dispute that the primary purpose of the subject loan was for Barker to continue residing in her personal home.  *See Tower v. Moss*, 625 F.2d 1161, 1166–67 (5th Cir. 1980) (reversing summary judgment for defendant and finding primary purpose of loan personal where plaintiff, "a single, relatively uneducated woman in her sixties," sought loan to perform repairs on house she "resided in . . . until she was grown" and return to residing there after her mother passed away and title passed to her).

Rokosz argues in response that Barker intended to rent out rooms in her house after repairing it, but in support of his argument, he cites only irrelevant paragraphs of his Rule 56.1 statement and allegations in the Second Amended Complaint that

34

he may not rely on at the summary judgment stage.  (*See* Def.'s Opp'n 5, 14–17, 19 (citing Def.'s 56.1 ¶¶ 3, 9, 29–30; 2d Am. Compl. ¶¶ 1–2, 30); Def.'s Mem. 4, 12 (same citations)); *Makhnevich v. Bougopoulos*, 650 F. Supp. 3d 8, 21 (E.D.N.Y. 2023) (explaining that parties may not rely on allegations in pleadings at summary judgment).  Only in his reply in support of his own summary judgment motion does Rokosz cite any relevant evidence, and even then, only in a footnote.[7]  (*See* ECF No. 318, Reply Mem. Further Supp. Def.'s Mot. Summ. J. ("Def.'s Reply"), 1 n.2.)

The evidence cited in that footnote, a single exchange from Defreitas's deposition, does not create a genuine factual dispute as to the purpose of the loan.  Defreitas's testimony amounts to speculation about how much money Barker might have made renting out rooms, not testimony that Barker actually intended to rent out rooms.  (*See* Defreitas Dep. 163:17–19 ("She was doing rooms.  So, she would have make [*sic*] a good, um, a good, um, change if she did rooms.").)  Although Defreitas testified later in the exchange that Barker "was going to" convert "the living room into a room," (*see id.* 163:21–24), after being pressed whether Defreitas actually "believe[d] that

---

[7] There were six memoranda of law filed with respect to the instant summary judgment motions, and Rokosz's reply in support of his own motion was the last of the six chronologically.  Waiting until his final submission to cite even remotely relevant evidence unfairly gave him the last word on the issue.

[Barker] intended to rent out the property to seven different tenants," Defreitas replied:

> Not she intended.  That was the only solution for her to make this – to make this monthly payment until she could acquire it back on her own.  There was no other way.  She had to rent it out.

(*See id.* 163:25–164:8.)  The cited exchange reflects only Defreitas's opinion about what Barker "had to" do with the property, not what Barker actually did or intended to do.

Even assuming Defreitas's testimony did evince Barker's intent to rent our part of her home, however, Rokosz failed to produce evidence from which a reasonable jury could find that the subject loan was "primarily" for a business purpose.  *See* 15 U.S.C. § 1602(i).  A homeowner's decision to rent out part of a home does not render a loan primarily for a business purpose when all the "factual circumstances evaluated in their totality" establish that the loan was for personal purposes.  *See Tower*, 625 F.2d at 1166–67 (reversing summary judgment for lender and finding primary purpose of loan personal despite plaintiff not leasing house to third party and not presently residing there).

For credit extended to "acquire, improve, or maintain" an owner-occupied rental property with fewer than four housing units, the purpose of the loan depends on five factors:

> A. The relationship of the borrower's primary occupation to the acquisition. The more closely related, the more likely it is to be business purpose.

36

B. The degree to which the borrower will personally
manage the acquisition. The more personal involvement
there is, the more likely it is to be business
purpose.

C. The ratio of income from the acquisition to the
total income of the borrower. The higher the ratio,
the more likely it is to be business purpose.

D. The size of the transaction. The larger the
transaction, the more likely it is to be business
purpose.

E. The borrower's statement of purpose for the loan.

12 C.F.R. Pt. 1026, Suppl. I, Part 1, cmts. 3(a)(5)(ii),

3(a)(3)(i).

Here, Rokosz agrees that Barker's primary occupation,
working as a home health aide, had nothing to do with acquiring,
improving, or renting property.  (Def.'s Opp'n 13.)  The fact
Barker "personally manage[d] the property does not show a
business purpose where the property at issue is the home in
which [she] live[d]." *See Romaker v. Crossland Mortg. Corp.*,
No. 94-cv-3328 (JFG), 1995 WL 17893120, at *7 (N.D. Ill. Nov. 3,
1995).  Even if the record contained evidence that Barker
intended to rent out part of her home, it contains no evidence
as to how much income Barker stood to make from doing so, and
Rokosz may not simply speculate in lieu of producing such
evidence. *See Bustamante*, 100 F.4th at 432.  As to the size of
the transaction, courts have found combined loans amounting to
$450,000 "weigh[ed] in favor of a personal purpose," *see, e.g.*,
*Cox v. LB Lending, LLC*, No. 17-cv-1580 (JGB), 2017 WL 6820171,

at *6 (C.D. Cal. Nov. 16, 2017), though that size alone is not
necessarily determinative.  Finally, as to Barker's statement of
purpose for the loan, Barker attested that she "sought a loan to
buy out" her sister's interest in the subject property so she
"could continue living there," (ECF No. 293-1, Decl. Carla
Barker Supp. Pl.'s Mot. Summ. J., ¶ 6), and Rokosz submitted no
document in which she contradicted that statement, such as a
loan application stating that the loan was for business
purposes, *see Gilliam v. Levine*, 562 F. Supp. 3d 614, 619
(C.D. Cal. 2021) (finding primary purpose commercial where
borrower completed loan application stating property was an
"investment" property).

In sum, Barker's undisputed evidence establishes that she
sought the subject loan to remain living in her childhood home.
In response, Rokosz offered only equivocal and speculative
testimony from Defreitas as evidence that Barker intended to
rent out part of the home, which does not create a genuine
factual dispute as to whether the subject loan had a business
purpose.  Even if it did, Rokosz submitted no evidence from
which a jury could reasonably find that any relevant factor –
other than possibly the size of the loan – weighed in favor of
finding a *primarily* business purpose.  Accordingly, the
undisputed facts establish that the primary purpose of the
subject loan was personal.  Because the subject loan was made to

a natural person primarily for personal purposes, it was a consumer credit transaction to which TILA applied.

**B.    High-Cost Mortgage**

As explained above, HOEPA applies only to "high-cost mortgages," which are "consumer credit transactions" secured by the consumer's "principal dwelling" where the annual percentage rate of the transaction exceeds a certain threshold.  *See* 15 U.S.C. §§ 1639, 1602(bb).  Rokosz appears to dispute that HOEPA applies solely on the ground that the subject loan was not a consumer credit transaction, and he does not appear to dispute that the principal dwelling and cost threshold elements of Barker's HOEPA claim are met.  (Def.'s Opp'n 19.)  Because the Court has found no genuine dispute that the subject loan was a consumer credit transaction, (*supra* I.A), the Court will only address the principal dwelling and cost threshold elements here.

The undisputed facts establish that the subject loan was secured by Barker's principal dwelling, the subject property. TILA defines "dwelling" to include a "residential structure" containing "one to four family housing units."  15 U.S.C. § 1602(w). A "consumer can have only *one* principal dwelling at a time," and a "vacation or other second home," for example, is not a principal dwelling.  12 C.F.R. Pt. 1026, Supp. I, Part 1, cmt. 2(a)(24)(3).

At the February 6, 2017, closing, Barker provided photo

identification listing the subject property as her residential address, which "Rokosz or his agents" collected and photocopied. (Def.'s Counter-56.1 ¶ 112.)  Barker also provided Rokosz an insurance binder listing the subject property as her address and identifying the property as owner-occupied.  (*Id.* ¶ 83.)  When Telsey and Legum contacted Barker, they did so at the subject property.  (*Id.* ¶¶ 166, 168.)  When Barker defaulted on the loan, Rokosz attempted to evict her from the subject property. (*Id.* ¶ 169.)  Further, it is undisputed that the subject property is a "two-family residential dwelling."  (*Id.* ¶ 31.)

Rokosz "[d]ispute[s]" that Barker resided at the subject property, speculating that it was "likely not actually livable" and noting that Barker "needed to stay elsewhere at different points."  (*Id.* ¶¶ 1–2.)  The evidence Rokosz cites establishes only that Barker lived with Defreitas "less than three months" while she "[got] herself together."  (*See* Defreitas Dep. 57:17–58:10.)  With respect to the property's condition, Rokosz cites only opinion testimony from Defreitas and Telsey.  (*See* Defreitas Dep. 57:4–16, 78:23–79:2, 80:9–14, 81:2–22; ECF No. 292-1 pp. 103–35, 92:13–21.)  None of this evidence would permit a reasonable jury to find that Barker principally resided somewhere other than the subject property.

The undisputed facts also establish that the subject loan's cost exceeded HOEPA's cost threshold.  A first mortgage on a

consumer's principal dwelling exceeds HOEPA's cost threshold if the annual percentage rate ("APR") at the consummation of the transaction exceeds the average prime offer rate ("APOR") for a comparable transaction by 6.5 percentage points.  15 U.S.C. § 1602(bb)(1)(A)(i)(I).  Here, the parties do not dispute that the subject loan's APR was at least 11.71%.  (Pl.'s Mem. 21-22.)  They also do not dispute that the APOR for a comparable transaction was 3.54%.  (Def.'s Counter-56.1 ¶ 125.)  Thus, there is no dispute that the subject loan's APR exceeded the APOR for a comparable transaction by more than 6.5%.

### C.  Creditor

A "creditor" is a person who "regularly extends . . . consumer credit" and is the "person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness," or "if there is no such evidence of indebtedness, by agreement."  15 U.S.C. § 1602(g).[8] A person is considered to "regularly extend" credit if he or she originates at least one high-cost mortgage through a mortgage broker.  *Id.*; *see* 12 C.F.R. § 226.2(a)(17)(v).  As explained above, (*supra* I.B), the subject loan was a high-cost mortgage. Further, it is undisputed that Rokosz originated the subject loan through a broker.  (Def.'s Counter-56.1 ¶¶ 9, 45-50, 130.)

---

[8] As with Section 1639(a), (*see supra* n.5), the Court reads Section 1602(g)'s cross-reference to "subsection (aa)" as a reference to Section 1602(bb).

It is also undisputed that Rokosz was the person to whom the debt arising from the subject loan was initially payable on the face of the evidence of indebtedness. (*See id.* ¶¶ 116–17; *see* ECF Nos. 293-48, 293-37, 293-55, 293-38.)  Accordingly, there is no genuine dispute that Rokosz was a "creditor" under TILA and HOEPA.

> **D.  Statute of Limitations**

Rokosz argues that Barker's TILA claim is time barred to the extent it seeks damages. (Def.'s Opp'n 18–19.)  Ordinarily, a TILA claim must be brought "within one year from the date of the occurrence of the violation."  15 U.S.C. § 1640(e).  A HOEPA claim, however, may be brought any time "before the end of the [three-year] period beginning on the date of the occurrence of the violation."  *Id.; see Claude v. Wells Fargo Home Mortg.*, No. 13-cv-535 (VLB), 2014 WL 4073215, at *20 (D. Conn. Aug. 14, 2014) ("The statute of limitations for a HOEPA violation is three years from the date of the occurrence of the violation.").  The "date of the occurrence of the violation" generally means the date on which the plaintiff entered into the loan transaction at issue. *Clement v. United Homes, LLC*, 914 F. Supp. 2d 362, 369 n.3 (E.D.N.Y. 2012).  Additionally, the plaintiff's right to rescission under both TILA and HOEPA "expire[s] three years after the date of consummation of the transaction."  15 U.S.C. § 1635(f).

Here, Barker entered into the subject loan through closings
that occurred on February 6, 2017, and February 16, 2017.
(Def.'s Counter-56.1 ¶¶ 111, 116.)  She filed her original
Complaint in this action on January 25, 2019, more than one year
after the alleged occurrence of the violation but less than
three years after it.  (*See* Compl.)  Thus, Barker's damages
claim is time barred insofar as she seeks damages under
Section 1638 of TILA, but not time barred to the extent she
seeks damages based on Rokosz's alleged violations of HOEPA, or
to the extent she seeks rescission under TILA or HOEPA.

### E.   Substantive Compliance

The parties agree that Rokosz did not comply with TILA's or
HOEPA's substantive provisions.  Rokosz concedes that he did not
even attempt to provide the disclosures that TILA and
Regulation Z require, such as the amount financed, itemization
of the amount financed, finance charge, APR, payment schedule,
late payment penalty, interest rate, payment summary, and no-
guarantee-to-refinance statement.  (Def.'s Counter-56.1 ¶ 108);
*see* 15 U.S.C. § 1638; 12 C.F.R. § 1026.18.  Further, Rokosz does
not contest that the subject loan violated HOEPA's prohibitions
on increasing the interest rate after default, scheduling
balloon payments, paying a contractor directly out of the loan
proceeds, and excessively financing points and fees.  (Def.'s
Counter-56.1 ¶¶ 115, 117, 121–24, 128–37, 140–41); *see* 15 U.S.C.

43

§§ 1639(d), 1639(e), 1639(m).  Nor does Rokosz dispute that he did not provide the pre-closing notice required by HOEPA and that he did not receive certification from a federally approved counselor that Barker had received counseling with respect to the advisability of the subject loan.  (Def.'s Counter-56.1 ¶¶ 95, 99); *see* 15 U.S.C. §§ 1639(a), 1639(u).  The Court "need find 'only a single violation of the statutory requirements to hold [a] defendant liable under TILA'" or HOEPA.  *See Barberan v. Nationpoint*, 706 F. Supp. 2d 408, 421 (S.D.N.Y. 2010) (quoting *Clement v. Am. Honda Fin. Corp.*, 145 F. Supp. 2d 206, 210 (D. Conn. 2001)).  Accordingly, the undisputed facts entitle Barker to summary judgment on her TILA and HOEPA claims.

## II.  New York Banking Law

Similarly to HOEPA, Section 6-l of the New York Banking Law restricts the terms on which a "lender" may issue a "high-cost home loan."  *See* N.Y. Banking Law § 6-l(2).  Rokosz does not dispute that he is a "lender" or that the subject loan was "high-cost."  (*See* Def.'s Opp'n 20-24.)  He also does not argue that he complied with Section 6-l's substantive provisions.  He disputes only that the subject loan was a "home loan."  (*See id.*)  As explained below, the Court finds no genuine dispute that the subject loan was a "home loan" and thus that Section 6-l applied to the subject loan.

**A.   Home Loan**

The term "home loan" is defined to include a loan where (1) the principal amount at origination does not exceed the conforming loan size limit for a comparable dwelling as established by the federal national mortgage association, (2) the borrower is a natural person, (3) the debt is incurred by the borrower primarily for personal, family, or household purposes, and (4) the loan is secured by a mortgage on real estate improved by a one-to-four family dwelling occupied by the borrower as the borrower's principal dwelling.  N.Y. Banking Law § 6-l(1)(e).

Only the "natural person" element is at issue.  Rokosz does not dispute that the principal amount of the subject loan at origination fell below the conforming loan size limit for a comparable dwelling as established by the federal national mortgage association.  The general loan limit for a first mortgage on a two-family home in the contiguous United States in 2017 was $543,000, which exceeds the $450,000 amount of the subject loan.  *See* Lender Letter LL-2016-05 (Nov. 23, 2016), https://singlefamily.fanniemae.com/media/15851/display [https://perma.cc/W5S2-7RBL].  Further, the Court already has found no genuine dispute that the subject loan's primary purpose was personal, (*supra* I.A.2), or that the subject loan was secured by a mortgage on real-estate improved by a two-family

45

home that was Barker's principal dwelling, (*supra* I.B).

Rokosz argues that the statute's "natural person" requirement is not met because the "borrower" was J&M, a corporation.  (Def.'s Opp'n 20.)  In *Aries Financial, LLC v. 12005 142nd Street, LLC*, 7 N.Y.S.3d 372 (2d Dep't 2015), however, a loan was found to be a "home loan" notwithstanding the involvement of an intermediary business entity.  Like Barker, the borrowers transferred title to their house to a business entity that took out a mortgage loan from the lender. *See* 7 N.Y.S.3d at 901.  The lender sued the borrowers to foreclose on the mortgage after they defaulted, and the borrowers moved for summary judgment in part based on Section 6-l.  *Id.*  The trial court denied the motion, but the Appellate Division reversed, reasoning that the lender had a policy of evading prohibitions against predatory lending by issuing loans to business entities to whom the companies' owners transferred their homes.  *Id.* at 901–02.  The court found that this policy triggered Section 6-l(3), which makes Section 6-l apply to "any person who in bad faith attempts to avoid" the statute's application by "subterfuge."  *Id.* at 902; *see* N.Y. Banking Law § 6-l(3).  Given the absence of authority from the New York State Court of Appeals interpreting Section 6-l(3) or persuasive evidence why that court would disagree with the result in *Aries*, the Court is bound to apply New York law as

46

stated by the Appellate Division in *Aries*.  *See Sleepy's LLC v. Select Comfort Wholesale Corp.*, 909 F.3d 519, 528-29 (2d Cir. 2018).

Applying Section 6-l(3) as *Aries* interpreted it, the Court concludes that Section 6-l applied to the subject loan notwithstanding J&M's involvement in the transaction.  As with the lender in *Aries*, Rokosz had a policy of lending to business entity borrowers to whom individuals transferred title to their homes.  (*See* Def.'s Counter-56.1 ¶¶ 55-56.)  A majority of the mortgage transactions in which Legum represented Rokosz from May 2016 to September 2019 involved the creation of a corporate or LLC borrower formed no more than fifteen business days before loan closing.  (*Id.* ¶¶ 57-58.)  Further, in each of these transactions, Rokosz required that all stock in the business entity be assigned to him and held in escrow, giving him further security in case of a default.  (*Id.* ¶ 59.)  Rokosz followed that policy in issuing the subject loan, as his broker instructed Barker that in order to receive the loan, a corporate entity had to be created to take title to her home and sign the mortgage and note.  (*Id.* ¶¶ 50, 115, 117.)  Moreover, J&M was incorporated only after Rokosz became interested in lending to Barker, and Rokosz has identified no independent business function that J&M served.  (*Id.* ¶¶ 45-47, 50-53, 61, 67, 70.)  Thus, the undisputed evidence establishes that Rokosz employed

in all material respects the same policy that *Aries* held to render Section 6-l applicable as a matter of law.   Accordingly, Section 6-l applies to the subject loan.

### B.   Substantive Compliance

Rokosz does not dispute that the subject loan violates Section 6-l's substantive provisions.   The subject loan's terms violate Section 6-l's prohibitions against balloon payments, increasing the interest rate after the borrower's default, lending without due regard to the borrower's ability to repay, lending without a counseling disclosure, excessively financing points and fees, directly paying a contractor from the proceeds of the loan, and failing to include the statutorily required legend on the mortgage.   (*See* Def.'s Counter-56.1 ¶¶ 71-76, 102-05, 115, 117, 121-24, 128-37, 140-41); N.Y. Banking Law §§ 6-l(2)(b), 6-l(2)(d), 6-l(2)(k), 6-l(2)(l), 6-l(2)(m), 6-l(2)(n), 6-l(2-a)(a).

### C.   Intent

Remedies for all Section 6-l violations include actual and statutory damages, attorney fees, and injunctive relief where appropriate.   N.Y. Banking Law §§ 6-l(7), 6-l(8), 6-l(9).   If the lender commits an "intentional violation," however, the "home loan agreement shall be rendered void."   *See* N.Y. Banking Law §§ 6-l(10).   Here, because "[Barker] established, prima facie, that certain violations of [Section] 6-l, which appear on

48

the face of the loan documents, were intentional, and [Rokosz] failed to raise a triable issue of fact in opposition," the undisputed facts establish an intentional violation of Section 6-l.  *See VFS Lending JV II, LLC v. Krasinski*, 152 N.Y.S.3d 470, 472 (2d Dep't 2021) (affirming summary judgment holding that lender's violation was intentional).

## III. Usury

Rokosz argues that Barker's usury claim is preempted by the Depository Institutions Deregulation and Monetary Control Act of 1980 ("DIDMCA").  (Def.'s Opp'n 25); *see* 12 U.S.C. § 1735f-7a. Congress enacted DIDMCA's usury preemption provision to "enhance the stability and viability" of the national financial system and "facilitate a national housing policy and the functioning of a national secondary market in mortgage lending."  S. Rep. No. 96-368, at 19 (1979).  It provides that state laws "limiting the rate or amount of interest . . . which may be charged, taken, received, or reserved shall not apply to any loan" or "mortgage . . . secured by a first lien on residential real property" issued after March 31, 1980, by a "creditor" (as defined in TILA) who makes or invests in residential real estate loans aggregating over one million dollars per year.  12 U.S.C. §§ 1735f-7a(a)(1), 1735f-5(b).

The Second Circuit has held that this provision of DIDMCA applies to New York's usury statute.  *Wolfert ex rel. Estate of*

49

*Wolfert v. Transamerica Home First, Inc.*, 439 F.3d 165, 175 (2d Cir. 2006). Further, it is undisputed that the subject loan is a mortgage secured by a first lien on residential real property and issued after March 31, 1980. (*See* Def.'s Counter-56.1 ¶¶ 31, 111, 115–17.) Finally, the Court already has determined that Rokosz qualifies as a "creditor" under TILA. (*Supra* I.C.) Thus, the only question as to whether DIDMCA preempts Barker's usury claim is whether Rokosz makes or invests in residential real estate loans aggregating over one million dollars per year.

Rokosz has submitted a declaration based on his personal knowledge that in 2017, the year he issued the subject loan, he made residential real estate loans aggregating over one million dollars per year. (ECF No. 299, Decl. Def. Supp. Mot. Summ. J. ("Rokosz Decl."), ¶¶ 6–9.) A lender's unrebutted declaration based on personal knowledge has been held sufficient to establish the aggregate value of the lender's loans for the purposes of summary judgment with respect to DIDCMA preemption. *See Brown v. Invs. Mortg. Co.*, 121 F.3d 472, 477 (9th Cir. 1997). Because Barker has submitted no evidence contradicting Rokosz's declaration, the fact that Rokosz made residential real estate loans aggregating over one million dollars per year is deemed established.

Barker responds by citing a 1980 letter from the Federal

Home Loan Bank Board ("FHLBB"), a now-defunct federal agency
that formerly governed the Federal Home Loan Banks,[9] opining that
DIDMCA's "million dollar test" is satisfied if the lender made
or invested in one million dollars in residential real estate
loans "in the previous year or in the current calendar year
prior to the exempt loan." *See* 1980 FHLBB LEXIS 124, at *1-2
(June 30, 1980).  Regardless of the extent to which this letter
from an agency no longer in existence warrants judicial
deference, it does not bring Barker's usury claim out of the
sweep of DIDMCA's preemption clause.  Rokosz's declaration
establishes that he made over one million dollars of
"residential real estate loans in the previous year . . . prior
to the exempt loan" (*i.e.*, February 2016 to February 2017), even
if not in the previous *calendar* year.  Further, the FHLBB letter
does not state that it sets forth a necessary – rather than
sufficient – condition to satisfy DIDMCA's million dollar test.

   Accordingly, because Barker has failed to create a genuine
issue of material fact with respect to Rokosz's aggregate
residential mortgage loans and does not dispute any other
factual issues as to whether DIDCMA preemption applies to her
usury claim, the Court concludes that Barker's usury claim is
preempted under DIDMCA and grants Rokosz's motion for summary

---

[9] Congress restructured its regulation of the industry in 1989, replacing the
FHLBB with the Office of Thrift Supervision.  *First Annapolis Bancorp, Inc.
v. United States*, 644 F.3d 1367, 1369 (Fed. Cir. 2011).

judgment as to that claim.

## IV.   Foreclosure

Under Section 1302(2) of the New York Real Property Actions and Proceedings Law, it is a "defense to an action to foreclose a mortgage that the terms of the home loan or the actions of the lender" violate Section 6-l of the New York Banking Law.  N.Y. Real Prop. Acts. Law § 1302(2).  Because the Court grants Barker's motion for summary judgment with respect to her claim under Section 6-l of the New York Banking Law, (*supra* II), Barker has established a defense to Rokosz's foreclosure claim as a matter of law under Section 1302(2) of the New York Real Property Actions and Proceedings Law, *see Wilmington Tr., Nat'l Ass'n v. Newman*, 201 N.Y.S.3d 506, 509 (2d Dep't 2023) (reversing summary judgment for lender and remanding to "vacate . . . order and judgment of foreclosure and sale" after borrowers "demonstrated potential merit" to their Section 6-l defense).  Accordingly, Rokosz's foreclosure claim is dismissed with prejudice.

## Conclusion

For the reasons above, the Court grants in part and denies in part each party's motion for summary judgment.

Barker's motion for summary judgment is granted with respect to her claims under TILA, HOEPA, and Section 6-l of the New York Banking Law.  Barker's motion is denied with respect to

her usury claim, and that claim is dismissed with prejudice.

Rokosz's motion for summary judgment is granted with respect to Barker's usury defense.  Rokosz's motion is otherwise denied, and Rokosz's foreclosure counterclaim is dismissed with prejudice.

The parties are directed to file a joint letter by August 7, 2024, explaining how they intend to proceed with respect to remedies and the existing preliminary injunction.

**So ordered.**

Dated:      July 8, 2024
            Brooklyn, New York

_____
Kiyo A. Matsumoto
United States District Judge
Eastern District of New York